**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OREGON ENVIRONMENTAL COUNCIL<br>1500 NE Irving St., Ste. 430<br>Portland, OR 97232;<br><br>NATURAL RESOURCES DEFENSE<br>COUNCIL, INC.<br>40 West 20th St.<br>New York, NY 10011;<br><br>PUBLIC CITIZEN<br>1600 20th St. NW<br>Washington, DC 20009;<br><br>HOPI UTILITIES CORPORATION<br>6 E Aspen Ave., Ste. 240<br>Flagstaff, AZ 86001;<br><br>WOVEN ENERGY<br>1010 Dale St. North,<br>St. Paul, MN 55117;<br><br>CITY AND COUNTY OF SAN FRANCISCO;<br>Fox Plaza<br>1390 Market St., 7th Floor<br>San Francisco, CA 94102;<br><br>AND<br><br>THE MARYLAND OFFICE OF PEOPLE'S<br>COUNSEL<br>6 St. Paul St., Ste. 2102<br>Baltimore, MD 21202,<br><br>     *Plaintiffs*,<br><br>     v.<br><br>INTERNAL REVENUE SERVICE OF THE<br>UNITED STATES<br>1111 Constitution Ave NW<br>Washington, DC 20224; | **Case No.  25-4400**<br><br>**COMPLAINT FOR**<br>**DECLARATORY RELIEF AND**<br>**VACATUR** |

UNITED STATES DEPARTMENT OF THE
TREASURY
1500 Pennsylvania Avenue, NW
Washington, DC 20220;

AND

SCOTT BESSENT, Secretary of the Department
of the Treasury and Acting Commissioner of the
Internal Revenue Service, in his official
capacity,
1500 Pennsylvania Avenue, NW
Washington, DC 20220,

  *Defendants*.

## INTRODUCTION

1.  This case challenges the Internal Revenue Service's recent decision—made at the direction of the President, and with no reasoned explanation, evidentiary support, or statutory grounding—to eliminate a longstanding method for most solar and wind facilities to demonstrate eligibility for federal tax credits.

2.  For decades, Congress has offered tax credits to incentivize clean energy projects. Since at least 2013, eligibility for these credits has turned on claimants' ability to demonstrate that their projects have begun construction before a credit deadline set by Congress.

3.  The IRS is responsible for implementing these tax credits. For over twelve years, the IRS consistently gave project developers a choice between two methods to demonstrate that they had begun construction. A project developer could use either "the Five Percent Safe Harbor," which requires "paying or incurring five percent or more of the total cost of the facility," or "the Physical Work Test," which requires "starting physical work of a significant

nature."[1] The IRS provided the same methods to project developers across multiple tax credits, covering diverse clean energy technologies, including wind, solar, hydropower, geothermal, biomass, and fuel cells.

4.    Project developers have relied on the IRS's longstanding methodology to plan projects, obtain financing and insurance, structure deals, seek permits, and complete required reviews.

5.    Because tax credits can offset 30 to 50 percent or more of the total cost of a facility, meeting or missing the Congressional deadline for beginning construction can have a dramatic effect on a project's cost and viability.

6.    Over the last ten months, President Donald J. Trump has mounted an all-out attack on solar and wind technologies, and has directed administrative agencies to do the same. As part of that effort, President Trump lobbied Republican lawmakers to terminate all tax credits for wind and solar projects in the 2025 budget reconciliation bill. Congress chose instead to pass a bill that moved up the credit expiration date, but left credits in place for projects that begin construction by July 4, 2026.

7.    Three days after signing that bill, President Trump issued an executive order directing the Secretary of the Treasury to revise the IRS's guidance on the meaning of "beginning of construction" for wind and solar facilities. The executive order declared it "the policy of the United States" to "end taxpayer support" for "'green' energy sources."[2]

8.    On August 15, 2025, the IRS issued Notice 2025-42.[3] The Notice applies only to wind and solar facilities. For all those facilities, except for solar facilities with a maximum net

---

[1] Prevailing Wage and Apprenticeship Initial Guidance Under Section 45(b)(6)(B)(ii) and Other Substantially Similar Provisions, 87 Fed. Reg. 73580, 73581 (Nov. 30, 2022).
[2] Exec. Order No. 14315, 90 Fed. Reg. 30821, 30821 (July 7, 2025).
[3] I.R.S. Notice 2025-42, 2025-36 I.R.B. 351 (2025).

output not greater than 1.5 megawatts (MW), the Notice announces that the Five Percent Safe Harbor "is not available for purposes of determining whether an applicable wind or solar facility has met the beginning of construction deadline." Instead, the Physical Work Test is now "the sole method" that such wind and solar facilities may use to establish credit eligibility.

9.      The Notice asserts that the change is necessary "to properly enforce the credit termination date for applicable wind and solar facilities," but provides no explanation or support for that conclusion. Nor does it provide any rationale for treating wind and solar differently from all other clean energy technologies, or for treating solar facilities larger than 1.5 MW differently from smaller facilities.

10.      Notice 2025-42 is arbitrary and capricious agency action in violation of the Administrative Procedure Act (APA). The Notice provides no statutory or evidentiary justification for eliminating the Five Percent Safe Harbor for wind and solar facilities, while retaining it for all other technologies. The Notice provides no reason for ignoring the longstanding and ongoing industry reliance interests on the Five Percent Safe Harbor. The Notice does not discuss any alternatives to the elimination of the Five Percent Safe Harbor that might better accommodate these reliance interests.

11.      For years, taxpayers have widely relied on the Five Percent Safe Harbor to demonstrate eligibility for the credit, obtain financing (including financing that specifically relies on the availability of tax credits), and plan their project development pipelines and timelines. Under Notice 2025-42, wind and most solar projects for which planning, design, and financing have been underway for months or years, all relying on the ability to demonstrate credit eligibility using the Five Percent Safe Harbor, must now instead prove that they have begun physical work of a significant nature.

12.     Notice 2025-42 is causing, and will continue to cause, harm to the wind and solar industries and to the people who design, support, or provide services to these industries. It is also harming, and will continue to harm, people who rely on the power and benefits provided by wind and solar energy facilities.

13.     Some solar and wind projects will not go forward due to Notice 2025-42. In their absence, Americans' electric bills will become more expensive; communities will lose access to resources for economic and workforce development; older and dirtier energy sources will run longer and more often, exposing the people who live nearby to more air pollution; and clean energy developers and service providers will lose business and compensation and sustain reputational and relational damage. Other projects will require substantial redesign, resulting in heightened risks, costs, and time constraints, and likely in scaled-down projects that provide reduced benefits to project proponents, energy users, and nearby communities. Some projects will move forward only because utility customer payments that would otherwise support the development of additional wind and solar capacity are used to replace the tax credits or to enable projects to meet the Physical Work Test.

14.     For all these reasons, Plaintiffs seek vacatur of Notice 2025-42.

## PARTIES

**The Plaintiffs**

15.     Founded in 1968, Oregon Environmental Council (OEC) is a nonpartisan, 501(c)(3) nonprofit organization that works on behalf of its 2,968 members and action-takers statewide to advance innovative, collaborative, and equitable solutions to address Oregon's environmental challenges and benefit people's health and quality of life. OEC's goals are a stable climate that safeguards our communities and economy; clean and plentiful water that supports people, fish, and wildlife; healthy homes and neighborhoods free of air pollution and toxic

4

chemicals; and clean, accessible, and affordable transportation options. OEC has supported renewable energy advancement for over a decade to further sustainable economic development, environmental protection, and energy affordability.

16.    Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a national, not-for-profit environmental and public health membership organization with hundreds of thousands of members nationwide. NRDC engages in research, advocacy, media, and litigation related to protecting public health and the environment, including by increasing the availability and affordability of clean energy. Clean energy is important to NRDC's goals of rapidly reducing greenhouse gas emissions and conventional air pollutants to fight against the harmful public health and environmental impacts of local pollution and climate change. Ensuring that electricity customers across the country have access to affordable, reliable energy is a vital part of NRDC's work.

17.    Plaintiff Hopi Utilities Corporation (HUC) is a wholly owned subsidiary of the Hopi Tribe. HUC was established to improve, promote, and develop businesses and economic opportunities for the Hopi Tribe and its members. HUC is actively developing solar projects designed to increase economic development, employment, electrification, and grid resilience for Tribal members on the Hopi Reservation.

18.    Plaintiff Woven Energy (Woven) is a private LLC that seeks to help Tribes capture the energy and economic potential of the clean energy transition. Woven assists in the planning and development of Tribal Utilities, Tribal Microgrids, and Tribally-owned clean energy projects. Woven is partnering with Tribes on multiple projects that have been impacted by Notice 2025-42.

19.     Plaintiff Public Citizen is a nonprofit research and advocacy organization that works to support the interests of consumers. Public Citizen has members in every state, including Texas. Public Citizen is active before federal agencies promoting actions that will result in just and reasonable electricity rates, and supporting efforts to make utilities accountable to the public interest.

20.     Plaintiff City and County of San Francisco ("San Francisco" or "the City") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county. The City's publicly owned utility generates or procures hydroelectric, solar, wind, and other renewable energy sources to serve the City's own power needs, as well as those of other customers. San Francisco has made substantial commitments to promote and provide clean and affordable energy solutions for the City and for its businesses and residents.

21.     The Maryland Office of People's Counsel is an agency of the State of Maryland established under Maryland law. OPC is authorized and charged, among other matters, to represent and "protect the interests of" Maryland's residential users of electric service before state and federal regulatory agencies. In determining whether the interests of residential and noncommercial users are affected, the Office of People's Counsel must consider "the public safety, economic welfare, and environmental interests of the State and its residents, including the State's progress toward meeting its greenhouse gas emissions reductions goals."

**The Defendants**

22.     Defendant IRS is an agency of the United States government. The IRS is a part of the U.S. Department of the Treasury, and the IRS carries out some of the responsibilities of that Department. The IRS issued the Notice challenged here.

23.     Defendant U.S. Department of the Treasury is a department of the United States government, within which sits the IRS. The Notice states that Treasury and the IRS determined the revised guidance was necessary, and that personnel from Treasury and the IRS participated in the development of the Notice.

24.     Defendant Scott Bessent, Secretary of the Treasury and Acting IRS Commissioner, is the highest-ranking official at Treasury and the highest-ranking official in the IRS. Plaintiffs sue Secretary Bessent in his official capacity.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under federal law. *See* 5 U.S.C. §§ 702, 706(2); 26 U.S.C. §§ 45Y, 48E.

26.     This Court has authority to issue declaratory relief pursuant to 28 U.S.C. §§ 2201-02.

27.     This Court has authority to set aside the Notice pursuant to 5 U.S.C. § 706.

28.     Venue is proper in this district because this action is brought against an agency of the United States and an officer of the United States acting in his official capacity and under color of legal authority; Defendants IRS, Treasury, and Secretary and Acting Commissioner Bessent reside in the District of Columbia; and a substantial part of the events giving rise to the claim occurred in the District of Columbia because the IRS issued the Notice in the District of Columbia. *See* 28 U.S.C. § 1391(e)(1).

## STATUTORY AND REGULATORY BACKGROUND

**Congress's Long History of Enacting Clean Energy Tax Credits**

29.     Tax credits are a tried-and-true tool for shaping federal energy policy. They reduce upfront costs and improve financing terms, making projects more financially viable and

price competitive. The value of these credits is significant: credits can defray 30 to 50 percent, or more, of a project's cost.

30.    Congress has long used the Tax Code to implement federal energy policy. For much of the 20th century, the Code primarily subsidized fossil fuels. Since the 1970s, Congress has also used tax credits to incentivize the development of clean energy technologies. These credits have taken two forms: Investment Tax Credits, which allow taxpayers to receive a credit equal to a percentage of the amounts they invest in energy property; and Production Tax Credits, which provide a tax credit based on the amount of energy a facility produces.

31.    For decades after clean energy tax credits were introduced, developers' uncertainty about whether their projects would qualify limited the credits' effectiveness. Projects qualified for tax credits only if they had been "placed in service"—that is, completed—before Congressional deadlines. Congress often did not extend those deadlines until just before they expired—or let them expire entirely before renewing them days or months later. Because energy infrastructure projects can take years to complete, and can face unpredictable delays, developers faced substantial uncertainty about whether they would complete their facilities in time to claim the benefit of the credits. This uncertainty chilled investment and deployment.

32.    To provide the clean energy industry with the certainty needed to stimulate investment, Congress altered its tax credit qualification criterion in the American Taxpayer Relief Act of 2012. Instead of tying a facility's eligibility for tax credits to the date it was completed, that law tied eligibility to the date on which a facility begins construction.[4]

33.    The Joint Committee on Taxation explained that this change was made because Congress "believes that certain renewable power projects do not move forward because

---

[4] American Taxpayer Relief Act, Pub. L. No. 112-240, 126 Stat. 2313 (Jan. 2, 2013).

developers and investors are concerned that those projects cannot be completed before the renewable electricity production credit expires," and that "Congress intends to reduce this uncertainty by replacing the placed-in-service expiration date with an expiration date based on when construction begins on a particular project."[5]

34.    Since 2013, Congress has routinely set credit eligibility based on the date "construction of such facility begins."

**IRS Methodology for Demonstrating "Beginning of Construction"**

35.    The change from deadlines based on placed-in-service dates to deadlines based on beginning-of-construction dates provided substantially more certainty to project owners, especially after the IRS issued guidance on beginning of construction.

36.    Following the passage of the American Taxpayer Relief Act, the IRS issued Notice 2013-29, titled "Beginning of Construction for Purposes of the Renewable Electricity Production Tax Credit and Energy Investment Tax Credit."[6]

37.    Notice 2013-29 set forth "two methods that a taxpayer may use to establish that construction of a qualified facility has begun." A taxpayer could demonstrate eligibility for the tax credit by either "pay[ing] or incur[ring] ... five percent or more of the total cost of the facility" or starting "physical work of a significant nature" before the deadline set by Congress. The Notice made clear that "a taxpayer need only satisfy one method to establish that construction of a facility has begun for the purpose of qualifying for" tax credits.[7]

---

[5] Staff of the Joint Comm. on Taxation, 112th Cong., General Explanation of Tax Legislation Enacted in the 112th Congress (Joint Comm. Print 2013), https://www.govinfo.gov/content/pkg/CPRT-113JPRT78693/html/CPRT113JPRT78693.htm.
[6] I.R.S. Notice 13-29, 2013-20 I.R.B. 1085 (2013).
[7] *Id.*

38.     For twelve years, the IRS maintained this fundamental framework for demonstrating that a project has begun construction. The agency has clarified and modified its guidance more than a dozen times without altering taxpayers' ability to choose between the Five Percent Safe Harbor and the Physical Work Test.[8]

39.     During that time, Congress has also repeatedly extended and enacted tax credits with deadlines pegged to beginning of construction, without making any statutory changes to the IRS's guidance or directing Treasury or the IRS to change that guidance in any way.[9]

**The Inflation Reduction Act's Clean Electricity Tax Credits**

40.     In 2022, Congress passed the Inflation Reduction Act (IRA). The Act included a suite of clean energy tax credits designed to significantly lower the cost of zero- and low-greenhouse-gas-emission technologies, with the goal of accelerating the nation's decarbonization efforts and supporting the development of a domestic clean energy economy.

---

[8] *See, e.g.*, I.R.S. Notice 2013-29, 2013-20 I.R.B. 1085 (2013); I.R.S. Notice 2013-60, 2013-2 C.B. 431 (2013); I.R.S. Notice 2014-46, 2014-2 C.B. 520 (2014); I.R.S. Notice 2015-25, 2015-13 I.R.B. 814 (2015); I.R.S. Notice 2016-31, 2016-23 I.R.B. 1025 (2016); I.R.S. Notice 2017-04, 2017-4 I.R.B. 541 (2017); I.R.S. Notice 2018-59, 2018-29 I.R.B. 196 (2018); I.R.S. Notice 2019-43, 2019-31 I.R.B. 487 (2019); I.R.S. Notice 2020-41, 2020-25 I.R.B. 954 (2020); I.R.S. Notice 2020-12, 2020-11 I.R.B. 495 (2020); I.R.S. Notice 2021-5, 2021-03 I.R.B. 479 (2021); I.R.S. Notice 2021-41, 2021-29 I.R.B. 17 (2021); I.R.S. Notice 2022-61, 2022-52 I.R.B. 560 (2022); *see also* 87 Fed. Reg. at 73581 (enumerating the Five Percent Safe Harbor and Physical Work Test as two methods to demonstrate that construction had begun).

[9] Tax Increase Prevention Act of 2014, Pub. L. No. 113-295, div. A, tit. 1, §§ 154(a), 155(a), 210(g)(1), 128 Stat. 4010 (2014); Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, div. P, tit. III, § 301(a), div. Q, tit. I, §§ 186(a)-(c), (d)(2), 187(a), 129 Stat. 2242, 3038, 3073, 3074 (2015); Bipartisan Budget Act of 2018, Pub. L. No. 115-123, div. D, tit. I, §§ 40408(a), 40409(a), 132 Stat. 64, 149, 150 (2018); Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, div. Q, tit. I, §§ 127(b), (c)(2)(B), 133 Stat. 2534, 3232 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. EE, tit. I, § 145(a), 134 Stat. 1182, 3054 (2020); Inflation Reduction Act of 2022, Pub. L. No. 117-169, §§ 13101(a)-(c), (e)(1), (e)(2)(A), (f)-(j), 13102(f)(4), 13204(b)(1), 136 Stat. 1818, 1903-21, 1933, 2015 (2022).

41.     Among other things, the IRA created the Clean Electricity Production Tax Credit (26 U.S.C. § 45Y) and the Clean Electricity Investment Tax Credit (26 U.S.C. § 48E) to encourage the production of clean electricity.

42.     The Clean Electricity Production Tax Credit is a tax credit equal to an amount for each kilowatt hour of electricity produced, and the Clean Electricity Investment Tax Credit is a tax credit equal to a percentage of the qualified investment in the facility.

43.     Whereas earlier tax credits were available only to certain named clean energy technologies, the IRA Clean Electricity Production and Investment tax credits were designed to be "technology-neutral": any clean electricity facility with zero greenhouse gas emissions could claim them.

44.     The IRA tasked the Department of the Treasury with determining which categories of current technologies would be considered eligible. The IRS designated the following categories of technologies as qualified to claim the Clean Electricity Production and Investment tax credits: wind, hydropower, marine and hydrokinetic, solar, geothermal, nuclear fission, fusion energy, and certain waste energy recovery property.[10]

45.     As with prior tax credits, the IRA tax credits were designed to expire. The full value of the credits was to be available, at minimum, to qualifying facilities that began construction by 2033.

**The IRS Applies its "Beginning of Construction" Guidance to IRA credits**

46.     IRS Notice 2022-61, the most recent prior notice before the challenged Notice 2025-42, provides that "principles similar to those under Notice 2013-29 regarding the Physical

---

[10] Rev. Proc. 2025-14, 2025-07 I.R.B. 770 (Jan. 15, 2025), https://www.irs.gov/pub/irs-drop/rp-25-14.pdf.

Work Test and Five Percent Test apply" for determining when construction begins for purposes

of the Clean Electricity Investment and the Clean Electricity Production tax credits.[11]

47.     Notice 2022-61 affirmed that the IRS's "beginning of construction" rules would

apply consistently across a variety of tax credits, including those set out in sections 30C, 45,

45Q, 45V, 45Y, and 48E of the Internal Revenue Code.[12]

48.     Since Notice 2022-61, Treasury has repeatedly reaffirmed that both the Five

Percent Safe Harbor and the Physical Work Test can be used to demonstrate the beginning of

construction. In the preamble to regulations governing implementation of the Clean Electricity

Production and Investment tax credits, the IRS reinforced that "Notice 2022-61 continues to

apply," and that "the Treasury Department and the IRS have determined that the existing Internal

Revenue Bulletin guidance (referred to as the IRS Notices) adequately addresses the beginning

of construction rules applicable to sections 45Y and 48E."[13] In the preamble to the regulations

governing application of a bonus credit that is available under the Clean Electricity Investment

and the Clean Electricity Production Tax Credits, as well as under credits set out in Code sections

30C, 45, 45Q, 45V, 48, and 179D, Treasury stated that "taxpayers may continue to rely on the

guidance provided in Notice 2022-61" and older notices, and that "taxpayers satisfying either

test"—the Five Percent Safe Harbor or Physical Work Test—"will be considered to have begun

construction."[14] So too, the preamble to the Treasury and IRS regulations for section 45V clean

hydrogen credits specifies that "[f]or purposes of determining [beginning of construction],

taxpayers may rely upon the guidance provided in Notice 2022-61" and earlier notices, allowing

---

[11] 87 Fed. Reg. at 73584.

[12] *Id.*

[13] Section 45Y Clean Electricity Production Credit and Section 48E Clean Electricity Investment Credit, 90 Fed. Reg. 4006, 4028 (Jan. 15, 2025).

[14] Increased Amounts of Credit or Deduction for Satisfying Certain Prevailing Wage and Registered Apprenticeship Requirements, 89 Fed. Reg. 53184, 53186 (June 25, 2024).

taxpayers to use either test.[15] The regulations implementing the section 48D investment tax credit for advanced manufacturing facilities also provide that both tests are available.[16]

49.     Treasury and the IRS have expressed repeatedly that their treatment of beginning of construction is a stable area of law that taxpayers and project proponents could rely on. As recently as January 10, 2025, the IRS referred to beginning of construction as "an established, defined concept in tax law."[17]

**The 2025 Reconciliation Bill**

50.     On January 3, 2025, the 119th United States Congress was sworn into session. Almost immediately, members of the new Congress began negotiating a budget reconciliation bill, titled the "One Big Beautiful Bill Act" (OBBBA).

51.     The IRA tax credits were a central issue of debate in the reconciliation negotiations. Some lawmakers sought a complete repeal of all IRA tax credits, which they dubbed the "Green New Scam." Others advocated for more modest modifications to the tax credits, or for them to be retained in full.

52.     An early version of the OBBBA, drafted by the House, drastically curtailed the clean electricity credits. The draft required most facilities to be placed in service no later than 2028 or begin construction within 60 days of enactment to qualify for credits.[18]

53.     The Senate did not advance that version. Instead, the Senate passed a compromise bill negotiated by legislators who sought total repeal of the IRA and legislators who sought to preserve the economic benefits of the credits. The bill left the Clean Electricity Production and

---

[15] Credit for Production of Clean Hydrogen and Energy Credit, 90 Fed. Reg. 2224, 2246 (Jan. 10, 2025).
[16] 26 C.F.R. § 1.48D-5(b) (2024).
[17] 90 Fed. Reg. at 2246.
[18] H.R. 1, 119th Cong. § 112008 (as placed on Senate Calendar, June 28, 2025).

Investment tax credits in place, but significantly shortened the time period in which solar and wind projects could qualify. It allowed solar and wind facilities to qualify *either* by beginning construction by July 4, 2026, or by being placed in service by December 31, 2027. [19]

54.    Members of the Congressional House Freedom Caucus expressed opposition to leaving the tax credits in place for wind and solar for any period of time. When the moment came for the House to vote on the Senate bill, the Republican party caucus appeared to be at an impasse, and members of the House Freedom Caucus held voting open for many hours as they continued to negotiate. Multiple credible sources have reported that the standoff ended only when President Trump struck a side deal with members of the House Freedom Caucus: if they voted for the bill, President Trump vowed to further limit the ability of the wind and solar industries to claim the remaining credits.[20]

55.    The OBBBA passed on July 3, 2025, and President Trump signed it into law on July 4.

56.    Although Congress modified the expiration date for the tax credits, the bill did not direct IRS to change its longstanding "beginning of construction" methodology. To the contrary, Congress endorsed the methodology established in Notice 2013-29 and continued through Notice 2022-61. In a "definitions" section concerning prohibited foreign entities, Congress specified that "beginning of construction" should be determined using rules "similar to" the IRS's then-existing guidance.[21]

---

[19] H.R. 1, 119th Cong. § 112008 (as signed into law, July 4, 2025), https://www.congress.gov/bill/119th-congress/house-bill/1/text/pcs.
[20] *E.g.,* Kelsey Tamborrino & Josh Siegel, *Conservatives say Trump won their megabill votes by promising crackdown on renewable energy credits*, POLITICO (July 3, 2025), https://www.politico.com/live-updates/2025/07/03/congress/conservatives-trump-megabill-energy-credits-crackdown-00438357.
[21] 26 U.S.C. § 7701(51)(J).

**The Trump Administration's Attacks on Wind and Solar**

57.    Since taking office, President Trump has been very clear that his administration "will not approve wind or farmer-destroying solar," declaring that ""[t]he days of stupidity are over."[22] He has referred to wind turbines as "ugly,"[23] "disgusting,"[24] and "a con job,"[25] called solar projects "ridiculous,"[26] and deemed both "THE SCAM OF THE CENTURY."[27]

58.    On his first day in office, President Trump issued a Presidential Memorandum halting all new or renewed approvals for wind projects on federal land and pausing indefinitely all offshore wind leasing.[28]

59.    At the President's direction, multiple agencies have issued orders and taken actions designed to interfere with wind and solar development.

60.    The Department of the Interior has declared that wind and solar are "highly inefficient uses of [f]ederal lands," and has announced new, unprecedented metrics that disfavor wind and solar that it will use to evaluate applications to construct energy projects on federal

---

[22] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 20, 2025, at 9:51 AM).

[23] Ellen Knickmeyer & Rodrique Ngowi, *Trump's Windmill hatred is a worry for booming industry*, Associated Press (Sept. 30, 2019), https://www.nbcnews.com/politics/politics-news/trump-s-windmill-hatred-worry-booming-industry-n1060206.

[24] *Id.*

[25] APT, *Trump Blasts Windmills as "Con Job" in Fiery Tirade at Von der Leyen* (YouTube, July 28, 2025), https://www.youtube.com/watch?v=LJejNsx6PeM.

[26] David Zimmerman, *Trump Pushes for More Oil and Gas, Says U.S. Can "Supply the Whole World with Energy,"* Nat'l Rev. (Jan. 23, 2025), https://www.nationalreview.com/news/trump-pushes-for-more-oil-and-gas-says-u-s-can-supply-the-whole-world-with-energy/.

[27] *Id.*

[28] Memorandum on Temporary Withdrawal of All Areas of the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, 90 Fed. Reg. 8363 (Jan. 29, 2025). The U.S. District Court for the District of Massachusetts declared unlawful and vacated agencies' implementation of section 2 of this memorandum. *New York v. Trump*, No. 1:25-cv-11221, 2025 WL 3514301, at *18 (D. Mass. Dec. 8, 2025).

lands and waters.[29] The Department also issued a memorandum requiring review by three senior

political offices for each of 68 separate steps in the permitting process for wind and solar

facilities.[30]

      61.    The Department of the Interior has ordered construction halted at multiple major

wind facilities, including the nearly finished Revolution Wind facility off the coast of

Connecticut.[31]

      62.    The Bureau of Ocean Energy Management has rescinded all designations of Wind

Energy Areas on the U.S. Outer Continental Shelf.[32]

      63.    The U.S. Army Corps of Engineers has announced that it will now mandate

consideration of a novel criterion that disfavors wind and solar projects in reviewing all

---

[29] Dep't of the Interior, Secretary Order 3438: Managing Federal Energy Resources and Protecting the Environment at 2 (Aug. 1, 2025); Dep't of the Interior, Secretary Order 3437: Ending Preferential Treatment for Unreliable, Foreign Controlled Energy Sources in Department Decision-Making (July 29, 2025).

[30] Dep't of the Interior, Memo on Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities (July 15, 2025).

[31] Bureau of Ocean Energy Mgmt., Director's Order (Aug. 22, 2025) (Revolution Wind Stop Work Order), https://www.boem.gov/sites/default/files/documents/renewable-energy/Director%26%23039%3BsOrder-20250822.pdf; Bureau of Ocean Energy Mgmt., Director's Order (Apr. 16, 2025) (Empire Wind Stop Work Order), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20Director%26%23039%3Bs%20Order%20Empire%20Wind.pdf; Press Release, Dep't of the Interior, Interior Department Moves to Cancel Reckless Biden-era Approval of Lava Ridge Wind Project (Aug. 6, 2025), https://www.doi.gov/pressreleases/interior-department-moves-cancel-reckless-biden-era-approval-lava-ridge-wind-project.

[32] Bureau of Ocean Energy Mgmt., BOEM Rescinds Offshore Renewable Energy Leasing Schedule (Aug. 4, 2025), https://www.boem.gov/newsroom/notes-stakeholders/boem-rescinds-offshore-renewable-energy-leasing-schedule; Bureau of Ocean Energy Mgmt., BOEM Rescinds Designated Wind Energy Areas on the Outer Continental Shelf (July 30, 2025), https://www.boem.gov/newsroom/notes-stakeholders/boem-rescinds-designated-wind-energy-areas-outer-continental-shelf.

applications for permits under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act.[33]

64.    The U.S. Fish and Wildlife Service has stopped issuing permits to wind facilities for incidental takes under the Bald and Golden Eagle Protection Act "until further notice."[34]

65.    The Environmental Protection Agency cancelled Solar For All, a multi-billion-dollar program designed to bring low-cost solar energy to more than 900,000 households in low-income communities. The agency terminated more than $7 billion in obligated funds.[35] Plaintiff Hopi Utilities Corporation was among the grant recipients who lost promised funding.

66.    The Department of Energy has reduced or eliminated funding for wind and solar research and development, and has stopped issuing loans to wind and solar projects.[36]

67.    The U.S. Department of Transportation imposed a new requirement that wind turbines be placed at minimum 1.2 miles away from any highway or railroad.[37]

68.    Upon information and belief, the Department of Defense has reduced or canceled contracts for solar facilities at several military bases, and cut funding for additional research and development programs.

---

[33] *See generally* Press Release, U.S. Army Corps of Eng'rs, Army Corps of Engineers Begins Implementing Policy to Increase America's Energy Generation Efficiency (Sept. 22, 2025), https://www.usace.army.mil/Media/News-Releases/News-Release-Article-View/Article/4311128/army-corps-of-engineers-begins-implementing-policy-to-increase-americas-energy.

[34] U.S. Fish & Wildlife Serv., 3-200-71: Eagle Incidental Take – General Permit (last visited Dec. 16, 2025), https://www.fws.gov/service/3-200-71-eagle-incidental-take-general-permit.

[35] U.S. Envtl. Prot. Agency, Greenhouse Gas Reduction Fund, Solar for All (last visited Dec. 16, 2025), https://www.epa.gov/aboutepa/greenhouse-gas-reduction-fund#solar-for-all.

[36] Zack Colman, *DOE Defies Congress by Shifting Funds from Wind, Solar, EVs*, POLITICO (July 8, 2025, 7:13 PM), https://www.politico.com/live-updates/2025/07/08/congress/doe-defies-congress-by-shifting-funds-from-wind-solar-evs-00443190.

[37] Press Release, U.S. Dep't of Transp., President Trump's Transportation Secretary Sean P. Duffy: Biden-Buttigieg Ignored the Dangers of Wind Turbines Near Railroads & Highways, Put Climate Religion Ahead of Safety (July 29, 2025), https://www.transportation.gov/briefing-room/president-trumps-transportation-secretary-sean-p-duffy-biden-buttigieg-ignored.

**Treasury's Abrupt Modification of "Beginning of Construction" Methodology**

69.     On July 7, 2025—four days after Congress passed the budget reconciliation bill that left in place tax credits for wind and solar facilities that begin construction by July 4, 2026—President Trump issued Executive Order 14315, titled "Ending Market Distorting Subsidies for Unreliable, Foreign Controlled Energy Sources."[38]

70.     The Executive Order stated that "[i]t is the policy of the United States to" "rapidly eliminate the market distortions and costs imposed on taxpayers by so-called 'green' energy subsidies," and to "build upon and strengthen the repeal of, and modifications to, wind, solar, and other 'green' energy tax credits."[39]

71.     The Executive Order directed Treasury to "strictly enforce the termination of the clean electricity production and investment tax credits . . . for wind and solar facilities."[40] It further directed Treasury to issue new and revised guidance within 45 days "to ensure that policies concerning the 'beginning of construction' are not circumvented, including by preventing the artificial acceleration or manipulation of eligibility and by restricting the use of broad safe harbors unless a substantial portion of the facility has been built."[41]

72.     The Executive Order cites no evidence that wind and solar facilities are circumventing, or would circumvent, beginning of construction policies. It provides no explanation of what would constitute "artificial acceleration or manipulation of eligibility."[42] Nor

---

[38] Exec. Order No. 14315, 90 Fed. Reg. 30821, 30821 (July 7, 2025), https://www.whitehouse.gov/presidential-actions/2025/07/ending-market-distorting-subsidies-for-unreliable-foreign%E2%80%91controlled-energy-sources/.
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.*

does it explain how requiring that "a substantial portion of the facility has been built" is consistent with the plain meaning of beginning construction.[43]

73.    In response to the Executive Order, on August 15, 2025, Treasury released Notice 2025-42, titled "Beginning of Construction Requirements for Purposes of the Termination of Clean Electricity Production Credits and Clean Electricity Investment Credits for Applicable Wind and Solar Facilities."[44]

74.    Notice 2025-42 applies only to wind facilities and solar facilities larger than 1.5 MW. The Notice declares that, for those facilities, the Five Percent Safe Harbor "is not available," and the Physical Work Test "is the sole method that a taxpayer may use" to establish eligibility for the Clean Electricity Investment and Production Tax Credits.[45]

75.    Notice 2025-42 makes no changes to the agency's longstanding beginning of construction guidance for other types of projects (e.g., hydropower, geothermal, or nuclear) that are also potentially eligible for the Clean Electricity Investment and Production tax credits. The Notice also leaves existing guidance in place for solar projects that are 1.5 MW or less in size.[46]

76.    Notice 2025-42 states that the change in guidance "is necessary and appropriate to properly enforce the credit termination date for applicable wind and solar facilities."[47] Paraphrasing President Trump's Executive Order, the Notice states that its purpose is to "prevent taxpayers from circumventing the statutory credit termination date, prevent the artificial manipulation of eligibility for the § 45Y credit and the § 48E credit for applicable wind and solar

---

[43] *Id.*
[44] I.R.S. Notice 2025-42, 2025-36 I.R.B. 351 (2025).
[45] *Id.* at 6.
[46] *Id.* at 17.
[47] *Id.* at 5.

facilities, and to ensure that a substantial portion of any applicable wind or solar facility not subject to the credit termination date is built by the beginning of construction deadline."[48]

77.    Notice 2025-42 provides no explanation or evidence to support its determination that the change in methodology is necessary and appropriate to enforce the credit termination date. It does not provide any explanation of what types of conduct would constitute manipulation of credit eligibility or circumvention of credit termination. It provides no evidence that any such conduct is occurring, or that it is occurring at higher rates among wind and larger solar facilities than all other potentially eligible facilities.[49]

78.    Notice 2025-42 provides no facts or rationale to justify requiring a methodology for proving eligibility for the Clean Electricity Investment and Production Tax Credits at wind and larger solar facilities that differs from the methodology used for smaller solar facilities and facilities employing other qualifying technologies.[50]

79.    Notice 2025-42 provides no rationale for requiring wind and solar project developers to use a methodology to establish beginning of construction for purposes of demonstrating tax credit eligibility that differs from the methodology used to establish beginning of construction for other parts of sections § 45Y and § 48E.[51]

80.    Notice 2025-42 further does not explain why this new guidance on beginning of construction should apply for all wind and some solar facilities, even as the prior definition continues to apply for deadlines in a wide range of other clean energy and technology tax credits.[52]

---

[48] *Id.*
[49] *See* I.R.S. Notice 2025-42.
[50] *Id.*
[51] *Id.*
[52] *Id.*

81.     Notice 2025-42 does not acknowledge the significant reliance interests that it disrupts, including in projects that were already in development when the Notice took effect. It does not assess whether there were reliance interests, determine whether they were significant, or weigh those interests against other policy concerns.[53]

82.     Notice 2025-42 does not discuss any alternatives to eliminating the Five Percent Safe Harbor, nor otherwise indicate that any were considered, that might better account for significant reliance interests.[54]

## FACTUAL BACKGROUND

83.     Notice 2025-42 took effect on September 2, 2025, and immediately impacted wind and solar project development.[55]

84.     Energy projects are planned many years in advance. Their financing often depends in substantial part on their anticipated tax treatment.

85.     As part of the planning process, project developers make decisions, and provide documentation to financing parties, about how they will qualify for available tax credits—including about which of the two methods for demonstrating "beginning of construction" they will use and how and when they will demonstrate eligibility under such method.

86.     Prior to Notice 2025-42, the Five Percent Safe Harbor was widely used to establish that a project had qualified for tax credits. Many developers preferred the Five Percent Safe Harbor to the Physical Work Test; industry experts understood the Five Percent Safe Harbor to be more objective, easier to document, and less risky.[56]

---

[53] *Id.*
[54] *Id.*
[55] *Id.* at 20.
[56] *See, e.g.*, David Burton, *Soundbites from Novogradac's Renewable Energy Conference*, Norton Rose Fulbright (June 4, 2019), https://www.projectfinance.law/tax-equity-news/2019/june/soundbites-from-novogradac-s-renewable-energy-conference/; Chad Durden,

87.    Many projects that were in active development on September 2, including projects that Plaintiffs are working on or will benefit from, planned to rely on the Five Percent Safe Harbor.

88.    After Notice 2025-42 took effect, the Physical Work Test became the sole method available for solar projects above 1.5 MW and all wind projects to demonstrate they had begun construction. As a result, many projects that were poised to establish credit eligibility using the Five Percent Safe Harbor can no longer demonstrate that they have commenced construction.

89.    Notice 2025-42 presents particular difficulties for mid-sized solar projects, which overwhelmingly relied on the Five Percent Safe Harbor to demonstrate that they had commenced construction, and which have design and development plans and financing arrangements that are sequenced accordingly.

90.    After Notice 2025-42, many developers have had to expend time and resources determining whether they need to revise their development plans or redesign their projects to be able to claim the clean electricity tax credits, or whether they will be able to proceed with development at all.

91.    Notice 2025-42 has caused some projects that were in active development to be cancelled or indefinitely paused. These cancellations and pauses have caused loss of business and revenue for project developers, consultants, workers, and other industry participants. Other projects that are continuing despite losing credit eligibility now face higher costs and may need to raise more capital. On information and belief, some project developers will seek to recoup higher development costs by passing them along to buyers of electricity and in many cases, consumers. Some developers are likely to scale back projects to account for the loss of credits

_IRS Issues 30 Percent ITC Preservation Guidance_, Novogradac (Sept. 6, 2018), https://www.novoco.com/periodicals/articles/irs-issues-30-percent-itc-preservation-guidance.

and resulting limitations of their project budgets, resulting in smaller projects with less generation capacity.

92.    Notice 2025-42 has forced developers and service providers trying to meet the new requirements to expend significant time and resources re-analyzing and revising their development plans, redesigning or downsizing projects, taking on additional legal and compliance costs, and renegotiating financing and insurance to establish eligibility for tax credits using the Physical Work Test.

93.    The Physical Work Test presents significant challenges to solar and wind energy projects whose developers were relying on the Five Percent Safe Harbor. For instance, developers in the early or middle stages of developing their projects may not yet have access to the physical site, and may thus be unable to begin significant on-site physical work. Those that already have access to their sites often need to conduct environmental and, in some cases, cultural and historic reviews, and must also seek and receive permits, including from state, regional, and federal agencies (some of which, as described above, have taken recent actions targeting wind and solar that exacerbate uncertainty over whether projects can move forward with on-site physical work). Projects must also obtain interconnection agreements prior to beginning site development. Taken together, these challenges and necessary prior steps mean that rapidly accelerating the process of breaking ground on a clean energy project may be difficult at best, and impossible at worst.

94.    While certain off-site physical work can also fulfill the Physical Work Test, it is a more difficult, and less certain, route to establishing credit eligibility. Notice 2025-42 does not provide a brightline test of the amount of work, nor an exhaustive list of the types of work, that satisfy the test. Additionally, as the entire industry must now pivot to the Physical Work Test,

demand for qualifying off-site physical work is high, and project developers may be unable to secure completion of high-demand work within the tight timeframe presented.

95.     By reducing the number and size of projects that will go forward, and by increasing project costs and risks for those that do, Notice 2025-42 will reduce the amount of solar and wind capacity that will be built and connected to the electric grid in the next five years. Demand for power is expected to grow at unprecedented rates during that time. As a result, Notice 2025-42 is likely to increase power prices, resulting in higher electric rates and bills for consumers. By reducing the amount of new clean energy projects that are built, it will increase reliance on older, dirtier power plants. With fewer clean power sources to meet growing demand, dirtier and more expensive power plants will run more frequently and for longer, and will discharge more air pollution as a result.

## STANDING

96.     Oregon Environmental Council has standing to bring this action on behalf of its members. Defendants' unfair treatment of wind and solar energy will increase electricity costs, which will harm OEC's members. Members who live near gas-fired power plants that run more because of the challenged Notice will also experience prolonged exposure to toxics, which will harm their health, make it more difficult to recreate outside, and reduce their enjoyment of the environment.

97.     Doris I. Penwell is a member of OEC. She lives in Keizer, Oregon. She pays Portland General Electric for her electricity, and she pays a special rate to support their renewable investments. Her utility recently gave her notice that her rates would be increasing. She does not want to pay even more for electricity. For her small house, her monthly bill is about

$85 to $125. She is concerned about her rates going up even more, and she would use the money she did not need to spend on higher bills on other things instead.

98.    NRDC has standing to bring this action on behalf of its members. NRDC members support the production of affordable clean energy. These members pay for electricity, and are harmed by the Notice because the Notice will decrease the production of clean energy and increase their energy bills. NRDC members also live, work, and recreate near fossil fuel power plants that are likely to run more often and for longer in order to fulfill the gap left by the decreased production of clean energy caused by the Notice. When running, these power plants emit toxic air pollutants that are harmful to the health of these members and to their environments.

99.    Jillian McFarland is a member of NRDC. She lives in Arlington, Texas, and pays for electricity through her utility. Her electricity bills are already high, and she will be harmed by increasing bills due to the decrease in clean energy, which is cheaper to generate than fossil fuel energy. She would rather use the money she will have to spend on higher electricity bills on other expenses, such as groceries.

100.    Ms. McFarland also lives within ten miles of the Handley Power Plant, which is a gas plant that generates soot and other pollution when running. She and her family spend a lot of time outside very close to that plant. They swim, play pickleball, hike, and bike in the area. The Handley Power Plant will run more if fewer wind and solar plants are built because of the Notice. The additional operation of this plant will generate more pollution, which will have negative health impacts. This additional pollution will also cause Ms. McFarland and her family to spend less time outside, reducing their enjoyment of the environment.

101.    Paul Kaplan is a member of NRDC. He lives in Pleasant Hill, Oregon. He pays for electricity through the Emerald People's Utility District. His house is fully electric and does not use any gas. Even though he has solar panels on his house, the panels do not generate enough power to cover his entire monthly electricity bill, which ranges from $100 a month to $250 a month in the winter. He does not want his electricity bill to increase, and he would rather spend that money on other things.

102.    NRDC members, including Tam Hunt, work in the clean energy industry and have professional, economic, and advocacy interests in the growth of that industry. As a result of Notice 2025-42, projects on which Mr. Hunt was actively advising have been cancelled or put on extended pause. This has eliminated consulting and legal work that Mr. Hunt would otherwise be doing. Notice 2025-42 has caused delays in, and risked complete elimination of, compensation for Mr. Hunt. It has also required him to invest substantial additional time and costs to analyze and respond to the new IRS position, and has prevented him from pursuing additional opportunities.

103.    NRDC also has standing to bring this action on its own behalf. NRDC pays for electricity for its five offices across the country, in New York, New York; Washington, D.C.; Chicago, Illinois; San Francisco, California; and Santa Monica, California. NRDC is harmed by the Notice, which will increase NRDC's energy bills.

104.    The Hopi Utilities Corporation has standing to bring this action on its own behalf. HUC is a wholly owned business of the Hopi Tribe. HUC was established in 2017 to expand electricity access and reliability and provide economic and workforce development opportunities for Tribal members on the Hopi Reservation in rural northeastern Arizona. A core component of HUC's work is to support the Hopi Tribe in owning and operating energy infrastructure to ensure

the Hopi Tribe has consistent, long-term access to the infrastructure, electricity, and economic and workforce development benefits that flow from energy projects.

105.    The Hopi Reservation has a significant, urgent need for new energy investments. The Hopi Reservation has among the lowest electrification rates in the country: 3,000 of the roughly 8,000 residents living there lack electricity access. Only one power line currently connects to the Hopi Reservation, and those living more than a mile away are unable to tap in. Even for those who have access to power, reliability is a challenge. The location, and the harshness of the climate and landscape of the red rock mesas that the Hopi Tribe inhabits, make the impacts of unstable power particularly concerning for the Tribe and its members.

106.    The Hopi Reservation also has a significant need for new economic development. For many years, the Hopi Tribe's economy was closely tied to the Navajo Generating Station, a coal-fired power plant located near the Reservation that provided jobs and generated revenue that accounted for roughly 85% of the Hopi Tribe's general budget. The Navajo Generating Station closed in 2019, and the Hopi Tribe and its members have since struggled to recover economically. Unemployment and poverty rates on the Reservation are high. Without the revenue from the Navajo Generating Station, the Tribe struggles to provide public services including electricity to pump water, assistance for the elderly, and off-grid electrification for Hopi homes too remote to connect to the power grid.

107.    Since HUC's founding in 2017, the Hopi Tribe and HUC have spent substantial time and resources developing solar projects designed to address these challenges. Revenue from selling solar power will support essential services—including electrification—on the Reservation, and solar projects will also provide employment opportunities for Tribal members and improve energy infrastructure and reliability on the Reservation. Among HUC's primary

initiatives to achieve these goals are a planned 8 MW solar and battery storage project and a planned 400 MW solar and battery storage project. HUC planned for both projects to be eligible for the Clean Electricity Investment Tax credit, and planned to demonstrate eligibility using the Five Percent Safe Harbor.

108.    Because of Notice 2025-42, HUC has had to significantly change its plans for its planned 8 MW project. HUC is racing to ensure the project will qualify for the Clean Electricity Investment Tax Credit using the Physical Work Test, and has had to devote time and resources to changing its development process to do so. The project faces additional costs and risks that it would not otherwise have experienced. If the project is unable to qualify for the tax credit under the Physical Work Test, HUC will need to significantly scale back the size of the project.

109.    With the changes made in Notice 2025-42, HUC no longer expects that its planned 400 MW solar project will begin construction in time to qualify for the Clean Electricity Investment Tax Credit. Without the tax credit, HUC will need to explore new financial arrangements to continue with the project, which will likely reduce the Hopi Tribe's equity in the project. This will result in reduced benefits for Tribal members.

110.    In addition to the financial and time costs caused by Notice 2025-42, HUC faces significant reputational risk as a result of the Notice. HUC has been working with the Hopi Tribal Government and with Tribal members for years to plan the projects and garner support. HUC is now having to go back on promises it made to Tribal members, push Tribal decisionmakers to move more quickly, and proceed with breaking ground on Tribal land earlier than it had represented to the community. Each of these impacts erodes trust and makes it harder for HUC to move forward with future projects. Moreover, if the projects fail to proceed, or if they proceed with increased cost and complication or at a reduced scale, it will lower confidence

in HUC's work and reduce the Tribe's willingness to engage in project developments in the future.

111.    Woven has standing to bring this action on its own behalf. Woven is a private business founded in 2020 with the goal of helping Tribes and Tribal organizations manage the energy resources on their land. Woven provides strategic energy development planning and consultation services to Tribes and Tribal organizations. Its mission is "to maximize the value of the clean energy transition on Tribal lands using a Tribally led energy planning, development, ownership, and management model." Through its service delivery model, Woven strives to empower Tribes with the knowledge, capacity, and confidence they need to become informed decision-makers and capable stewards of their energy resources. Woven helps clients seek a variety of funding resources to support energy project development, including both tax credits and federal grants. Because the federal government has canceled many sources of grant funding, particularly for wind and solar projects, tax credits are an increasingly important part of financing Tribal energy projects.

112.    HUC is a current client of Woven. Woven is providing technical assistance, planning, and development support for both of HUC's planned solar projects, including advising and supporting HUC as it navigates the impacts of Notice 2025-42.

113.    Prior to Notice 2025-42, Woven's clients overwhelmingly preferred to demonstrate eligibility for Clean Electricity Investment and Production Tax Credits using the Five Percent Safe Harbor, and all of the energy development projects that Woven is presently supporting were intending to rely on the Five Percent Safe Harbor to demonstrate that they had commenced construction. Notice 2025-42 has caused significant changes to the way Woven is working with its clients. Woven has had to expend significant resources determining how the

projects it will support can meet the Physical Work Test. Woven's clients have also paid more for goods and services because of the need to value speed over cost.

114.    Because of the changes caused by Notice 2025-42, Woven has had less time to devote to activities that are essential to its business model. For instance, Woven is devoting the vast majority of its staff resources to helping current clients complete their projects, and has significantly reduced sales or business development work due to constrained resources. This creates a significant risk of a potential development services cliff for the company. Woven has also been forced to scale down some of the capacity building and education elements of its client services as a function of directing focus to support out-of-sequence development activities to meet new IRS deadlines.

115.    Public Citizen brings this action on behalf of itself and its members. Public Citizen and its members are harmed by the Notice because Public Citizen and its members pay for electricity, and the Notice will decrease the production of clean energy and increase their energy bills.

116.    For example, member Kaiba White lives in Austin, Texas, and pays Austin Energy for electricity. Because the Notice will decrease the production of cheaper wind and solar energy, it will cause her state to rely more on more expensive sources of energy, resulting in increased energy bills. She will also be negatively impacted by increased air pollution caused by greater use of fossil fuels rather than wind and solar to generate electricity.

117.    Public Citizen also has standing to bring this action on its own behalf. Public Citizen pays for electricity for its offices in the District of Columbia and Austin, Texas. Because the Notice will decrease the production of cheaper wind and solar energy, it will result in reliance on more expensive sources of energy, resulting in higher energy bills.

118.    San Francisco has standing to bring this action on behalf of itself as an electricity

market participant. For more than 100 years, the City's publicly owned utility—the San

Francisco Public Utilities Commission (SFPUC)—has generated clean, 100% greenhouse gas-

free electricity for the City. Over the years, San Francisco has continued to make significant

citywide clean energy commitments. In 2019, the Board of Supervisors enacted Ordinance No.

220-19, requiring all non-residential buildings over 50,000 square feet to source 100% of their

electricity from greenhouse gas-free or renewable energy sources.[57] In 2021, San Francisco

adopted a Climate Action Plan that sets a goal of achieving net-zero greenhouse-gas emissions

citywide by 2040.[58]

119.    Today, SFPUC either generates or procures hydroelectric, wind, solar, and other

renewable energy that it provides to its municipal, business, and residential customers who pay

published electric rates. The City's departments and services—including its transit system,

general hospital, and international airport—are powered by renewable or greenhouse gas-free

energy from SFPUC.

120.    SFPUC faces upcoming increases in electricity demand from City capital

improvement projects including at the San Francisco International Airport, growing commercial

technology sectors, and transitions from fossil fuels to clean electricity across the City. To meet

this rising demand, SFPUC is actively procuring additional renewable energy sources. San

Francisco's strategy for affordable electricity depends on securing new solar, wind, and other

renewable energy sources through long-term contracts, which require developers to make initial

upfront investments to build the required infrastructure.

---

[57] S.F., Cal., Env't Code ch. 30, § 3001 *et seq*. (2019) (enacted by Ordinance 220-19).
[58] S.F. Dep't of the Env't, *San Francisco Climate Action Plan 2021* (2021),
https://www.sfclimateplan.org/sites/default/files/2023-
02/cap_fulldocument_wappendix_web_220124.pdf.

121.    By eliminating significant tax incentives to make such investments, the IRS Notice will make SFPUC's current procurement of renewable energy sources—and overall energy portfolio—more expensive. Developers may walk away from renewables projects, reducing overall supply and raising prices. But even the projects that proceed will become more expensive. In light of the Notice, renewable energy developers have already proposed new provisions in contracts that would pass costs on to SFPUC if they do not receive anticipated tax credits. Because SFPUC sets electric rates based on cost of service and must pass through increased procurement costs to its customers, City departments will also incur those increased costs for their own power usage. San Francisco is therefore directly harmed because the Notice will increase its municipal electricity costs.

122.    The Maryland Office of People's Counsel has standing to bring this action on behalf of its clients, the residential consumers of electricity of the State of Maryland. Residential consumers (Marylanders) pay for the electricity that is distributed to them by their electric utilities, and are harmed by the Notice because it will decrease the production of clean energy and increase their energy bills.

123.    Marylanders are also harmed by the Notice because it has diminished the value of the payments they make, through their electricity bills, to support the purchase of alternative compliance payments (ACPs) under the Maryland Renewable Energy Portfolio Standard Act (RPS). Under the RPS, Maryland's electric utilities and retail suppliers are required to buy a certain number of renewable energy credits (REC) on an annual basis and, to the extent they fall short of their respective REC targets, to make ACPs. ACPs are in turn deposited into the Maryland Strategic Energy Investment Fund (SEIF) and used to support renewable energy projects.

124.    Before the issuance of the Notice, the ACP funds provided by Marylanders were used to support the development of renewable energy capacity in addition to the capacity that was supported by federal clean energy tax credits. Since the issuance of the Notice, upon information and belief, a portion of the ACP funds deposited in the SEIF has instead been used to replace the value of tax credits that renewable projects will not receive as a result of the Notice. This diminishes the incremental additional value of Marylanders' ACPs.

## CLAIM FOR RELIEF

### *Arbitrary, Capricious, and Unlawful Agency Action (5 U.S.C. § 706(2)(A))*

125.    Plaintiffs incorporate by reference Paragraphs 1-124.

126.    The Administrative Procedure Act grants a right of judicial review of final agency action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702.

127.    Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

128.    Agency action is arbitrary and capricious if the agency fails to give adequate reasons for its decisions, fails to examine the relevant data, or offers no rational connection between the facts found and the choice made. *See Motor Vehicle Mfrs. Ass'n of U.S, Inc.. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

129.    An agency cannot change course without a reasoned explanation for the change—it must show that there are good reasons for the new policy and must believe the new policy is better than the old policy. *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Moreover, when an agency abandons or changes longstanding guidance or practice,

it must take into account serious reliance interests engendered by the prior policy. *Id.*; *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220 (2016).

130.    Notice 2025-42 is a final agency action. It marks the conclusion of the agency's decision-making process, and it is currently affecting the rights and obligations of members of the public, including Plaintiffs.

131.    Notice 2025-42 unlawfully changes the tests for beginning of construction for only solar and wind facilities, without providing adequate reasons or data for treating those facilities differently from all other industries that have long been subject to the same methodology. The IRS asserts that the Notice "is necessary and appropriate to properly enforce the credit termination date for applicable wind and solar facilities," but provides no explanation for why changing a longstanding methodology is either necessary or appropriate.

132.    The Notice asserts that the change "prevent[s] taxpayers from circumventing the statutory credit termination date" and "prevent[s] the artificial manipulation of eligibility" for the credits, but provides no explanation or evidence to suggest that taxpayers are either circumventing or manipulating credit eligibility.[59] Moreover, it provides no explanation or evidence that, to the extent any such circumvention or manipulation is occurring, it is more common among wind and solar projects than any other technology.

133.    There is no rational connection between the IRS's asserted reason for Notice 2025-42 and the action it took.

134.    The Notice exempts solar facilities smaller than 1.5 MW with no explanation for why such facilities should be subject to different treatment from all other solar facilities.

---

[59] I.R.S. Notice 2025-42 at 5.

135.    The IRS failed entirely to consider and take account of serious reliance interests engendered by more than a decade of consistent policy.

136.    The IRS failed entirely to consider alternatives within the ambit of existing policy that might better account for significant reliance interests.

137.    For all of these reasons, the Notice is arbitrary and capricious.

138.    There is no adequate alternative to APA review.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment as follows:

A.  Declaring that the Notice is contrary to law and arbitrary and capricious;

B.  Holding unlawful and vacating the Notice; and

C.  Granting such other relief that the Court considers just and proper.

Dated: December 18, 2025                    Respectfully submitted,

_____
Thomas Zimpleman (DC Bar #1049141)
Sarah Fort (*admission pending*)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
Phone: (202) 513-6244
Fax: (415) 795-4799
tzimpleman@nrdc.org
sfort@nrdc.org

_____
Simi Bhat (*pro hac vice forthcoming*)
Natural Resources Defense Council
111 Sutter Street, 21st Fl.

San Francisco, CA 94104
Phone: (415) 875-6110
Fax: (415) 795-4799
sbhat@nrdc.org

Counsel for Plaintiffs Oregon Environmental
Council, Natural Resources Defense Council, Inc.,
Public Citizen, Hopi Utilities Corporation, and
Woven Energy


*/s/ David Chiu*
David Chiu (*pro hac vice forthcoming*)
San Francisco City Attorney
Yvonne R. Meré (*pro hac vice forthcoming*)
Chief Deputy City Attorney
Sophia L. Cai (*pro hac vice forthcoming*)
Sushil C. Jacob
Deputy City Attorneys
CITY AND COUNTY OF SAN FRANCISCO
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102
Phone: (415) 554-4274
sophia.cai@sfcityatty.org

Counsel for Plaintiff City and County of San
Francisco


*/s/ David S. Lapp*
David S. Lapp (*pro hac vice forthcoming*)
People's Counsel
Maryland Office of People's Counsel
6 St. Paul Street, Suite 2102
Baltimore, MD 21201
Phone: (410) 767-8171

Counsel for Plaintiff Maryland Office of People's
Counsel