## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OREGON ENVIRONMENTAL COUNCIL, et al.,

     *Plaintiffs*,

     v.

INTERNAL REVENUE SERVICE OF THE UNITED STATES, et al.,

     *Defendants*.

**Case No. 25-cv-04400 (CKK)**

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................................................................ iv

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 2

I.     Statutory and Regulatory Background........................................................... 2

    A.     Tax Credit Incentives for Clean Energy Technologies ........................... 2

    B.     Historical Use and Interpretation of "Beginning of Construction" ......................................................................................... 3

    C.     Current Clean Energy Tax Credits ......................................................... 5

        1.     The Inflation Reduction Act........................................................... 5

        2.     The "Beginning of Construction" Guidance Applied to IRA Credits ................................................................................. 6

        3.     The One Big Beautiful Bill Act ..................................................... 8

II.     Factual and Procedural Background .............................................................. 9

    A.     The July 7, 2025 Executive Order ......................................................... 9

    B.     IRS Notice 2025-42 ............................................................................. 10

    C.     Procedural History .............................................................................. 12

LEGAL STANDARD .............................................................................................. 12

ARGUMENT ........................................................................................................... 14

I.     Plaintiffs have standing to challenge Notice 2025-42 .................................. 14

    A.     Injury-in-fact ....................................................................................... 14

        1.     Plaintiffs are suffering economic, business, and reputational harm ......................................................................... 16

        2.     The Notice is harming Plaintiffs by making electricity more expensive ........................................................... 20

        3.     The Notice will cause increased air pollution near Plaintiffs' members' homes ........................................................ 22

B.     Causation and Redressability ........................................................... 24

II.    Notice 2025-42 is arbitrary and capricious ........................................................ 25

A.     Defendants' cursory explanation does not provide a
reasoned basis for changing longstanding practice, and
bears no rational connection to the choice they made .......................... 25

B.     The Notice arbitrarily singles out wind and certain solar
projects for unfavorable treatment, while retaining
longstanding rules for all other projects ............................................. 29

C.     In issuing the Notice, Treasury and the IRS entirely failed
to consider serious reliance interests or evaluate
alternatives ....................................................................................... 33

CONCLUSION ............................................................................................................ 35

## TABLE OF AUTHORITIES

### Cases

*Alley Cat Allies, Inc. v U.S. Nat'l Park Serv.*, No. 25-4269-CKK,
    2026 WL 221343 (D.D.C. Jan. 28, 2026) ........................................................ 16

*Am. Bioscience, Inc. v. Thomspon*,
    269 F.3d 1077 (D.C. Cir. 2001) ........................................................ 13, 35

*Biden v. Nebraska*,
    600 U.S. 477 (2023)........................................................ 14

*Bost v. Ill. State Bd. of Elections*,
    607 U.S. ____ (2026), 2026 WL 96707........................................................ 14

*Carpenters Indus. Council v. Zinke*,
    854 F.3d 1 (D.C. Cir. 2017) ........................................................ 24

*Chamber of Com. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ........................................................ 27

*Clean Wis. v. EPA*,
    964 F.3d 1145 (D.C. Cir. 2020)........................................................ 22, 24

*\*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)........................................................ 25, 26, 28

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020)........................................................ 29, 33

*\*Diamond Alt. Energy, LLC v. EPA*,
    606 U.S. 100 (2025)........................................................ 16, 20, 24

*Doc Soc'y v. Rubio*,
    141 F.4th 1273 (D.C. Cir. 2025) ........................................................ 14

*\*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)........................................................ 13, 32, 35

*\*Env't Action v. FERC*,
    996 F.2d 401 (D.C. Cir. 1993) ........................................................ 20, 21

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)........................................................ 35

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)........................................................ 16, 17

*FERC v. Elec. Power Supply Ass'n,*
    577 U.S. 260 (2016) ................................................................................................ 21

*\*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ......................................................................................... 22, 23

*\*Grayscale Invs., LLC v. Sec. & Exchange Comm'n,*
    82 F.4th 1239 (D.C. Cir. 2023) ............................................................................. 29

*Gustafson v. Alloyd Co.,*
    513 U.S. 561 (1995) ................................................................................................ 32

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ................................................................................................ 17

*IMS, P.C. v. Alvarez,*
    129 F.3d 618 (D.C. Cir. 1997) ............................................................................... 13

*Int'l Org. of Masters, Mates, & Pilots, ILA, AFL-CIO v. Nat'l Labor Rels. Bd.,*
    61 F.4th 169 (D.C. Cir. 2023) ............................................................................... 35

*Kingdom v. Trump,*
    No. 25-cv-691-RCL, 2025 WL 1568238 (D.D.C. June 3, 2025) ........................... 27

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ......................................................................................... 14, 16

*Michigan v. EPA,*
    576 U.S. 743 (2015) ................................................................................................ 26

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ......................................................................................... 13, 27

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ................................................................................................ 33

*Nat'l Lifeline Assoc. v. FCC,*
    921 F.3d 1102 (D.C. Cir. 2019) ............................................................................. 34

*Nebraska v. Su,*
    121 F.4th 1 (9th Cir. 2024) .................................................................................... 27

*Planned Parenthood of Greater N.Y. v. HHS,*
    No. 25-2453, 2025 WL 2840318, (D.D.C. Oct. 7, 2025) ...................................... 13

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ................................................................................................ 16

*Steger v. Def. Investigative Serv.*,
    717 F.2d 1402 (D.C. Cir. 1983) ........................................................................ 33

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ...................................................................................... 17

*United States v. Stanchich*,
    550 F.2d 1294 (2d Cir. 1977) ....................................................................... 28

*United States v. Texas*,
    599 U.S. 670 (2023) ...................................................................................... 16

*Westar Energy, Inc. v. Fed. Energy Regul. Comm'n*,
    473 F.3d 1239 (D.C. Cir. 2007) .................................................................... 33

## Statutes

15 U.S.C. § 78f ................................................................................................... 29

26 U.S.C. § 45Y ................................................................................... 5, 6, 9, 31

26 U.S.C. § 48E ........................................................................... 2, 5, 6, 9, 31

26 U.S.C. § 7701 ............................................................................... 9, 12, 32

5 U.S.C. § 706 .................................................................................... 12, 35

American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, 126 Stat. 2313 (2013)............. 4, 29

Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 (2022)........................ 5, 6

Md. Code Pub. Util. § 2-205 .............................................................................. 22

One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025) ........................................ 8, 9

## Regulations and Notices

26 C.F.R. § 1.48D-5 (2024) ............................................................................ 7, 30

87 Fed. Reg. 73580 (Nov. 30, 2022)............................................................ 5, 6, 7, 30, 34

89 Fed. Reg. 53184 (June 25, 2024) ............................................................ 7, 30, 34

90 Fed. Reg. 2224 (Jan. 10, 2025) ............................................................ 7, 8, 33

90 Fed. Reg. 4006 (Jan. 15, 2025) ............................................................ 6, 7, 34

IRS Notice 2013-29, 2013-1 C.B. 1085 (2013) ................................................ 4, 29, 33

IRS Notice 2018-59, 2018-29 I.R.B. 196 (2018) ........................................................................ 5

IRS Notice 2022-61, 2022-52 I.R.B. 560 (2022) ................................................................. 5, 30

IRS Notice 2025-42, 2025-36 I.R.B. 347 (2025).................................... 10, 11, 12, 26, 27, 31, 32

IRS Notice 2026-15 (Feb. 12, 2026) ................................................................................... 32

Rev. Proc. 2025-14, 2025-07 I.R.B. 770 (Jan. 15, 2025)................................................ 6, 10, 31

## Other Authorities

171 Cong. Rec. (daily ed. July 23, 2025) ............................................................................. 8

171 Cong. Rec. (daily ed. May 21, 2025) ............................................................................. 8

Exec. Order No. 14315, 90 Fed. Reg. 30821 (July 7, 2025)............................. 1, 9, 10, 24, 26, 28

Fed. R. Civ. P. 56 ............................................................................................................... 13

H.R. 1, 119th Cong. (as placed on Senate Calendar, June 28, 2025)............................................ 8

Salvatore Lazarri, Cong. Rsch. Serv., RL33578, Energy Tax Policy: History and Current Issues
    (2008) .......................................................................................................................... 2

Staff of the Joint Comm. on Taxation, 112th Cong., General Explanation of Tax Legislation
    Enacted in the 112th Congress (Joint Comm. Print 2013)................................................. 4

## INTRODUCTION

The federal tax code provides significant tax credits for wind and solar energy facilities that begin construction before July 4, 2026. These credits are make-or-break for many projects: wind and solar facilities are planned years in advance, and their financing, size, and timeline are structured around the availability of credits. For some, like Hopi Utilities Corporation and Woven Energy, such projects offer a chance to provide electricity to families who currently have none, and to create needed revenue and jobs in rural communities. For others, like the City and County of San Francisco and the Maryland Office of People's Counsel, wind and solar projects offer low-cost power sources that can meet the rising power demands of their jurisdictions. And for all, including the Oregon Environmental Counsel, the Natural Resources Defense Council, Public Citizen, and their members, wind and solar energy can reduce pollution and prevent, or at least offset, substantial near-term increases in electricity prices.

President Trump—who makes no secret of his personal dislike for wind and solar energy—has declared it "the policy of the United States" to "end taxpayer support" for "'green' energy sources." Exec. Order No. 14315, 90 Fed. Reg. 30821, 30821 (July 7, 2025). To enact that policy, and at the President's direction, the Internal Revenue Service (IRS) issued Notice 2025-42, which abruptly terminated a longstanding, widely relied-upon methodology for demonstrating tax credit eligibility. It did so only for the wind and solar industries. And it did so without reasoned explanation or evidentiary grounding, and without even acknowledging the serious reliance interests at stake.

While an administration is entitled to pursue its political priorities, agencies must act within the guardrails established by the Administrative Procedure Act (APA). An agency must provide a reasoned basis for its decision and draw a rational connection between the facts and its chosen course of action. When an agency changes a policy, it must acknowledge and consider the

1

interests of those who have reasonably relied on its prior policy. And at all times, an agency must treat similarly situated entities similarly.

In issuing Notice 2025-42, the IRS ran headlong through each of those guardrails. Its resulting policy choice threatens serious, longstanding harm to Plaintiffs and many others. Because Notice 2025-42 is arbitrary, capricious, and an abuse of discretion, Plaintiffs respectfully ask this Court to vacate the Notice.

## BACKGROUND

I.    **Statutory and Regulatory Background**

A.    **Tax Credit Incentives for Clean Energy Technologies**

Congress has long used the Tax Code to shape federal energy policy. Tax incentives can reduce upfront costs and are key to financing, making projects more financially viable and price-competitive. Their value can be significant—in some instances, they can offset 30 to 50 percent, or even more, of the cost of a project. *See* 26 U.S.C. § 48E(a)(2)(A)(ii) (providing 30 percent credit if relevant conditions are met), (a)(3)(A) (providing additional 10 percent credit increase for projects in energy communities), (a)(3)(B) (providing additional 10 percent credit for projects using domestic content), (h) (providing a further 10-20 percent credit increase for projects with connections to low-income communities).

Historically, federal tax policy exclusively favored oil and gas. Salvatore Lazarri, Cong. Rsch. Serv., RL33578, Energy Tax Policy: History and Current Issues 2 (2008). But beginning in the 1970s, there was a shift toward also promoting the development and commercialization of more renewable energy sources, including wind and solar power. *Id.* at 3. Since then, Congress has repeatedly enacted tax credits to lower costs and incentivize the development of clean energy technologies. These credits have typically assumed two forms: Investment Tax Credits (ITCs), which provide taxpayers a credit equal to a percentage of the amount invested in energy

2

property; and Production Tax Credits (PTCs), which are based on the amount of energy a facility produces. *See* Energy Tax Act of 1978, Pub. L. No. 95-618, § 301, 92 Stat. 3174, 3194; *see also* Energy Policy Act of 1992, Pub. L. No. 102-486, § 1914, 106 Stat. 2776, 3020-3023.

In the early decades of clean energy tax credits, projects qualified for tax credits only if they were "placed in service"—that is, completed—before the ITC and PTC expiration dates set by Congress. *See* American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, §§ 1101(a)-(b), 1102(a), 123 Stat. 115, 319; *see also* Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, §§ 101(a), 103(a), 122 Stat. 3765, 3808, 3811. This approach resulted in significant challenges for project developers. Energy infrastructure projects can take years to complete and often face unpredictable delays that result in projects being placed in service much later than initially expected. Moreover, Congress often either did not extend the tax credit deadlines until immediately before their expiration or allowed them to expire before renewing them days or months later.[1] The attendant uncertainty chilled investment and deployment.

### B.    Historical Use and Interpretation of "Beginning of Construction"

Congress introduced a new approach to determining eligibility for clean energy tax credits in the American Taxpayer Relief Act of 2012. Instead of conditioning eligibility on the date a project was completed, the Act tied eligibility to the date on which the facility began

---

[1] *See, e.g.*, Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, § 4006, 102 Stat. 3342, 3652; Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 7106, 103 Stat. 2106, 2306; Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 11406, 104 Stat. 1388, 1388-474; Tax Extension Act of 1991, Pub. L. No. 102-227, § 106, 105 Stat. 1686, 1687 (providing examples of short term extensions of the ITC); Ticket to Work & Work Incentives Improvement Act, Pub. L. No. 106-170, § 507, 113 Stat. 1860, 1922 (1999); Job Creation and Worker Assistance Act, Pub. L. No. 107-147, § 603, 116 Stat. 21, 59 (2002); Working Families and Tax Relief Act, Pub. L. No. 108-311, § 313, 118 Stat. 1166, 1181 (2004) (providing examples of short-term extensions of the PTC).

construction. American Taxpayer Relief Act, Pub. L. No. 112-240, § 407(a)(3), (b), 126 Stat.

2313, 2340-41 (2013). As the Joint Committee on Taxation explained, this change stemmed from

Congress's "belie[f] that certain renewable power projects do not move forward because

developers and investors are concerned that [their] projects cannot be completed before

the renewable electricity production credit expires." Staff of the Joint Comm. on Taxation, 112th

Cong., General Explanation of Tax Legislation Enacted in the 112th Congress 212 (Joint Comm.

Print 2013). Congress sought "to reduce this uncertainty by replacing the placed-in-service

expiration date with an expiration date based on when construction begins on a particular

project." *Id.* at 212-13.

Following the passage of the American Taxpayer Relief Act, the IRS[2] issued Notice

2013-29, entitled "Beginning of Construction for Purposes of the Renewable Electricity

Production Tax Credit and Energy Tax Credit." IRS Notice 2013-29, 2013-1 C.B. 1085. Notice

2013-29 set forth "two methods that a taxpayer may use to establish that construction of a

qualified facility has begun." *Id.* A taxpayer could demonstrate eligibility for the tax credit by

"pay[ing] or incur[ring] . . . five percent or more of the total cost of the facility" (the "Five

Percent Safe Harbor"), or by starting "physical work of a significant nature" (the "Physical Work

Test"), before the deadline set by Congress. *Id.* at 1085, 1087. The Notice made clear that "a

taxpayer need only satisfy one method to establish that construction of a facility has begun for

the purpose of qualifying for the PTC or ITC." *Id.* at 1085.

For twelve years, this fundamental framework for establishing the beginning of

construction remained a stable, established area of tax law. Indeed, since issuing Notice 2013-29,

---

[2] The IRS is a bureau of the Department of the Treasury (Treasury). 26 C.F.R. § 601.01(a). It oversees the assessment and collection of taxes. *Id.*

the IRS has clarified and modified its guidance on clean energy tax credits at least a dozen times, each time retaining the availability of both the Five Percent Safe Harbor and the Physical Work Test.[3] Likewise, Congress has repeatedly passed laws extending and enacting clean energy tax credits—all with deadlines tethered to the beginning of construction—without either changing the methodology or directing the IRS to change its guidance.[4]

## C.    Current Clean Energy Tax Credits

### 1.    The Inflation Reduction Act

In 2022, Congress passed the Inflation Reduction Act (IRA). Pub. L. No. 117-169, 136 Stat. 1818 (2022). To accelerate the nation's decarbonization efforts and support development of and investment in a domestic clean energy economy, the IRA included a suite of clean energy tax credits to lower the cost of zero- and low-greenhouse gas emission technologies. Among other things, the IRA included the Clean Electricity Production tax credit, codified at 26 U.S.C. § 45Y, (45Y) and the Clean Electricity Investment tax credit, codified at 26 U.S.C. § 48E (48E). 136 Stat. at 1982-97. Like prior PTCs and ITCs, the Clean Electricity Production tax credit

---

[3] IRS Notice 2013-60, 2013-2 C.B. 431 (2013); IRS Notice 2014-46, 2014-2 C.B. 520 (2014); IRS Notice 2015-25, 2015-13 I.R.B. 814 (2015); IRS Notice 2016-31, 2016-23 I.R.B. 1025 (2016); IRS Notice 2017-04, 2017-4 I.R.B. 541 (2017); IRS Notice 2018-59, 2018-29 I.R.B. 196 (2018); IRS Notice 2019-43, 2019-31 I.R.B. 487 (2019); IRS Notice 2020-41, 2020-25 I.R.B. 954 (2020); IRS Notice 2020-12, 2020-11 I.R.B. 495 (2020); IRS Notice 2021-5, 2021-03 I.R.B. 479 (2021); IRS Notice 2021-41, 2021-29 I.R.B. 17 (2021); IRS Notice 2022-61, 2022-52 I.R.B. 560 (2022); *see also* 87 Fed. Reg. 73580, 73581 (Nov. 30, 2022).

[4] *See, e.g.*, Tax Increase Prevention Act of 2014, Pub. L. No. 113-295, §155(a)-(b), 128 Stat. 4010, 4021; Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, div. P, tit. III, §§ 301(a)-(b), 302(a)-(b), 303(a)-(b) §§ 187(a)-(b), 129 Stat. 2242, 3038-3039, 3074 (2015); Bipartisan Budget Act of 2018, Pub. L. No. 115-123, §§ 40409(a), 40411(a), 132 Stat. 64, 150-151; Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, §§ 127(a)-(c), 133 Stat. 2534, 3231-3232 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, §§ 131(a)-(c), 132(a)-(b), 134 Stat. 1182, 3052-3053 (2020); Inflation Reduction Act of 2022, Pub. L. No. 117-169, §§ 13101(a)-(e), 13102(a)-(c), (d)(2), (f)(3), 13701(a), 13702(a), 136 Stat. 1818, 1906, 1913-1915, 1982-1996.

authorizes a tax credit calculated based on the number of kilowatt hours of electricity produced, *id*. at 1982-83, and the Clean Electricity Investment tax credit authorizes a tax credit calculated using a percentage of the qualified investment in the facility, *id.* at 1990-91.

Whereas earlier PTC and ITC credits were available only to certain enumerated clean energy technologies, the Clean Electricity Production and Investment tax credits were designed to be "technology-neutral": any clean electricity facility with zero greenhouse gas emissions could claim either credit. 90 Fed. Reg. 4006, 4011 (Jan. 15, 2025). The IRS designated the following categories of technologies as qualified to claim these credits: wind, hydropower, marine and hydrokinetic, solar, geothermal, nuclear fission, fusion, and certain waste energy recovery property. Rev. Proc. 2025-14, 2025-07 I.R.B. 770 (Jan. 15, 2025).

As with prior tax credits, Congress intended for these IRA tax credits to eventually expire. The full value of the credits was to be available, at minimum, to qualifying facilities that began construction by 2033. IRA §§ 45Y(d)(2)-(3), 48E(e)(2)-(3).[5]

## 2. The "Beginning of Construction" Guidance Applied to IRA Credits

Following the passage of the IRA, the IRS issued Notice 2022-61, the most recent prior Notice before the Notice challenged in this case. Notice 2022-61 states that "principles similar to those under Notice 2013-29 regarding the Physical Work Test and Five Percent Safe Harbor apply" for determining when construction begins for purposes of the Clean Electricity Production and Investment tax credits. 87 Fed. Reg. at 73584. Moreover, Notice 2022-61 affirmed that the IRS's "beginning of construction" rules apply consistently across a variety of

---

[5] Congress later abbreviated this timeframe, requiring qualifying facilities to either begin construction by July 4, 2026, or be placed in service by December 31, 2027. *See infra* pp. 8-9.

provisions of the Internal Revenue Code ("the Code"), including the Clean Electricity Production and Investment tax credits set out in Code sections 45Y and 48E. *See id.*

From 2022 through early 2025, Treasury repeatedly reaffirmed that taxpayers could demonstrate eligibility for the § 45Y Clean Electricity Production tax credit and the § 48E Clean Electricity Investment tax credit using either the Five Percent Safe Harbor or the Physical Work Test. In the preamble to regulations governing implementation of both tax credits, the IRS reinforced that "Notice 2022-61 continues to apply," and that "the Treasury Department and the IRS have determined that the existing Internal Revenue Bulletin guidance (referred to as the IRS Notices) adequately addresses the beginning of construction rules applicable to sections 45Y and 48E." 90 Fed. Reg. at 4028. In the preamble to the regulations governing the application of beginning of construction to the Clean Electricity Production and Investment tax credits, as well as to Code sections 30C, 45, 45Q, 45V, 48, and 179D, Treasury stated that "taxpayers may continue to rely on the guidance provided in Notice 2022-61" and older notices, and "taxpayers satisfying either test"—the Five Percent Safe Harbor or Physical Work Test—"will be considered to have begun construction." 89 Fed. Reg. 53184, 53186 (June 25, 2024). Treasury made similar statements in the context of other clean energy technologies, repeatedly confirming that both tests were available to demonstrate eligibility with the IRA tax credits. *See, e.g.*, 90 Fed. Reg. 2224, 2246 (Jan. 10, 2025) (stating that, to demonstrate beginning of construction for purposes of clean hydrogen credits, "taxpayers may rely upon the guidance provided in Notice 2022-61" and earlier notices); 26 C.F.R. § 1.48D-5(b) (2024) (specifying that both tests are available to facilities seeking advanced manufacturing tax credits).

Put simply, Treasury and the IRS have consistently provided assurances that their treatment of the beginning of construction is a stable area of law upon which taxpayers and

project proponents can rely. As recently as January 10, 2025, the IRS referred to beginning of construction as "an established, defined concept in tax law." 90 Fed. Reg. at 2246.

### 3.    The One Big Beautiful Bill Act

Soon after the 119th United States Congress was sworn into session on January 3, 2025, Congressional members began negotiating a budget reconciliation bill, known as the "One Big Beautiful Bill Act" (OBBBA). Pub. L. No. 119-21, 139 Stat. 72 (2025). The IRA tax credits were a central issue of debate in the negotiations. *See, e.g*., 171 Cong. Rec. H2228-29 (daily ed. May 21, 2025) (statement of Rep. Casten). Some lawmakers sought a wholesale repeal of all IRA tax credits, while others advocated either for more modest modifications to the credits, or for their retention in full. *See, e.g.*, 171 Cong. Rec. H2334-56 (daily ed. May 21, 2025); *see also* 171 Cong. Rec. S4618 (daily ed. July 23, 2025) (statement of Sen. Grassley).

The first version of OBBBA passed by the House drastically curtailed the clean electricity credits. The draft bill required most facilities to *both* begin construction within 60 days of the bill's enactment *and* be placed in service no later than 2028 to qualify for credits. H.R. 1, 119th Cong. § 112008 (as placed on Senate Calendar, June 28, 2025).

That version of the bill did not become law. Instead, the Senate passed a compromise bill that retained the Clean Electricity Production and Investment tax credits, while significantly abbreviating the period in which solar and wind projects could qualify for credits. The House passed the Senate's revised version of the OBBBA on July 3, 2025, and President Trump signed it into law the next day. Pub. L. No. 119-21. As enacted, the OBBBA left the Clean Electricity Production and Investment tax credits in place for all qualified facilities that begin construction by July 4, 2026. *Id*. §§ 70512-3. It terminated tax credits for wind and solar facilities that begin

8

construction after July 4, 2026, unless such facilities are placed in service by December 31, 2027. *Id.*

In addition to modifying the expiration date for the tax credits, the OBBBA imposed new restrictions on credit eligibility for facilities that begin construction after December 31, 2025, and receive material assistance from certain enumerated "prohibited foreign entities." 26 U.S.C. §§ 45Y(b)(1)(E), 48E(b)(1)(E). In a newly added definition that applies to these restrictions, Congress expressly endorsed the IRS's existing guidance on the meaning of "beginning of construction," directing that "[b]eginning of construction" "shall be determined pursuant to rules similar to the rules under Internal Revenue Service Notice 2013-29 and Internal Revenue Service Notice 2018-59 (as well as any subsequently issued guidance clarifying, modifying, or updating either such Notice), *as in effect on January 1, 2025.*" 26 U.S.C. § 7701(a)(51)(J) (emphasis added).

## II.    Factual and Procedural Background

### A.    The July 7, 2025 Executive Order

On July 7, 2025—four days after Congress passed the OBBBA—President Trump issued Executive Order 14315, entitled "Ending Market Distorting Subsidies for Unreliable, Foreign Controlled Energy Sources." Exec. Order No. 14315, 90 Fed. Reg. 30821 (July 7, 2025). In framing its purpose, the Executive Order states, *inter alia*, "[f]or too long, the Federal Government has forced American taxpayers to subsidize expensive and unreliable energy sources like wind and solar." *Id.* The Executive Order further pronounces that "[i]t is the policy of the United States to . . . end taxpayer support" for "'green' energy sources." *Id*. The goals of the Executive Order are to "rapidly eliminate the market distortions and costs imposed on taxpayers by so-called 'green' energy subsidies," and to "build upon and strengthen the repeal of, and modifications to, wind, solar, and other 'green' energy tax credits." *Id.*

The Executive Order directed Treasury to "strictly enforce the termination of the clean electricity production and investment tax credits . . . for wind and solar facilities." *Id.* It further directed Treasury to issue new and revised guidance within 45 days "to ensure that policies concerning the 'beginning of construction' are not circumvented, including by preventing the artificial acceleration or manipulation of eligibility and by restricting the use of broad safe harbors unless a substantial portion of the facility has been built." *Id.*

The Executive Order cites no evidence that wind and solar facilities are circumventing, or would circumvent, beginning of construction policies. *Id.* It neither describes what constitutes "artificial acceleration or manipulation of eligibility" nor establishes that wind and solar facilities have engaged in such conduct. *Id.* And it provides no evidence that the Five Percent Safe Harbor failed to ensure that construction began before the credit deadlines. *Id.*

**B.    IRS Notice 2025-42**

In accord with the Executive Order, on August 15, 2025, the Treasury Department and the IRS issued Notice 2025-42, titled "Beginning of Construction Requirements for Purposes of the Termination of Clean Electricity Production Credits and Clean Electricity Investment Credits for Applicable Wind and Solar Facilities." IRS Notice 2025-42, 2025-36 I.R.B. 347, 351 (2025) ("Notice 2025-42"). Notice 2025-42 applies only to wind facilities and to solar facilities with a net output greater than 1.5 megawatts (MW). *See id.* at 352, 355. The Notice declares that the Five Percent Safe Harbor "is not available" for those facilities, and that the Physical Work Test is "the sole method that a taxpayer may use" to show beginning of construction for eligibility for the Clean Electricity Investment and Production Tax Credits. *Id.* at 352. Notice 2025-42 did not change beginning of construction guidance for other types of clean energy technologies seeking the same tax credits, including smaller solar facilities, hydropower, geothermal, nuclear fission, fusion energy, and certain waste energy recovery property. *See id.*; *see also* Rev. Proc. 2025-14.

10

Notice 2025-42 described the change as "necessary and appropriate to properly enforce the credit termination date for applicable wind and solar facilities." 2025-36 I.R.B. at 352. Mirroring the Executive Order's conclusory language, Notice 2025-42 stated that it "provides beginning of construction guidance to prevent taxpayers from circumventing the statutory credit termination date, prevent the artificial manipulation of eligibility for the § 45Y credit and § 48E credit for applicable wind and solar facilities, and ensure that a substantial portion of any applicable wind or solar facility not subject to the credit termination date is built by the beginning of construction deadline." *Id.*

Much like the Executive Order, Notice 2025-42 is silent on the rationale for its abrupt departure from longstanding guidance on beginning of construction. Notice 2025-42 never provides evidence illustrating the necessity of changing pre-existing guidance to enforce the credit termination. *Id.* The Notice does not explain how curtailing wind and larger solar projects' eligibility for tax credits enforces the credit termination codified in the OBBBA; it does not specify the type of conduct that constitutes "circumvent[ion]" and "artificial manipulation of eligibility"; and it cites no evidence showing that such conduct is occurring, or that wind and larger solar facilities are engaged in such conduct more frequently than other potentially eligible facilities. *Id.*

Notice 2025-42 also provides no explanation for the inconsistencies flowing from its new guidance. For instance, it provides no reasoning for its decision to eliminate use of the Five Percent Safe Harbor by wind and larger solar developers in demonstrating that they have begun construction for purposes of tax credit eligibility, when OBBBA directs that the Five Percent Safe Harbor remain available to the same developers as a means of demonstrating that they have begun construction for purposes of compliance with new prohibited foreign entity restrictions.

*Id.*; *see* 26 U.S.C. § 7701(a)(51)(J). There is no explanation for treating large solar facilities differently from smaller solar facilities, and no explanation for treating wind and solar facilities differently from other qualifying technologies seeking the same tax credits. 2025-36 I.R.B. at 352.

Notice 2025-42 does not acknowledge the industry reliance interests it disrupts, including for projects already in development when the Notice took effect. *Id.* It does not assess the significance of reliance interests, discuss any effort to ascertain whether reliance interests exist, nor the significance of such interests, or discuss how they weigh against other policy concerns. *Id.* Nor does it consider alternatives to eliminating the Five Percent Safe Harbor that might better account for significant reliance interests. *Id.*

On September 2, 2025, Notice 2025-42 took effect, and immediately began impacting wind and solar project development, as detailed *infra*. *Id.* at 356.

### C.    Procedural History

On December 18, 2025, Plaintiffs filed this case, challenging the abrupt departure from longstanding guidance on beginning of construction in IRS Notice 2025-42. *See* ECF No. 1. Plaintiffs raise a single claim under the APA. *See id.* at 33-35. Plaintiffs now move for summary judgment on this claim. Because the Clean Electricity Investment and Production tax credits remain available only for facilities that begin construction before July 4, 2026, and because Plaintiffs' injuries will best be remedied by a decision that vacates the Notice before that date, Plaintiffs also seek expedited consideration of this case in a separate motion.

### LEGAL STANDARD

A reviewing court must "set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if the agency fails to give adequate

reasons for its decisions, fails to examine the relevant data, or offers no "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). An agency cannot "chang[e] its course" when rescinding a rule without a "reasoned analysis for the change," *id*. at 30, and, when an agency rescinds prior policy, its "reasoned analysis" must consider alternatives that are "within the ambit of the existing" policy, *id*. at 51. When an agency changes longstanding guidance or practice, it must take into account "serious reliance interests" engendered by the prior policy and provide a reasoned explanation for disregarding facts and circumstances underlying that policy. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (cleaned up).

A party "may file a motion for summary judgment at any time" until 30 days after the close of discovery, "even as early as the commencement of the action." Fed. R. Civ. P. 56, Advisory Committee Notes, 2009 Amendment. The Court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

When the Court reviews agency action under the APA, "[t]he 'entire case' on review is a question of law," *Am. Bioscience, Inc. v. Thomspon*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), to be decided on the basis of the administrative record that was before the agency, *e.g., IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997). Nonetheless, when plaintiffs face "urgent time constraints" and anticipate a "sparse" record, they may properly move for summary judgment before a record has been produced. *Planned Parenthood of Greater N.Y. v. HHS*, No. 25-2453, 2025 WL 2840318, at *7, *16 (D.D.C. Oct. 7, 2025).

"To satisfy the requirements of Article III standing in a case challenging government action, a party must allege an injury in fact that is fairly traceable to the challenged government action, and 'it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Doc Soc'y v. Rubio*, 141 F.4th 1273, 1276 (D.C. Cir. 2025) (citations omitted). At the summary judgment stage, plaintiffs must set forth, by affidavit or other evidence, specific facts supporting standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Only one plaintiff need demonstrate standing for a suit to proceed. *Bost v. Ill. State Bd. of Elections*, 607 U.S. _____ (2026), No. 24–568, 2026 WL 96707, at *3 n.3 (citing *Biden v. Nebraska*, 600 U.S. 477, 489 (2023)).

## ARGUMENT

### I.    Plaintiffs have standing to challenge Notice 2025-42

Plaintiffs and their members are suffering, or will soon suffer, acute harm in the forms of economic losses and diverted resources, reputational risk, increased electric prices, and heightened pollution exposure. Because the challenged action is the cause of that harm, and because a favorable decision from this Court would remedy it, Plaintiffs have standing.

#### A.    Injury-in-fact

Notice 2025-42 is disrupting wind and solar project development. Projects in development at the time the Notice was issued have been indefinitely paused, *see* Decl. of Tam Hunt ("Hunt Decl.") ¶¶ 5-11. Other projects are moving forward, but only because project proponents are changing their project plans and timelines to qualify. *See* Decl. of Fletcher Wilkinson ("Wilkinson Decl.") ¶¶ 22-24; Decl. of Jacob Schueller ("Schueller Decl.") ¶¶ 10-12. Some will likely fail to qualify for tax credits despite proponents' best efforts, and will be cancelled as a result. Schueller Decl. ¶ 13. A multi-factor risk assessment of announced energy projects indicates that the Notice has put hundreds of projects, totaling approximately 150,000

MW of planned wind, solar, and co-located battery storage projects, at increased risk of cancellation. Decl. of Amanda Levin ("Levin Decl.") ¶ 40; *see also* Hunt Decl. ¶ 22. Losing even a small percentage of this capacity would have a measurable impact on energy markets: by comparison, between 2022 and 2025, approximately 46,700 MW of combined wind, solar, and battery storage were added to the U.S. grid on average each year. Levin Decl. ¶ 43.

Clean energy development is a complex endeavor; nearly every in-development wind and solar project depends on a large ecosystem of involved entities. These entities include:

- developers and/or owners, who shepherd projects from concept to execution, *see, e.g.*, Wilkinson Decl. ¶¶ 3, 11-12;

- investors and lenders, who provide up-front financing that allows capital-intensive projects to move forward, *see, e.g.*, *id.* ¶ 25; Schueller Decl. ¶¶ 7-8;

- energy service providers and consultants, who provide expertise in design, financing, legal and regulatory compliance, and other technical requirements, *see, e.g.*, Schueller Decl. ¶ 4; Hunt Decl. ¶¶ 3-4;

- power purchasers, like utilities and municipalities, who enter into long-term purchase agreements to buy the power the project produces, *see, e.g.*, Decl. of Michael Hyams ("Hyams Decl.") ¶ 4; Wilkinson Decl. ¶ 15; and

- residential and commercial customers, who get the benefits, and pay the costs, of the power these projects provide, *see, e.g.*, Decl. of Mark Szybist ("Szybist Decl.") ¶¶ 16, 26-27.

Government actions that target tax credits for wind and solar projects injure the taxpayers who are the object of the action; they also "cause downstream or upstream economic injuries to

others in the chain." *See Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 384 (2024)).

Plaintiffs and their members are participants in the clean energy industry. Hopi Utilities Corporation is a project developer, Wilkinson Decl. ¶ 11; Woven Energy is a strategic design and execution consultant, Schueller Decl. ¶¶ 3-4; NRDC members are legal and design consultants, Hunt Decl. ¶¶ 2-4; San Francisco is a utility owner and power purchaser, Hyams Decl. ¶¶ 2-4, 9; and Oregon Environmental Council, NRDC, Public Citizen, and the Maryland Office of People's Counsel, and/or their members and clients, are electricity consumers, Decl. of Doris I. Penwell ("Penwell Decl.") ¶¶ 2-3; Decl. of Toya Lampley ("Lampley Decl.") ¶¶ 6-10; Decl. of Noyan Eyigor ("Eyigor Decl.") ¶¶ 4-7; Szybist Decl. ¶¶ 7, 10.

Plaintiffs have interests in projects that have already been canceled and in projects that are still trying to qualify for tax credits, and the IRS Notice is causing Plaintiffs to suffer harm that is both "concrete and particularized" and "actual or imminent." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).

### 1.    Plaintiffs are suffering economic, business, and reputational harm

The IRS Notice is causing Plaintiffs Hopi Utilities Corporation (HUC) and Woven Energy economic loss and interfering with their core business activities, forcing them to divert resources to offset the Notice's harmful effects. Both are legally cognizable injuries. *See Diamond Alt.*, 606 U.S. at 113-14 ("Monetary costs are of course an injury." (quoting *United States v. Texas*, 599 U.S. 670, 676 (2023))); *Alley Cat Allies, Inc. v U.S. Nat'l Park Serv.*, No. 25-4269-CKK, 2026 WL 221343, at *8 (D.D.C. Jan. 28, 2026) ("To show an injury to its interests, an organization must show that the challenged action has 'perceptibly impaired' its ability to provide services for its members or 'directly affected and interfered with its core business

activities.'" (cleaned up) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *All. for Hippocratic Med.*, 602 U.S. at 395)). The Notice is also putting pressure on their relationships with clients and prospective clients, which compromises their ability to attract additional future business. "[R]eputational harms" are classic Article III injuries. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).

HUC is chartered and wholly owned by the Hopi Tribe, and was founded to address energy and water access and sovereignty issues on the Hopi Reservation. Wilkinson Decl. ¶¶ 3, 11. More than 35% of homes on Hopi land do not have even basic electrification; homes that do have electricity experience frequent outages. *Id.* ¶¶ 5-7. Extending access and improving reliability for all tribal members who want electricity is core to HUC's work and purpose. *Id.* ¶ 11. HUC also advances economic development by raising revenue to provide essential services and by prioritizing projects that provide expanded employment opportunities to Tribal members. *Id.* ¶¶ 3, 9-11.

Woven Energy was founded to help Tribes manage energy resources on their land. Schueller Decl. ¶ 4. Woven partners with Tribes to plan, design, and deploy energy infrastructure. *Id.* Woven couples these services with ongoing counseling and capacity-building for tribal governments and utilities like HUC. *Id.* Woven structures its support and the projects it designs to prioritize Tribes' ability to maintain ownership and control over their energy resources. *Id.*

HUC and Woven are working together to develop two planned solar projects on Hopi land, including an 8 MW project that depends in part on the federal investment tax credit for funding. Wilkinson Decl. ¶ 12; Schueller Decl. ¶ 10. If completed, the project will produce energy that HUC can sell to the local electric utility; HUC will use proceeds to fund rooftop solar

systems that will electrify homes on Hopi land. Wilkinson Decl. ¶ 15. The project will also electrify homes located near newly planned distribution lines, extending electricity to Hopi families who currently lack access. *Id.*

HUC and Woven designed the 8 MW project to qualify for the federal investment tax credit using the Five Percent Safe Harbor. *See id.* ¶ 16; Schueller Decl. ¶ 15. The project crossed the five percent threshold, but not before Notice 2025-42 took effect. Wilkinson Decl. ¶ 16. Because of Notice 2025-42, to demonstrate tax credit eligibility, HUC and Woven must *also* meet the Physical Work Test for the 8 MW project before July 4. *Id.* ¶¶ 12, 22; Schueller Decl. ¶¶ 10-11. To meet this deadline, HUC and Woven are redesigning the project plan and timeline— a process that has caused significant increased expenses, including fees for expedited reviews and approvals and increased legal and staffing costs. Wilkinson Decl. ¶ 24; *see also* Schueller Decl. ¶ 16.

In addition to causing economic harm, the Notice has interfered with HUC and Woven's ability to perform their core business functions. The additional time and expense involved in changing project development plans and timelines has diverted staff time and resources away from other work. Wilkinson Decl. ¶ 24. Woven has had to scale down its education and capacity-building efforts, Schueller Decl. ¶ 12, which represent a key part of the company's purpose, *id.* ¶ 4. Woven is focusing nearly all staff time on expediting implementation of projects for its current clients, and has significantly reduced work on future client development and sales. *Id.* ¶ 18. This creates a substantial risk to the company's future business. *Id.*

The abbreviated timeline is also straining the reputations as trusted partners that HUC and Woven have worked to build with the Hopi Tribal Council and Tribal leaders and members. Wilkinson Decl. ¶ 27; Schueller Decl. ¶¶ 15, 17-18. HUC has had to pressure Tribal leaders to

make quick decisions on topics like financial management, land use, equipment and material purchasing, and contractors, which places stress on the Tribe's confidence and trust in HUC's work. Wilkinson Decl. ¶ 27. Notice 2025-42 is similarly harming Woven's ability to deliver on its promise to work transparently with Tribes to demystify the energy production process and build tribal capacity to own and run their own energy projects, further threatening Woven's business pipeline. Schueller Decl. ¶ 12. For Woven, these dynamics extend across the company's projects for multiple Tribes. *Id.* ¶¶ 6-12.

The IRS Notice has also caused economic and business harm to NRDC members who work in the solar and wind industries. NRDC member Tam Hunt is a consultant who specializes in clean energy projects. Hunt Decl. ¶¶ 2-3. Mr. Hunt was retained in 2022 to consult on two combined solar and battery projects that have now been indefinitely paused because of the uncertainty caused by the IRS Notice. *Id.* ¶¶ 4-11. As a result, the ongoing consulting work that Mr. Hunt would otherwise be performing has been largely eliminated, which has caused him substantial economic loss and opportunity cost, and forced him to spend time and effort on things he would not otherwise have had to do. *Id.* ¶¶ 12-13, 15-18.[6]

As a power purchaser and provider of electricity, the City and County of San Francisco is suffering economic harm because of Notice 2025-42. The San Francisco Public Utility Commission is actively negotiating power purchase agreements to meet future energy demand and will need to add 150 MW of new renewable energy capacity in the next several years. Hyams Decl. ¶¶ 5-7. The IRS Notice is harming San Francisco's ability to procure the power it needs. Project developers are declining to respond to solicitations, have withdrawn active bids, and are proposing contract terms that pass increased tax-credit related costs and risks on to San

---

[6] NRDC has associational standing to sue on behalf of its members, *see infra* p. 22.

Francisco. *Id.* ¶ 8. As demand for projects that have already qualified for tax credits increases, these projects are able to raise their prices, eroding price stability and affordability. *Id.*

### 2. The Notice is harming Plaintiffs by making electricity more expensive

The Notice is causing, and will cause, Plaintiffs to pay more for electricity. These "[m]onetary costs" are a cognizable injury in fact. *See Diamond Alt.*, 606 U.S. at 113-14; *see also Env't Action v. FERC*, 996 F.2d 401, 406-07 (D.C. Cir. 1993) (environmental organization had standing by virtue of increased electricity costs to its members).

Demand for electricity is hitting record levels across the United States and is projected to continue to grow over the next several years. Levin Decl. ¶ 44. New power generation facilities can help meet these growing electricity needs and maintain the reliability of the electric grid without substantially increasing costs for customers. Wind and solar energy are the fastest-growing[7] and most cost-effective[8] forms of electricity generation in the country, and are part of many utilities' and governmental entities' strategies to meet the growing demand for energy. *See* Hyams Decl. ¶¶ 6-7; Szybist Decl. ¶¶ 11-14. A leading global energy firm has concluded that renewables like wind and solar "need to play a key role in making demand growth in the US more affordable."[9]

By jeopardizing a large amount of new solar and wind generation, Notice 2025-42 is reducing the amount of energy generation that will be available to meet increasing demand in the

---

[7] Ember*, US Electricity 2025 Special Report* 2 (Mar. 12, 2025), https://perma.cc/XR6P-SQVS.

[8] Press Release, Lazard, Lazard Releases 2025 Levelized Cost of Energy⁺ Report (June 16, 2025), https://perma.cc/32PZ-AW7Y ("Despite facing macro challenges and headwinds, utility scale solar and onshore wind remain the most cost-effective forms of new-build energy generation on an unsubsidized basis.")

[9] *See* Press Release, Wood Mackenzie, Coal and Gas Generation Can Accommodate 40 to 75% of Expected US Peak Demand Growth Through 2030 (Nov. 20, 2025), https://perma.cc/F67B-4LRJ.

next few years. As demand rises without a corresponding increase in supply, wholesale electric prices will go up. San Francisco is already experiencing impacts to wholesale energy markets, as projects that face new uncertainty regarding whether they will qualify for tax credits are requiring buyers like San Francisco to take on the risk of higher prices if the projects do not qualify. Hyams Decl. ¶¶ 8-9.

As the Supreme Court has recognized, "transactions that occur on the wholesale market have natural consequences at the retail level." *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 281 (2016). Ratepayers will soon bear these higher costs, too. In Texas, in a moderate load growth scenario, and adjusting for other factors that increase risk of cancellation, Notice 2025-42 could cause wholesale electric prices at times of peak load to rise as much as 21%. Levin Decl. ¶¶ 81-82. In Arizona and New Mexico, peak summer wholesale price impacts could go up more than 60%. *Id.* ¶¶ 57, 87. In the Pacific Northwest, peak wholesale prices are likely to go up materially in both the summer and the winter. Levin Decl. ¶¶ 75, 84.

Plaintiffs, and in some cases their members and clients, will be forced to pay these higher prices for electricity. These economic harms are a classic basis for standing. *Env't Action*, 996 F.2d at 406. Plaintiffs San Francisco, NRDC, and Public Citizen are all electricity consumers; as prices rise, they will be forced to pay more to power their facilities. Hyams Decl. ¶¶ 8-9; Lampley Decl. ¶¶ 6-12; Eyigor Decl. ¶¶ 4-7.

Plaintiffs NRDC, Oregon Environmental Council, and Public Citizen all seek to improve energy affordability by expanding wind and solar energy, and they have associational standing to challenge policies that make energy less affordable for their members, especially when those policies target clean energy. *See Env't Action*, 996 F.2d at 406-07 (environmental organization had standing by virtue of increased electricity costs to its members). These Plaintiffs all have

21

members who pay electric bills, including in markets—like Texas and Oregon—where electricity prices are projected to go up significantly in the coming years because of Notice 2025-42. *See* Decl. of Jillian McFarland ("McFarland Decl.") ¶¶ 1, 17; Decl. of Mary Kathryn Mrgudic ("Mrgudic Decl.") ¶¶ 1, 13-15; Decl. of Nathan South ("South Decl.") ¶¶ 1, 7; Penwell Decl. ¶¶ 1, 3-5; Decl. of Kaiba White ¶¶ 6-8. Their members' interests are "germane" to these Plaintiffs' organizational purposes, Decl. of Jana Gastellum ¶ 5; Decl. of Gina Trujillo ¶¶ 7-8; Decl. of Robert Weissman ¶¶ 4-6; and because plaintiffs do not seek individualized relief for their members, individual members' participation in this case is not required. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Finally, Plaintiff Maryland Office of People's Counsel (OPC) is tasked by the Maryland General Assembly with protecting the interests of Maryland's residential and noncommercial electric customers. Szybist Decl. ¶¶ 5-7; *see* Md. Code Pub. Util. § 2-205(b) ("The Office of People's Counsel may appear before any federal or State unit to protect the interests of residential and noncommerical users."). Many Marylanders are already struggling to pay the rising costs of their electric bills; OPC expects that the Notice will further increase Marylanders' energy bills, exacerbating this problem. Szybist Decl. ¶¶ 9, 16-17. OPC has standing to challenge the Notice because of the economic harm it will cause electric customers in Maryland.

### 3. The Notice will cause increased air pollution near Plaintiffs' members' homes

The Supreme Court and D.C. Circuit have identified "several environmental harms that are cognizable injuries," including aesthetic and recreational effects and realistic health concerns. *Clean Wis. v. EPA*, 964 F.3d 1145, 1156-57 (D.C. Cir. 2020). Plaintiffs' members will be exposed to dirtier air as a result of Notice 2025-42. This exposure inflicts cognizable legal harms on the

members' recreational, aesthetic, and economic interests. *See Friends of the Earth*, 528 U.S. at 181-84.

With fewer wind and solar facilities coming online to meet demand, grid operators will be called on to meet electricity demand by dispatching existing power plants. *See* Levin Decl. ¶ 7. Electric grid operators use "least-cost" dispatch to meet electricity demand—that is, they call first upon the facilities with the lowest marginal production cost per unit of electricity, then the next-lowest, until they have dispatched sufficient production facilities to meet customers' demands. *Id.* ¶ 48. Solar and wind projects typically have near-zero marginal costs and are usually dispatched whenever they are available. *Id.* ¶ 65. If planned solar and wind projects are cancelled, other facilities—including facilities that burn fossil fuels and produce harmful and toxic air pollutants, like sulfur dioxide, nitrogen oxides, particulate matter, carbon monoxide, and mercury—will need to run more frequently, and for longer, to make up for the loss in generation. *See* Levin Decl. ¶¶ 89-106, figs. 3-6.[10] Even at low levels, these pollutants can affect human health and interfere with aesthetic interests.

Using least-cost dispatch data for specific regions of the country, Plaintiffs have identified power plants that are likely to be dispatched more often, and for longer periods, because of the Notice's disruption of wind and solar development. Levin Decl. figs. 3-6 & app. D. Plaintiff NRDC has members who live and frequently spend time outside near these facilities that are likely to run more frequently, and for longer, as a result of Notice 2025-42. McFarland Decl. ¶¶ 3-8; Mrgudic Decl. ¶¶ 4-8; South Decl. ¶ 4. NRDC's members are thus likely to suffer exposure to additional pollution, which is harmful to their health and well-being. As pollution

---

[10] *See also* Savannah Bertrand, *Fact Sheet: Climate, Environmental, and Health Impacts of Fossil Fuels*, Env't & Energy Study Inst. (Dec. 17, 2021), https://perma.cc/6MFM-4Q7B.

increases from nearby fossil-fuel plants running more, NRDC's nearby members will spend less time outside doing the activities they love with the people they love; when they do make it outside, they will face greater health risks. McFarland Decl. ¶¶ 9-13; Mrgudic Decl. ¶¶ 9-10. These are cognizable injuries for purposes of standing. *See Clean Wis.*, 964 F.3d at 1156-5.

**B.    Causation and Redressability**

Notice 2025-42 is the cause of Plaintiffs' harms, and a favorable decision will redress those harms.

Causation and redressability here are two sides of the same coin. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017). "After all, if a government action causes an injury, enjoining the action usually will redress the injury." *Id*. "[T]he fact that a regulation was designed to produce a particular effect on the market ordinarily means that the likely result of vacating that regulation would be to reduce that effect on the market." *Diamond Alt.*, 606 U.S. at 117. And in a case "where government regulation of a business may be likely to cause injuries" to downstream businesses or entities, "commonsense inferences may be drawn" to demonstrate causation. *Id.* at 116 (cleaned up).

Here, Notice 2025-42 was issued in direct response to an Executive Order declaring it "the policy of the United States" to "rapidly eliminate" and "build upon and strengthen the repeal of" federal tax credits for wind and solar. Exec. Order No. 14315, 90 Fed. Reg. at 30821. The Notice was meant to make tax credits less available for these technologies, and thus to render more difficult the financing and completion of wind and solar projects. Both "commonsense economic inferences," *Diamond Alt.*, 606 U.S. at 120, and Plaintiffs' evidence indicate that it is having its intended effects.

Vacating Notice 2025-42 would redress Plaintiffs' injuries. Many energy projects that are currently struggling to meet the Physical Work Test have already satisfied the Five Percent Safe

Harbor. *See, e.g.*, Wilkinson Decl. ¶ 16. If Notice 2025-42 is vacated and the prior methodology

goes back into effect, these projects would have certainty that they have qualified for the tax

credits, and could stop spending money and diverting resources to meet the Physical Work Test.

*See id.* ¶¶ 21-29. Similarly, vacatur would eliminate the uncertainty that has caused other projects

to be indefinitely paused, *see* Hunt Decl. ¶ 11, unfavorable contract terms to be introduced, *see*

Hyams Decl. ¶ 8, and resources to be diverted from Plaintiffs' core business activities, *see*

Schueller Decl. ¶¶ 12, 18; Wilkinson Decl. ¶ 24. Likewise, vacatur would mitigate the impacts to

electricity prices and pollution loads that Notice 2025-42 will soon cause. *See* McFarland Decl.

¶¶ 16-18; Mrgudic Decl. ¶¶ 17-20; South Decl. ¶ 9; Szybist Decl. ¶¶ 18, 29.

Because Notice 2025-42 is the cause of Plaintiffs' injuries-in-fact, and because vacatur

will redress those injuries, Plaintiffs have demonstrated standing.

## II.    Notice 2025-42 is arbitrary and capricious

Notice 2025-42 upends longstanding industry practice that has been in place for more

than a decade. It singles out two politically disfavored technologies for prejudicial treatment,

fails to consider alternatives, disregards reliance interests engendered by the prior policy, and

provides only a cursory explanation for the choice it made—one that bears no rational

connection to that choice. For all these reasons, the IRS Notice is arbitrary and capricious agency

action, in violation of the APA, and Plaintiffs are entitled to summary judgment.

### A.    Defendants' cursory explanation does not provide a reasoned basis for changing longstanding practice, and bears no rational connection to the choice they made

An agency must "'disclose the basis' of its action," and that basis must not be arbitrary or

capricious. *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019). Agency action is arbitrary if it

is taken without "an explanation," *id.* at 785, or shows an absence of "reasoned decisionmaking," *Michigan v. EPA*, 576 U.S. 743, 750 (2015).

In issuing Notice 2025-42, the Treasury Department and IRS claimed to have determined that its change in policy "is necessary and appropriate to properly enforce the [tax] credit termination date for applicable wind and solar facilities." 2025-36 I.R.B. at 352. But nowhere do the agencies provide any explanation for how they reached these conclusions, or any analysis or evidence to support them.

Instead, the relevant portion of the Notice parrots the language of an Executive Order, issued just days after OBBBA was signed into law, in which the President opined that, "[f]or too long, the Federal Government has forced American taxpayers to subsidize expensive and unreliable energy sources like wind and solar," and declared it his "policy" to "end taxpayer support" for "'green' energy sources," including by "strengthen[ing] the repeal" of tax credits. Exec. Order No. 14315 §§ 1, 2(b), (c), 90 Fed. Reg. at 30821. The Executive Order directed Treasury to take all action that the Secretary "deems necessary and appropriate to strictly enforce the termination" of tax credits. *Id.* § 3, 90 Fed. Reg. at 30821. The Notice, in turn, announced that its changes were "necessary and appropriate" to "properly enforce" the credit "termination date." 2025-36 I.R.B. at 352. The Executive Order directed Treasury to issue guidance to avoid "circumvent[ing]" beginning of construction policy, to "prevent[] the artificial acceleration or manipulation of eligibility," and to "restrict[] the use of broad safe harbors unless a substantial portion of a subject facility has been built," Executive Order No. 14315 § 3, 90 Fed. Reg. at 30821. The Notice mimics this language, stating that it would "prevent . . . circumvent[ion]," "prevent the artificial manipulation of eligibility," and "ensure that a substantial portion" of covered facilities "is built by the beginning of construction deadline." 2025-36 I.R.B. at 352.

26

Indeed, the agencies' entire one-paragraph explanation for eliminating the Five Percent Safe Harbor is contained in a section titled "Executive Order 14315." *Id.*

"[A]s numerous courts have held, the fact that an agency's actions were undertaken to fulfill a presidential directive does not exempt them from arbitrary-and-capricious review." *Kingdom v. Trump*, No. 25-cv-691-RCL, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025) (collecting cases). If it did, "presidential administrations [could] issue agency regulations that evade APA-mandated accountability by simply issuing an executive order first." *Nebraska v. Su*, 121 F.4th 1, 16 (9th Cir. 2024); *see also Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA…."). Treasury and the IRS cannot "avoid the need to justify [their] decisions simply by gesturing to an Executive Order." *Kingdom*, 2025 WL 1568238, at *10. Rather, they must still support their decision with evidence and reasoning. *See State Farm*, 463 U.S. at 43.

Here, the agencies have entirely failed to do that. Neither the Executive Order nor the Notice cites any evidence of wind or solar facilities "circumventing" tax credit deadlines, "manipulating" eligibility, or failing to build enough of their facilities to qualify as beginning construction. Nor do they provide even the barest of reasoning for differentiating solar facilities over 1.5 MW from those under that threshold.

Moreover, the agencies purported rationale bears no rational connection to the policy choice they made. The Notice's alleged purpose is to "enforce" the credit termination date enacted into law in the OBBBA, *see* 2025-36 I.R.B. at 352. But enforcement involves ensuring compliance with the rules as they are written—not abruptly altering those rules to make it harder to comply. Projects that were poised to demonstrate that they had begun construction using the

well-established Five Percent Safe Harbor were neither "circumventing" the credit termination date nor engaging in "artificial manipulation of eligibility": they were complying with the exact procedures that the IRS had directed them to follow. Changing those established rules, with only months remaining to qualify for credits, has no rational connection to enforcement.

Whereas the agencies' action bears little relation to its stated rationale, it is entirely consistent with the President's disdain for these tax credits,[11] and his policy preference to "end taxpayer support" for wind and solar projects, *see* Executive Order 14315 § 2(c), 90 Fed. Reg. at 30821. And it is consistent with publicly reported assurances he made to certain conservative members of the House that he would take executive action to minimize the number of wind and solar projects that could qualify for tax credits even before the new expiration dates in OBBBA. *See, e.g.*, Kelsey Tamborrino & Josh Siegel, *Conservatives say Trump won their megabill votes by promising crackdown on renewable energy credits*, POLITICO (July 3, 2025), https://perma.cc/7CMR-D3JC.

While this Court's review "is deferential," the Court is "not required to exhibit a naivete from which ordinary citizens are free." *Dep't of Com.*, 588 U.S. at 785 (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). Nor should it "ignore the disconnect between the decision made and the explanation given." *Id.* "Accepting contrived reasons would defeat the purpose" of judicial review. *Id.*

The agencies' recitation of lines from an Executive Order is not reasoned decision making. And the stated rationale does not explain the decision to alter longstanding practice. The President's dislike of wind and solar technologies is not a sufficient reason to single those

---

[11] *See* Donald J. Trump (@realDonaldTrump), Truth Social (June 21, 2025, at 3:21 PM) ("I HATE "GREEN TAX CREDITS" IN THE GREAT, BIG, BEAUTIFUL BILL."), https://truthsocial.com/@realDonaldTrump/posts/114722976310902061.

facilities out for unfavorable treatment. Because Defendants have offered no reasoned basis for their action, [12] and because the sparse explanation they have offered bears no rational connection to the action they have chosen, Notice 2025-42 is unlawful.

**B.    The Notice arbitrarily singles out wind and certain solar projects for unfavorable treatment, while retaining longstanding rules for all other projects**

"[D]issimilar treatment of evidently identical cases" is "the quintessence of arbitrariness and caprice." *Grayscale Invs., LLC v. Sec. & Exchange Comm'n*, 82 F.4th 1239, 1245 (D.C. Cir. 2023) (internal quotation marks omitted). "Treating similarly situated parties differently is at the core of 'unfair discrimination.'" *Id.* (quoting 15 U.S.C. § 78f(b)(5)). "The great principle that like cases must receive like treatment" is "black letter administrative law." *Id.* (citation modified).

For more than twelve years, Congress has tied eligibility for energy tax credits to the date on which a facility begins construction. *See* American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 407(a)(3), (b), 126 Stat. 2313, 2340-41 (2013). And where it has done so, the IRS has provided "two methods that a taxpayer may use to establish that construction of a qualified facility has begun." Notice 2013-29, 2013-1 C.B. at 1085; *see also* IRS Notice 2013-60, 2013-2 C.B. 431 (2013); IRS Notice 2014-46, 2014-2 C.B. 520 (2014); IRS Notice 2015-25, 2015-13 I.R.B. 814 (2015); IRS Notice 2016-31, 2016-23 I.R.B. 1025 (2016); IRS Notice 2017-04, 2017-4 I.R.B. 541 (2017); IRS Notice 2018-59, 2018-29 I.R.B. 196 (2018); IRS Notice 2019-43, 2019-31 I.R.B. 487 (2019); IRS Notice 2020-41, 2020-25 I.R.B. 954 (2020); IRS Notice 2020-12, 2020-11 I.R.B. 495 (2020); IRS Notice 2021-5, 2021-03 I.R.B. 479 (2021); IRS Notice 2021-41,

---

[12] Defendants cannot come forward now, in litigation, with reasoning or evidence that was neither cited in the Notice nor considered by the agencies before issuing the Notice. Any such post hoc rationalizations are improper and cannot be credited. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20-24 (2020).

2021-29 I.R.B. 17 (2021); IRS Notice 2022-61, 2022-52 I.R.B. 560 (2022); see also 87 Fed. Reg. at 73581 (enumerating the Five Percent Safe Harbor and Physical Work Test as two methods to demonstrate that construction had begun). While the agency has clarified and modified its guidance more than a dozen times, it has never eliminated a taxpayers' ability to choose between the Five Percent Safe Harbor and the Physical Work Test.

For virtually all technologies, the IRS's longstanding methodology remains in place today, and taxpayers may choose how to demonstrate credit eligibility. But for wind facilities, and for solar facilities larger than 1.5 MW, the Five Percent Safe Harbor is no longer available.

Defendants have made no effort to demonstrate that wind and solar facilities are somehow differently situated than other technologies. Nor could they. Across the Tax Code, a broad range of diverse tax incentives contain provisions that reference the date on which a project begins construction. In addition to the section 45Y and 48E clean electricity tax credits, they include credits for carbon capture and storage (section 45Q), clean hydrogen production (section 45V), clean energy (sections 45 and 48), advanced manufacturing (section 48D), and energy-efficient buildings (section 179D). *See* Notice 2022-61, 2022-52 I.R.B. 560 (2022); 89 Fed. Reg. at 53186; 26 C.F.R. § 1.48D-5. For *all* these other credits and incentives, the IRS authorizes taxpayers to use the same two tests for beginning of construction.

Wind and solar are not only similarly situated to all of the technologies covered by other tax incentives for which the Five Percent Safe Harbor continues to apply—they are similarly situated to all other technologies covered *within* the Clean Electricity Production and Investment tax credits, for which the Five Percent Safe Harbor also continues to apply. The section 45Y and 48E credits are available to "any qualified facility" "the construction of which begins" within a prescribed timeframe. *See* 26 U.S.C. §§ 45Y(d), 48E(e). The IRS has designated wind and solar,

30

as well as hydropower, marine and hydrokinetic, solar, geothermal, nuclear fission, fusion, and certain waste energy recovery property as technologies eligible for these credits. Rev. Proc. 2025-14, 2025-07 I.R.B. 770 (Jan. 15, 2025). But Notice 2025-42 applies only to wind and certain solar projects, not any of these other "qualified facilit[ies]."

The arbitrary nature of the Notice's differential treatment of similarly situated entities is also illustrated by its treatment of solar projects of different sizes. The Notice retains the availability of the Five Percent Safe Harbor for "low output solar facilities"—that is, solar facilities with a maximum net output of not greater than 1.5 MW—while eliminating it for all other solar facilities. 2025-36 I.R.B. at 355. The Notice provides neither an explanation for this disparate treatment nor any evidence or data to support it.

Congress's decision in the OBBBA to terminate credits for wind and solar facilities that begin construction *after* July 4, 2026, also does not provide any justification for the agencies' decision to employ uniquely restrictive and discriminatory eligibility methodology for wind and solar facilities that begin construction *before* July 5, 2026. In the nearly 13 years that have passed since the IRS first established the Physical Work Test and the Five Percent Safe Harbor, there have been multiple instances in which tax credits for certain technologies have been set to expire, including instances where Congress set earlier expirations for certain technologies than others.[13] The IRS has never before treated the proximity of an eligibility deadline as a reason to change what it means to begin construction.

---

[13] *See, e.g.*, Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. P, tit. III, § 301(a)-(b), 302(a)-(b), 303(a)-(b) 129 Stat. 2242, 3038-3039 (2015) (providing separate phaseout schedules for solar property and for wind facilities from other property and facilities based on begin construction dates).

Defendants' unexplained departure from the existing rules implementing beginning of construction is particularly inexplicable in light of the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Gustafson v. Alloyd Co.* 513 U.S. 561, 568 (1995) (internal quotation marks omitted). In OBBBA, Congress defined "beginning of construction"—albeit in a different context—by endorsing the IRS's existing interpretations. In new sections establishing rules for foreign-entity involvement that apply to the Clean Electricity Production and Investment tax credits, Congress specified that "the beginning of construction with respect to any property shall be determined pursuant to rules similar to" those rules in the first notice establishing those two tests, Notice 2013-29, and its successor Notice 2018-59, as well as subsequent updates, "as in effect on January 1, 2025." 26 U.S.C. § 7701(a)(51)(J); *see also id.* § 7701(a)(52)(F).

Because these new rules governing foreign-entity involvement apply to the Clean Electricity Production and Investment tax credits, some wind and solar projects are now in the absurd position of having two different dates on which they "began construction" for the same project: one based on the Five Percent Safe Harbor, which they may still use to satisfy the new OBBBA foreign-entity provisions; and one based on the Physical Work Test, which is now their only option for demonstrating eligibility for the credit. Though the IRS recognizes these two inconsistent definitions, it nowhere explains why the split is necessary or appropriate. *See* 2025-36 I.R.B. at 352 n.3; IRS Notice 2026-15 12 n.11, 18 n.14 (Feb. 12, 2026), https://www.irs.gov/pub/irs-drop/n-26-15.pdf.

This "'[u]nexplained inconsistency' in agency policy," which treats similar situations dissimilarly, constitutes "an arbitrary and capricious change from agency practice." *Encino Motorcars*, 579 U.S. at 222 (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,

545 U.S. 967, 981 (2005)). By treating these facilities differently from all other facilities, without providing any evidence that wind projects and solar projects over 1.5 MW are materially different from other facilities, the Agencies have violated the "fundamental norm of administrative procedure," that "requires an agency to treat like cases alike." *Westar Energy, Inc. v. Fed. Energy Regul. Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007); *see also Steger v. Def. Investigative Serv.*, 717 F.2d 1402, 1406 (D.C. Cir. 1983) (per curiam) (an agency "can be said to be at its most arbitrary when" it "treat[s] similar situations dissimilarly").

### C. In issuing the Notice, Treasury and the IRS entirely failed to consider serious reliance interests or evaluate alternatives

Treasury and the IRS also failed to acknowledge significant industry reliance interests in the longstanding "beginning of construction" rules, or to consider any alternative actions that could have mitigated harm to those interests. Their failure to do so was unlawful—the agencies had a legal obligation to recognize "that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec.*, 591 U.S. at 30 (citations omitted).

IRS methodology for establishing beginning of construction, including both the Five Percent Safe Harbor and the Physical Work Test, has been consistent since the agency issued its first guidance on the matter in 2013. IRS Notice 2013-29, 2013-1 C.B. 1085. As recently as last January, the IRS referred to beginning of construction as "an established, defined concept in tax law." 90 Fed. Reg. at 2246.

For years, the IRS has affirmatively represented that the Physical Work Test and the Five Percent Safe Harbor would both be available to developers seeking to claim the Clean Electricity Investment and Clean Electricity Production tax credits. In IRS Notice 2022-61, the IRS stated that "principles similar to those under Notice 2013-29 regarding the Physical Work Test and Five

Percent Safe Harbor apply" to the clean electricity tax credits. 87 Fed. Reg. at 73584. In January

of last year, the IRS reinforced that "Notice 2022-61 continues to apply" to the clean electricity

tax credits. 90 Fed. Reg. at 4028. Elsewhere, the IRS said that "taxpayers may continue to rely

on the guidance provided in Notice 2022-61" and older notices, assuring that "taxpayers

satisfying either test will be considered to have begun construction." 89 Fed. Reg. at 53186.

Unsurprisingly, wind and solar project developers *did* rely on these assurances from the

IRS. Clean energy projects require years of planning and complex financing arrangements.

Schueller Decl. ¶ 8. Many wind and solar projects that are actively in development have been

relying on their ability to use the Five Percent Safe Harbor to qualify for tax credits. *See supra*,

p. 14-15, 17-18, 19. In many cases, their ability to secure financing—and thus their ability to

build planned projects at all—depended on it. Schueller Decl. ¶ 10.

The Notice fails entirely to acknowledge these reliance interests. The only mention of

industry reliance, or any related concept, that occurs in the Notice is in a summary of prior

guidance in the "Background" section. That earlier Notice provided that "taxpayers may rely" on

the continued application of "principles similar to those" provided in earlier Notices. *Id.*

(describing Notice 2022-61). The Notice nowhere considers how widely wind and solar

participants have relied on the Five Percent Safe Harbor, or analyzes the impacts that an abrupt

change would cause to those reliance interests. *See, e.g.*, *Nat'l Lifeline Assoc. v. FCC*, 921 F.3d

1102, 1114 (D.C. Cir. 2019) (concluding that agency ignored reliance interests where it did not

estimate the number of entities who would be impacted). Nor does the Notice consider any

alternatives that could mitigate harm to those who relied on prior notices. *See id.* (noting agency

did not "consider alternatives to ensure coverage" for those affected by its changing policy).

Agencies "are free to change their existing policies." *Encino Motorcars*, 579 U.S. at 221. But in doing so, they "must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account,'" and must provide "'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.'" *Id.* at 221-22 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)). Where an agency "offer[s] barely any explanation" after "decades of industry reliance on [its] prior policy," "the unavoidable conclusion is that" its action "was issued without the reasoned explanation that was required." *Id.* at 222.

Because Defendants issued the notice "with no regard for" industry's reliance interests, *Int'l Org. of Masters, Mates, & Pilots, ILA, AFL-CIO v. Nat'l Labor Rels. Bd.*, 61 F.4th 169, 180 (D.C. Cir. 2023), their actions were unlawful.

## CONCLUSION

Section 706 of the APA provides that a court "*shall* . . . hold unlawful and set aside agency action[s]" that violate the statute. 5 U.S.C. § 706(2) (emphasis added). Remand with vacatur is the presumptive remedy for unlawful agency action. *See, e.g.*, *Am. Bioscience*, 269 F.3d at 1084.

Because Notice 2025-62 is arbitrary and capricious, Plaintiffs respectfully ask this Court to grant summary judgment and vacate the Notice.

Dated: February 13, 2026                    Respectfully submitted,

_Sarah V Fort_
_____
Sarah Fort (DC Bar #1032192)
Sitara Witanachchi (DC Bar #1023007)
Thomas Zimpleman (DC Bar #1049141)
Natural Resources Defense Council

35

1152 15th Street NW, Suite 300
Washington, D.C. 20005
Phone: (202) 513-6244
Fax: (415) 795-4799
sfort@nrdc.org
switanachchi@nrdc.org
tzimpleman@nrdc.org


_____
Simi Bhat (*admitted pro hac vice*)
Natural Resources Defense Council
111 Sutter Street, 21st Fl.
San Francisco, CA 94104
Phone: (415) 875-6110
Fax: (415) 795-4799
sbhat@nrdc.org

Counsel for Plaintiffs Oregon Environmental
Council, Natural Resources Defense Council, Inc.,
Public Citizen, Hopi Utilities Corporation, and
Woven Energy


*/s/ Sophia L. Cai*
David Chiu (*admitted pro hac vice*)
San Francisco City Attorney
Yvonne R. Meré (*admitted pro hac vice*)
Chief Deputy City Attorney
Sophia L. Cai (*admitted pro hac vice*)
Sushil C. Jacob
Deputy City Attorneys
City and County of San Francisco
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102
Phone: (415) 554-4274
sophia.cai@sfcityatty.org

Counsel for Plaintiff City and County of San
Francisco


*/s/ David S. Lapp*
David S. Lapp (*admitted pro hac vice*)
People's Counsel

36

Maryland Office of People's Counsel
6 St. Paul Street, Suite 2102
Baltimore, MD 21201
Phone: (410) 767-8171

Counsel for Plaintiff Maryland Office of People's
Counsel