### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

OREGON ENVIRONMENTAL COUNCIL;
NATURAL RESOURCES DEFENSE
COUNCIL, INC.; PUBLIC CITIZEN; HOPI
UTILITIES CORPORATION; WOVEN
ENERGY; CITY AND COUNTY OF SAN
FRANCISCO; and THE MARYLAND OFFICE
OF PEOPLE'S COUNSEL,

     *Plaintiffs*,

     v.

INTERNAL REVENUE SERVICE OF THE
UNITED STATES; UNITED STATES
DEPARTMENT OF THE TREASURY; SCOTT
BESSENT, SECRETARY OF THE U.S.
DEPARTMENT OF THE TREASURY and
ACTING COMMISSIONER OF THE
INTERNAL REVENUE SERVICE, IN HIS
OFFICIAL CAPACITIES,

     *Defendants*.

**Case No.  1:25-cv-04400-CKK**

**[PROPOSED] AMICUS CURIAE BRIEF
OF ENVIRONMENTAL DEFENSE
FUND IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

**BRIEF OF ENVIRONMENTAL DEFENSE FUND AS *AMICUS CURIAE*
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………..iii

RULE 26.1 CORPORATE DISCLOSURE STATEMENT……………………………………1

INTEREST OF AMICUS CURIAE……………………………………………………1

INTRODUCTION AND SUMMARY OF ARGUMENT ………………………………………..2

ARGUMENT………………………………………………………………….......5

I.  The Clean Energy Tax Credits are Key Tools for Addressing the Climate Crisis, Improving
    Air Quality, Lowering Electricity Costs, and Promoting Grid Reliability……………………5
    A.  Wind and solar power offer affordable, readily deployable means of reducing air
        pollution and strengthening grid reliability…………………………………………..……5
    B.  The Production and Investment Tax Credits have driven significant growth in wind and
        solar development, especially since passage of the IRA in 2022…………………………9

II. The Safe Harbor Promotes Proper and Fair Access to Tax Credits and its Elimination for
    Wind and Solar Projects is Arbitrary and Unlawful………………………………………....11
    A.  The Safe Harbor is a longstanding feature of IRS start-of-construction guidance
        and promotes appropriate access to production and investment tax credits…...………...11
    B.  Congress endorsed the Five Percent Safe Harbor in OBBBA………..……………….12
    C.  The IRS has arbitrarily and unlawfully eliminated the Five Percent Safe Harbor
        for wind and solar as part of the Administration's efforts to systematically
        undercut these technologies…………..……………………………………….....14

CONCLUSION…………………………………………………………………..18

CERTIFICATE OF SERVICE…………………………………………………....19

CERTIFICATE OF COMPLIANCE……………………………………………..19

# TABLE OF AUTHORITIES

## Cases

*California ex rel. Becerra v. U.S. Dep't of the Interior*,
381 F. Supp. 3d 1153 (N.D. Cal. 2019)…………………………………………..17

*C.I.R. v. Lundy*,
516 U.S. 235 (1996)……………………………………………………………...13

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)………………………………………………………………...16

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)……………………………………………………………...15

*Green Rock v. IRS*,
104 F.4th 220 (11th Cir. 2024)………………………………………………...16

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995)……………………………………………………………...13

*Housing Auth. of City & County of San Francisco v. Turner*,
2025 WL 3187761 (N.D. Cal. Nov. 14, 2025)…………………...……………………17

*Muwekma Ohlone Tribe v. Salazar*,
708 F.3d 209 (D.C. Cir. 2013)…………………………………………………...16

*New York v. Trump*,
2025 WL 3514301 (D. Mass. Dec. 8, 2025)...…...……………………………………..2

*Ohio v. EPA*,
603 U.S. 279 (2024)……………………………………………………………...15

*Renew Northeast v. U.S. Dep't of the Interior*,
No. 1:25-cv-13961 (D. Mass. Dec. 23, 2025)……………...…………………………..3

*Saint Paul v. Wright*,
2026 WL 88193 (D.D.C. Jan. 12, 2026)...…...…………………………………………..3

## Statutes

5 U.S.C. § 706(2)(A)……………………………………………………………15, 18

26 U.S.C. § 45Y……………………………………………………………………1, 13

26 U.S.C. § 48E…………………………………………………………….................1

26 U.S.C. § 7701(a)(51)(J)………………………………………………………12

Energy Policy Act, Pub. L. No. 102-486, 106 Stat. 2776 (1992)…..………………………………..9

Energy Tax Act, Pub. L. No. 95-618, 92 Stat. 3174 (1978).…………………………………………9

Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1837 (2022)…………………………1, 9

One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 269 (2025)……………………...3, 4

**Presidential Actions**

Exec. Order No. 14315, 90 Fed. Reg. 30821 (July 10, 2025)…………………………..4, 5, 17, 18

Exec. Memorandum, Temporary Withdrawal of All Areas on the
Outer Continental Shelf From Offshore Wind Leasing, 90 Fed. Reg. 8363 (Jan. 20, 2025)…...…2

**Administrative Materials**

I.R.S. Notice 2013-29, 2013-20 I.R.B. 1085……………………………………………...2, 11, 12

I.R.S. Notice 2018-59, 2018-28 I.R.B. 196......…………………………………………………12

I.R.S. Notice 2025-42, 2025-36 I.R.B. 351……………………………………………...4, 11

U.S. Dep't of the Interior, Secretarial Order No. 3438,
Managing Federal Energy Resources and Protecting the Environment (Aug. 1, 2025)………….3

U.S. Dep't of the Interior, Office of the Secretary, Memorandum: Departmental Review
Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to
Wind and Solar Energy Facilities (July 15, 2025)…………………………………...……………3

**Legislative Materials**

171 Cong. Rec. S5201 (daily ed. Aug. 1, 2025) (statement of Sen. Grassley)…………………..14

Cong. Budget Off., Business Tax Credits for Wind and Solar Power (Apr. 2025),
www.cbo.gov/publication/61329.......................................................………………10

Cong. Rsch. Serv., IN12626, IRA Tax Credit Repeal in FY2025 Reconciliation Law:
Part 2 (Dec. 12, 2025)………………………………….…………………………………………3

Cong. Rsch. Serv., R48358, Domestic Content Requirements for Electricity Tax Credits in
the Inflation Reduction Act (IRA) (Jan. 16, 2025)……………………………………..…………9

Rep. Jason Smith, *et al.*,
Letter to Colleagues Urging Full Repeal of the Inflation Reduction Act (May 2025)……………5

**Other Authorities**

Am. Council on Renewable Energy, *The Role of Safe Harbor for Energy Tax Credits: Guardrails, Not Loopholes*, Issue Brief (Aug. 2025), https://acore.org/wp-content/uploads /2025/08/Full-Issue-Brief-The-Role-of-Safe-Harbor-for-Energy-Tax-Credit.pdf ..............11, 12

Dai, Mona Q., *et al.*, *Sociodemographic Disparities in Mercury Exposure from United States Coal-Fired Power Plants*, Envtl. Sci. & Tech. Letters, Vol. 10, 7 (2023)...............................8

Earthjustice, EPA Abandons Solar for All Program (Aug. 8, 2025), https://earthjustice.org/press/2025/epa-abandons-solar-for-all-program.........................................3

Ember, US Electricity 2025, Special Report (Mar. 25, 2025), https://ember-energy.org/latest-insights/us-electricity-2025-special-report/............................10

Envtl. Entrepreneurs (E2), Clean Economy Works: Tracking New Clean Energy Projects Across the U.S., https://e2.org/project-tracker/ (last visited Feb. 7, 2026).....................10

Grid Strategies LLC, Transmission Congestion for 2024 (Oct. 2025), https://gridstrategiesllc.com/wp-content/uploads/GS_Transmission-Congestion-for-2024.pdf......7

Groom, Nichola, *Wind and Solar Power Frozen out of Trump Permitting Push*, Reuters (Dec. 10, 2025),.................................................................................................3

Int'l Renewable Energy Agency, IRENA Renewable Power Generation Costs in 2024 (2025), www.irena.org/-/media/Files/IRENA/Agency/Publication/2025/Jul/IRENA_TEC_ RPGC_in_2024_Summary_2025.pdf.................................................................................6

Lazard, Lazard's Levelized Cost of Energy (Report) (June 2024), www.lazard.com/media/xemfey0k/lazards-lcoeplus-june-2024-_vf.pdf...................................6, 7

Levinson, Michelle and Ian Goldsmith, *What's Really Driving Up US Electricity Prices? We Unpack the Numbers*, World Res. Inst. (Dec. 15, 2025)..............................................................6

Office of Mgmt. & Budget, Exec. Office of the President, Ending the Green New Scam Fact Sheet (May 2, 2025), www.whitehouse.gov/wp-content/ uploads/2025/05/Ending-the-Green-New-Scam-Fact-Sheet.pdf.........................................4

Henning, Robert J, *Particulate Matter Air Pollution Is a Significant Risk Factor for Cardiovascular Disease*, 49 Current Problems in Cardiology 102094 (Jan. 2024)...................8

Rhodium Grp. & MIT Ctr. For Energy & Env't Pol'y Rsch., Clean Investment Monitor: Tallying the Two-Year Impact of the Inflation Reduction Act (Aug. 7, 2024), https:// rhg.com/wp-content/uploads/2024/08/Clean-Investment-Monitor_Tallying- the-Two-Year-Impact-of-the-Inflation-Reduction-Act-1.pdf..............................................10

Tamborrino, Kelsey & Josh Siegel, *Conservatives Say Trump Won Their Megabill Votes by Promising Crackdown on Renewable Energy Credits*, Politico (July 3, 2025)....................4, 5

Thyagarajan, Akshay, *Clean Energy Is Essential to Preventing Blackouts During Dangerous Extreme Heat and Cold*, Ctr. for Am. Progress (Aug. 28, 2025), www.americanprogress.org/ article/clean-energy-is-essential-to-preventing-blackouts-during-dangerous-extreme-heat-and-cold/................................................................7

Union of Concerned Scientists, 7 Benefits of Renewable Energy Use (July 3, 2025), www.ucs.org/resources/benefits-renewable-energy-use..........................……………….......2, 8, 9

U.S. Dep't of Energy, Energy Department Announces Termination of 223 Projects, Saving Over $7.5 Billion (Oct. 1, 2025), www.energy.gov/articles/energy-department-announces-termination-223-projects-saving-over-75-billion….....................................................3

U.S. Dep't of Energy, Study Finds Air Quality and Environmental Benefits from Recent Wind and Solar Deployment Amounted to $249 Billion (June 5, 2024), www.energy.gov/eere/wind/ articles/study-finds-air-quality-and-environmental-benefits-recent-wind-and-solar.....................9

U.S. Energy Info. Admin., Electric Power Monthly, tbl. 5.3 (Sept. 2025), www.eia.gov/electricity/monthly/epm_table_grapher.php?t=table_5_03......................................5

U.S. Envtl. Prot. Agency, Centralized Generation of Electricity and its Impacts on the Environment (Dec. 23, 2025), www.epa.gov/energy/centralized-generation-electricity-and-its-impacts-environment...........................................................................7

U.S. Envtl. Prot. Agency, Greenhouse Gas Reduction Fund (Sept. 30, 2025), www.epa.gov/aboutepa/greenhouse-gas-reduction-fund.................................................................3

U.S. Envtl. Prot. Agency, Health and Envtl. Effects of Particulate Matter (PM) (May 23, 2025), www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm..................8

U.S. Envtl. Prot. Agency, Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2023 (2025), https://library.edf.org/AssetLink/lho850vn3sgns65501wj6dleypl0o477.pdf.....................8

U.S. Envtl. Prot. Agency, Regulatory Impact Analysis for the Proposed National Emission Standards for Hazardous Air Pollutants: Coal-and Oil-Fired Electric Utility Steam Generation Units (Apr. 2023)................................................................................................6

U.S. Dep't of the Treasury, Fact Sheet: Clarifying "Begin Construction" for the Purposes of the Production Tax Credit or the Investment Tax Credit (Aug. 8, 2014) https://home.treasury.gov/news/press-releases/jl2606.................................................................11

Weise, Elizabeth, *Wind, Solar Power Account for Record 13% of U.S. Energy in 2021*, USA Today (Mar. 3, 2022)......................................................................................10

Zhang, Jianjun J., *et al.*, *Ozone Pollution: A Major Health Hazard Worldwide*, Front Immunology (Oct. 31, 2019)..............................................................................8

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1, *Amicus Curiae*, Environmental Defense Fund ("EDF"), states that it is a non-profit and public health organization, and that it has no parent corporation, and no publicly held company owns 10% or more of an ownership interest in EDF.

## INTEREST OF AMICUS CURIAE

EDF is a public interest organization dedicated to protecting public health and the environment, stabilizing the climate, and strengthening people's ability to thrive—based on solutions firmly anchored in science, economics, and law. EDF is one of the world's largest environmental organizations and it employs over 1,000 scientific, policy, and legal experts.

As part of its core mission, EDF advocates for effective implementation of federal statutes supporting zero-emission renewable energy generation, including wind and solar power generation. EDF and its members have an interest in ensuring that tax credits supporting clean energy generation are administered as Congress intended and that renewable project developers are not arbitrarily deprived of access to credits to which they are entitled.

EDF does not accept gifts from companies with whom it works or that are involved or impacted by its U.S. advocacy or litigation, nor does EDF invest or otherwise have a financial interest in  the production and investment tax credits ("the Credits") at issue.[1] No party's counsel authored this brief in whole or in part, and no person or entity other than the amicus curiae or its members contributed monetarily to the preparation or submission of this brief.

---

[1] Enacted under the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1837 (2022) ("IRA"), and codified under Internal Revenue Code §§ 45Y and 48E.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Wind and solar power generation substantially reduce harmful pollutants, including greenhouse gases ("GHGs"), nitrogen oxides (NOx), and sulfur oxides (SOx), by displacing fossil-fuel electric generation, the largest domestic source of GHG emissions.[2] At the same time, these renewable power resources provide low-cost, rapidly deployable electricity that can meet rising demand and support a reliable grid. Production and investment tax credits have been instrumental in incentivizing wind and solar development, and for more than ten years, the Five Percent Safe Harbor ("the Safe Harbor") has provided developers with a clear, predictable framework for accessing them.[3]

Since taking office, the present Administration ("the Administration") has aimed to systematically dismantle federal clean-energy programs, undermining decades of progress towards a stable, reliable, and zero-emissions energy future. On its first day, the Administration ordered federal agencies to stop issuing all new permits, leases, and other authorizations needed to develop and operate wind energy projects pending a broad assessment of federal wind leasing and permitting practices. 90 Fed. Reg. 8363 (Jan. 29, 2025).[4] The U.S. Department of Interior further issued secretarial orders that significantly delayed wind and solar projects by imposing

---

[2] *See* Union of Concerned Scientists, 7 Benefits of Renewable Energy Use (July 3, 2025), www.ucs.org/resources/benefits-renewable-energy-use

[3] Notice 2013-29, 2013-20 I.R.B. 1085 (May 13, 2013)

[4] The U.S. District Court for the District of Massachusetts held that the Executive Memorandum titled "Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects" was "arbitrary and capricious and contrary to law" and vacated the order. *New York v. Trump*, 2025 WL 3514301 (D. Mass. Dec. 8, 2025).

unworkable procedural barriers,[5] and restructured the Department's evaluation process for wind and solar facilities on federal lands in ways that disadvantaged them during permitting.[6]

The Administration has since canceled more than $7 billion in funding for clean energy projects;[7] paused ongoing projects—including those nearing completion;[8] and eliminated $20 billion from the Greenhouse Gas Reduction Fund[9] and $7 billion from the Solar for All program.[10] This same hostility towards clean-energy development is reflected here in the IRS's arbitrary action unlawfully impeding access to the Credits, which Congress preserved.

The One Big Beautiful Bill Act ("OBBBA"), enacted in 2025, preserves the Credits for wind and solar facilities if they are either placed into service by December 31, 2027, or— relevant here—if construction begins prior to July 4, 2026.[11] Pub. L. No. 119-21, §§ 70501-

---

[5] U.S. Dep't of the Interior, Office of the Sec'y, Mem.: Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities (July 15, 2025) (from Deputy Chief of Staff Gregory Wischer to Assistant Secretaries, Bureau & Office Heads) (announcing issuance of SO 3417 and 3418); *see Renew Northeast v. U.S. Dep't of Interior*, No. 1:25-cv-13961 (D. Mass. Dec. 23, 2025) ECF No. 1 at ¶ 182.

[6] Secretarial Order No. 3438, Managing Federal Energy Resources and Protecting the Environment, U.S. Dep't of the Interior (Aug. 1, 2025); *see Renew Northeast v. U.S. Dep't Interior*, No. 1:25-cv-13961 (D. Mass. Dec. 23, 2025) at ECF No. 1 at ¶ 91.

[7] *See* U.S. Dep't of Energy, Energy Department Announces Termination of 223 Projects, Saving Over $7.5 Billion (Oct. 1, 2025), www.energy.gov/articles/energy-department-announces-termination-223-projects-saving-over-75-billion; *see also Saint Paul v. Wright*, No. 1:25-cv-03899 (D.D.C. Jan. 12, 2026) at ECF No. 28 (holding that the U.S. Dept. of Energy's termination of $7.56 billion in clean energy grants violated the equal protection clause guaranteed under the Fifth Amendment).

[8] Groom, Nichola, *Wind and Solar Power Frozen out of Trump Permitting Push*, Reuters (Dec. 10, 2025), www.reuters.com/sustainability/climate-energy/wind-solar-power-frozen-out-trump-permitting-push-2025-12-10/

[9] U.S. Envtl. Prot. Agency, Greenhouse Gas Reduction Fund (Sept. 30, 2025), www.epa.gov/aboutepa/greenhouse-gas-reduction-fund

[10] Earthjustice, *EPA Abandons Solar for All Program* (Aug. 8, 2025), https://earthjustice.org /press/2025/epa-abandons-solar-for-all-program

[11] Cong. Rsch. Serv., *IRA Tax Credit Repeal in FY2025 Reconciliation Law: Part 2*, IN12626 (Dec. 12, 2025), www.congress.gov/crs-product/IN12625

70508 (2025). Nevertheless, without justification or evidence, the IRS has departed from its longstanding Safe Harbor framework by disallowing wind and large-scale solar facilities[12] ("Wind and Solar Facilities")—and only these facilities—from establishing eligibility for the Credits through the Safe Harbor, *i.e.*, by demonstrating commencement of construction through the incurrence of five percent of project costs. *See* Notice 2025-42, 2025-36 IRB 351 (*i.e.*, "the Notice").

The IRS—echoing language from Executive Order 14315—claims that this change was necessary to prevent circumvention of the "beginning of construction" requirement, including by preventing "the artificial acceleration or manipulation" of credit eligibility. Compare the Notice at 5 and Executive Order 14315, 90 Fed. Reg. 30821. But the Notice cites no evidence of such circumvention and offers no explanation for why *only* wind and solar facilities have been denied access to the Safe Harbor. Nor does the IRS reconcile its action with OBBBA's express instruction that the IRS continue to apply its longstanding beginning-of-construction criteria.

The IRS's elimination of the Safe Harbor, however, is consistent with the Administration's efforts to curtail wind and solar energy programs, especially those established under IRA, which the Administration regularly refers to as the "green new scam."[13] After the Senate passed OBBBA in July 2025, the Administration aggressively pressured House Republicans, both publicly and behind-the-scenes, to approve the package without changes.[14]

---

[12] IRS Notice 2025-42 excludes solar facilities with a nameplate capacity of 1.5 MW (AC) or less (as generally measured on an interconnection point basis).

[13] Office of Mgmt. & Budget, Exec. Office of the President, *Ending the Green New Scam Fact Sheet* (May 2, 2025), www.whitehouse.gov/wp-content/uploads/2025/05/Ending-the-Green-New-Scam-Fact-Sheet.pdf.

[14] Tamborrino, Kelsey & Josh Siegel, *Conservatives Say Trump Won Their Megabill Votes by Promising Crackdown on Renewable Energy Credits*, Politico (July 3, 2025), www.politico.com

Despite substantial resistance over OBBBA's significant fiscal impacts, House Republicans acquiesced when the Administration committed to constricting wind and solar projects that qualified for the IRA tax credits,[15] a result some House Republicans sought for some time.[16] The Administration subsequently followed through by, for example, issuing Executive Order 14315—discussed above—on July 7, 2025, three days following the enactment of OBBBA. 90 Fed. Reg. 30821.

For these reasons, the Court should grant Plaintiffs' motion for summary judgment and vacate the IRS Notice as arbitrary, capricious, and contrary to law.

## ARGUMENT

I.     **The Clean Energy Tax Credits are Key Tools for Addressing the Climate Crisis, Improving Air Quality, Lowering Electricity Costs, and Promoting Grid Reliability.**

  A.   **Wind and solar power offer affordable, readily deployable means of reducing air pollution and strengthening grid reliability.**

Preserving full access to the Credits for the remaining period in which they are available will play an important role in reducing electricity costs and improving air quality. Since January 2025, domestic consumer electricity prices have risen more than 10% nationwide—over twice the rate of inflation.[17] Although no single factor alone explains this surge in prices, many regions

---

/live-updates/2025/07/03/congress/conservatives-trump-megabill-energy-credits-crackdown-00438357.

[15] *Id.*

[16] Rep. Jason Smith et al., Letter to Colleagues Urging Full Repeal of the Inflation Reduction Act (May 2025), https://static.foxnews.com/foxnews/content/uploads/2025/05/ira-repeal-letter.pdf.

[17] U.S. Energy Info. Admin., Electric Power Monthly, tbl. 5.3 (Sept. 2025), www.eia.gov/electricity/monthly/epm_table_grapher.php?t=table_5_03

are experiencing tight supply alongside rising demand.[18] In the Mid-Atlantic and Midwest, for example, demand for new data centers has driven an 82% increase in transmission auction revenues, costs that are ultimately borne by consumers.[19] Adding to the United States' electric generation complexities is its composition of power-producing facilities that includes aging fossil fuel-burning plants, like coal-burning plants, that are being retired due to scaling inefficiencies and costs.[20]

Against this backdrop of increasing energy demand and rising prices, wind and solar power facilities have seen dramatic declines in development costs over the last decade— approximately 70% for wind and 90% for solar—driven by technological improvements and expanded deployment.[21] These reductions have lowered the Levelized Cost of Electricity ("LCOE") for wind and solar—the price at which electricity must be sold to cover development and production costs—to extremely competitive levels as of 2024.[22] As shown in the table below, onshore wind and utility-scale solar offer LCOE ranges that are *lower* than those of fossil fuels and nuclear generation.[23]

---

[18] Levinson, Michelle and Ian Goldsmith, *What's Really Driving Up US Electricity Prices? We Unpack the Numbers.*, World Res. Inst. (Dec. 15, 2025), www.wri.org/insights/whats-driving-us-electricity-prices

[19] *Id.*

[20] U.S. Envtl. Prot. Agency, Regulatory Impact Analysis for the Proposed National Emission Standards for Hazardous Air Pollutants: Coal-and Oil-Fired Electric Utility Steam Generating Units Review of Residual Risk and Technology Review (Apr. 20023), at 2-4, tbl. 2-2, www.epa.gov/system/files/documents/2023-4/MATS%20RTR%20Proposal%20RIA%20Formatted.pdf

[21] Int'l Renewable Energy Agency, IRENA Renewable Power Generation Costs in 2024 (2025), at pp. 1-2, www.irena.org/-/media/Files/IRENA/Agency/Publication/2025/Jul/IRENA_TEC_RPGC_in_2024_Summary_2025.pdf

[22] Lazard, *Lazard's Levelized Cost of Energy, June 2024* at p. 9 (2024), www.lazard.com/media/xemfey0k/lazards-lcoeplus-june-2024-_vf.pdf

[23] *Id.*

| Power Source | LCOE/MWh Low | LCOE/MWh High |
|---|---|---|
| *Wind* | | |
| Onshore Wind | $ 27.00 | $ 73.00 |
| Offshore Wind | $ 74.00 | $ 139.00 |
| *Solar* | | |
| Solar PV Utility | $ 29.00 | $ 92.00 |
| Solar PV + Storage Utility | $ 60.00 | $ 210.00 |
| *Fossil Fuels & U.S. Nuclear* | | |
| Gas (combined cycle) | $ 45.00 | $ 108.00 |
| Gas (Peaking) | $ 110.00 | $ 228.00 |
| Coal | $ 74.00 | $ 168.00 |
| U.S. Nuclear | $ 142.00 | $ 222.00 |

The economic benefits of solar in particular are further enhanced by its decentralized generation model, in which power production and storage can be located closer to consumers. This model diversifies energy sources and allows the grid to respond more effectively to fluctuations in demand.[24] Nevertheless, when paired with advanced battery storage, both wind and solar facilities can supply low-cost electricity even during peak periods, reducing reliance on expensive peaking plants.[25] By contrast, a traditional power grid premised predominantly on fossil fuel-fired plants is largely centralized, transmitting electricity from large-scale power plants to consumers over long distances.[26] This structure contributes to congestion, delays, and rising costs as transmissions distances increase.[27]

---

[24] Thyagarajan, Akshay, *Clean Energy Is Essential to Preventing Blackouts During Dangerous Extreme Heat and Cold*, Ctr. for Am. Progress (Aug. 28, 2025), www.americanprogress.org /article/clean-energy-is-essential-to-preventing-blackouts-during-dangerous-extreme-heat-and-cold/

[25] *Id.*

[26] U.S. Envtl. Prot. Agency, Centralized Generation of Electricity and its Impacts on the Environment (Dec. 23, 2025), www.epa.gov/energy/centralized-generation-electricity-and-its-impacts-environment

[27] *See generally* Grid Strategies LLC, *Transmission Congestion for 2024* (Oct. 2025), https://gridstrategiesllc.com/wp-content/uploads/GS_Transmission-Congestion-for-2024.pdf

In addition to providing substantial cost and reliability benefits, wind and solar facilities emit *far* less emissions per megawatt-hour than fossil fuel plants, incurring emissions primarily in manufacturing, construction, and decommissioning phases, but not during operations.[28] Air pollution from power plants leads to fine particulate matter pollution that penetrates deep into the lungs and bloodstream,[29] contributing to cardiovascular and respiratory diseases as well as premature deaths;[30] contributes to ground-level ozone pollution that is associated with premature deaths, respiratory diseases, and other harmful health impacts;[31] and is a leading source of hazardous air pollutants, such as mercury and other heavy metals, that can harm the neurological development of children and fetuses and cause a range of other health harms.[32] Moreover, fossil fuel-fired power plants are among the Nation's largest source of GHG emissions driving climate change, accounting for nearly one-quarter of the nation's GHG emissions in 2023.[33]

Between 2019 and 2022, every 1,000 kilowatt-hours (kWh) (*i.e.*, 1 MWh) of electricity generated domestically from wind or solar facilities displaced approximately 890 and 750 kWh,

---

[28] *See* Union of Concerned Scientists, 7 Benefits of Renewable Energy Use (July 3, 2025), www.ucs.org/resources/benefits-renewable-energy-use

[29] U.S. Env't Prot. Agency, Health and Envtl. Effects of Particulate Matter (PM) (May 23, 2025), www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm

[30] Henning, Robert J., *Particulate Matter Air Pollution Is a Significant Risk Factor for Cardiovascular Disease*, 49 Current Problems in Cardiol. 102094 (Jan. 2024), www.sciencedirect.com/science/article/abs/pii/S014628062300511X.

[31] Jianjun J. Zhang, *et al.*, *Ozone Pollution: A Major Health Hazard Worldwide*, Front Immunology (Oct. 31, 2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6834528/.

[32] Mona Q. Dai, *et al.*, *Sociodemographic Disparities in Mercury Exposure from United States Coal-Fired Power Plants*, Envtl. Sci. & Technol. Lett. Vol. 10, 7 589 (2023), https://doi.org/10.1021/acs.estlett.3c00216

[33] U.S. Envtl. Prot. Agency, Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2023 (2025) at Figure ES-5, https://library.edf.org/AssetLink/lho850vn3sgns65501wj6dley pl0o477.pdf.

respectively, of fossil fuel output. This reduction in polluting generation resulted in improved air quality and human health benefits in many communities affected by power plant pollution across the United States.[34] For example, in 2022, domestic wind and solar generation avoided sufficient NOx and SOx emissions to prevent an estimated 1,200–1,600 premature deaths, and produced tens of billions of dollars in combined air-quality and climate benefits.[35]

In short, wind and solar power provide the cleanest, lowest-cost electricity available today and are critical technologies towards assuring grid reliability needs are met.

### B. The Production and Investment Tax Credits have driven significant growth in wind and solar development, especially since passage of the IRA in 2022.

The production and investment tax credits under Sections 45 and 48 have long contributed to the growth of wind and solar generation, and IRA significantly expanded and reinforced that role in 2022.[36] IRA broadened the number of qualifying technologies, extended expiration and phaseout periods, and provided developers with greater certainty and longer planning horizons.[37] It also enhanced the economic value of the Credits through bonus incentives for projects meeting energy communities and domestic content requirements.[38]

---

[34] *See* Union of Concerned Scientists, 7 Benefits of Renewable Energy Use (July 3, 2025), www.ucs.org/resources/benefits-renewable-energy-use

[35] U.S. Dep't of Energy, Study Finds Air Quality and Environmental Benefits from Recent Wind and Solar Deployment Amounted to $249 Billion (June 5, 2024), www.energy.gov/eere/wind/articles/study-finds-air-quality-and-environmental-benefits-recent-wind-and-solar

[36] The production and investment tax credits in sections 45 and 48 existed prior to IRA in forms that applied to a limited set of technologies and were scheduled to expire or phaseout between 2019 and 2031. The investment tax credit was first enacted in 1978 under the Energy Tax Act (Pub. L. No. 95-618), and the production tax credit was first enacted in 1992 under the Energy Policy Act of 1992 (Pub. L. No. 102-486).

[37] Cong. Rsch. Serv., R48358, Domestic Content Requirements for Electricity Tax Credits in the Inflation Reduction Act (IRA) (Jan. 16, 2025) at pp. 1-3, www.congress.gov/crs_external_products/R/PDF/R48358/R48358.1.pdf

[38] IRA, Pub. L. No. 117-169, §§ 13101, 13102, 13701, and 13702

These changes spurred the wind and solar industries to make significant advancements in the development of power-generating facilities and technologies, including battery storage, and strengthened supply chains.[39] Between 2022 and 2025, wind and solar power generation increased from 13% to 17% of total U.S. power generation, driven by dozens of newly announced and constructed projects.[40] During the same period, U.S. business and consumer investment in clean energy technologies rose 71% over the previous two years, totaling $493 billion.[41]

Federal estimates projected that, absent the Credits, investment in clean energy technologies and infrastructure would decline by roughly one-third between 2024 to 2026.[42] Because the Credits play a central role in sustaining clean energy investment and development, arbitrary changes to their implementation pose a significant risk of disrupting ongoing projects and undermining the policy objectives Congress sought to advance by making the Credits available.

---

[39] *See* Envtl. Entrepreneurs (E2), Clean Economy Works: Tracking New Clean Energy Projects Across the U.S., https://e2.org/project-tracker/ (last visited Feb. 7, 2026) (citing 28 wind, 100 solar, and 67 battery storage projects announced in the U.S. from 2022 to 2025)

[40] Elizabeth Weise, *Wind, Solar Power Account for Record 13% of U.S. Energy in 2021*, USA Today (Mar. 3, 2022), www.usatoday.com/story/tech/science/2022/03/03/wind-and-solar-power-producing-record-amount-u-s-electricity/9353259002/; Ember, US Electricity 2025, Special Report (Mar. 25, 2025), https://ember-energy.org/latest-insights/us-electricity-2025-special-report/

[41] Rhodium Grp. & MIT Ctr. For Energy & Env't Pol'y Rsch., Clean Investment Monitor: Tallying the Two-Year Impact of the Inflation Reduction Act (Aug. 7, 2024) at p. 2, https://rhg.com/wp-content/uploads/2024/08/Clean-Investment-Monitor_Tallying-the-Two-Year-Impact-of-the-Inflation-Reduction-Act-1.pdf

[42] Cong. Budget Off., Business Tax Credits for Wind and Solar Power (Apr. 2025), www.cbo.gov/publication/61329

## II.  The Safe Harbor Promotes Proper and Fair Access to Tax Credits and its Elimination for Wind and Solar Projects is Arbitrary and Unlawful.

The economic, reliability, and environmental benefits described above that are associated with tax credits for wind and solar projects depend not only on the credits themselves but also on predictable rules for claiming them. For well over a decade, the Safe Harbor has long provided a clear standard for determining when project construction begins, guiding project financing, procurement, and development timelines. The IRS's abrupt and unexplained departure from that framework is both arbitrary and inconsistent with Congress's direction in OBBBA.

### A.  The Safe Harbor is a longstanding feature of IRS start-of-construction guidance and promotes appropriate access to production and investment tax credits.

The Safe Harbor—allowing taxpayers to establish the start of construction by incurring at least 5% of total project costs—originated in 2013, when the IRS first issued "begin construction" guidance for Section 45 production tax credits and Section 48 investment tax credits.[43] The IRS subsequently carried this framework forward—readopting it through a series of notices, fact sheets and other guidance—as Congress repeatedly extended and modified the Credits.[44] Over time, the Safe Harbor became a central feature of the IRS's administration of the Credits. As the Safe Harbor was repeatedly reaffirmed and applied, developers structured financing, procurement, and construction timelines in reliance on its clear and repeatable standards.[45] The Safe Harbor thus functioned as a settled feature of the statutory and

---

[43] *See* Notice 2013-29 sec. 5; *see also* U.S. Dep't of the Treasury, Fact Sheet: Clarifying "Begin Construction" for the Purposes of the Production Tax Credit or the Investment Tax Credit (Aug. 8, 2014), https://home.treasury.gov/news/press-releases/jl2606

[44] *See* Notice 2025-42, footnote 2, 2025-36 IRB 351 (citing ten IRS notices issued after Notice 2013-29 in which the Safe Harbor was either updated, modified, or clarified).

[45] Am. Council on Renewable Energy, *The Role of Safe Harbor for Energy Tax Credits: Guardrails, Not Loopholes*, Issue Brief (Aug. 2025), https://acore.org/wp-content/uploads/2025

administrative landscape governing renewable energy development.[46] Against that backdrop, any departure from the Safe Harbor carries significant consequences for regulated parties and disrupts serious reliance interests.

### B. Congress endorsed the Five Percent Safe Harbor in OBBBA

When Congress enacted OBBBA, it amended the termination date for wind and solar tax credits, but it did not revise—much less unsettle—the well-established rules governing how project developers should document the "beginning of construction" for purposes of credit eligibility. To the contrary, Congress endorsed the continued application of the IRS' longstanding "beginning of construction" framework.

A provision within section 75012 of OBBBA, codified at 26 U.S.C. § 7701(a)(51)(J), directs that in applying new foreign-entity restrictions, "the beginning of construction with respect to any property shall be determined pursuant to rules *similar to the rules* under Internal Revenue Service Notice 2013-29 and Internal Revenue Service Notice 2018-59 (as well as any subsequently issued guidance clarifying, modifying or updating either such Notice)" (emphasis added). This statutory command confirms that Congress embraced the analytical framework set forth in those Notices, of which the Safe Harbor is a central and integral component.

Although this instruction appears within a provision addressing foreign-entity restrictions, nothing in the statutory context or structure suggests that Congress intended a different "beginning of construction" standard to govern the early termination of wind and solar tax credits. Any such interpretation would require the IRS to assign a single project multiple,

---

/08/Full-Issue-Brief-The-Role-of-Safe-Harbor-for-Energy-Tax-Credit.pdf (stating that the Credits' safe harbors allow for "good-faith, diligent investments in domestic energy projects while allowing for foreseeable risks during development and construction.")

[46] *Id.*

conflicting construction start-dates depending on which provision of OBBBA is being applied—

an implausible result. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (it is a "normal rule

of statutory construction that identical words used in different parts of the same act are intended

to have the same meaning" (cleaned up))

The statute's structure reinforces that the "beginning of construction" standard should be

understood to be uniform across OBBBA's provisions. As enacted, Congress used—in the same

"effective dates" paragraph—the nearly identical phrases "construction begins" and

"construction of which begins" to govern the effective dates for the early-termination provision

and the foreign-entity restrictions respectively. *See* OBBBA Section 75012(l) ("Effective

Dates"), 139 Stat. 269-70. The Office of Law Revision Counsel later codified those effective

date provisions together, without substantive change, in a single statutory note providing:

> Amendment by Pub. L. 119-21 applicable to taxable years beginning after
> July 4, 2025, except that amendment by section 70512(a) of Pub. L. 119-21
> applicable to facilities *the construction of which* begins after the date which
> is 12 months after July 4, 2025, and amendment by section 70512(b)(1) of
> Pub. L. 119-21 applicable to facilities *for which construction begins* after
> Dec. 31, 2025 . . .[.]

(emphasis added). 26 U.S.C. § 45Y note (Effective Date of 2025 Amendment).[47] To conclude

that a particular project has one "construction . . . begins" date for purposes of the early-

termination provisions and a different "construction begins" date for purposes of the foreign-

entity restrictions would therefore require the implausible assumption that these nearly identical

phrases—used in immediate proximity within the same effective-date framework—carry

different meanings. That interpretation is untenable. *See C.I.R. v. Lundy*, 516 U.S. 235, 250

(explaining that the "interrelationship and close proximity" of provisions "presents a classic case

---

[47] Section 70512(a) contained the amendments related to the early-credit-termination date and
section 70512(b)(1) contained the amendments related to the foreign-entity restrictions.

for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." (cleaned up))

Near-contemporaneous legislative statements further confirm this understanding. In a legislative session held shortly after enactment of OBBBA—but before issuance of the challenged IRS Notice—Senator Grassley explained Congress' intent to codify IRS' existing guidance, including the Safe Harbor, for purposes of the early-credit termination provisions:

> During consideration of the One Big Beautiful Bill Act, I worked with my colleagues to provide wind and solar an appropriate glidepath for the orderly phase-out of the tax credits. Ultimately, Congress enshrined in statute a 12-month transition period based on when projects "begin construction."
>
> What it means for a project to "begin construction" *has been well established by Treasury guidance for more than a decade. Moreover, Congress specifically references current Treasury guidance to set that term's meaning in law*. This is a case where both the law and congressional intent are clear.

171 Cong. Rec. S5201 (daily ed. Aug. 1, 2025) (emphasis added).

Congress thus did not intend for the meaning of "beginning of construction" to be subject to administrative reinvention and a bifurcated approach.  It instead endorsed the continued approach of the IRS's longstanding "beginning of construction" rules, including the Safe Harbor. The agency's contrary approach cannot be squared with this best reading of OBBBA.

### C.  The IRS has arbitrarily and unlawfully eliminated the Five Percent Safe Harbor for wind and solar as part of the Administration's efforts to systematically undercut these technologies

The IRS Notice is additionally arbitrary and capricious in multiple, independent respects. It offers no reasoned justification for abandoning the agency's longstanding beginning-of-construction framework; treats similarly situated energy sources disparately without justification; disregards serious reliance interests engendered by prior guidance; and substitutes

14

impermissible considerations for the governing statute—which expressly instructs IRS to maintain guidance "similar" to the existing regime. The Notice must therefore be vacated. *See* 5 U.S.C. § 706(2)(A).

Agency action is arbitrary and capricious when it is not "reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (cleaned up). And where, as here, an agency departs from a longstanding policy on which parties have reasonably relied, it must provide a more "detailed justification" for doing so—particularly when the prior policy has structured investment and development decisions over many years. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

The Notice falls well short of these requirements. The agency's entire rationale for eliminating the Safe Harbor for wind and large solar projects is confined to a single paragraph. The Notice at 5-6. Therein, the IRS asserts—using language that simply tracks the Executive Order nearly verbatim—that eliminating the Safe Harbor will "prevent taxpayers from circumventing the statutory credit termination date," "prevent the artificial manipulation of eligibility" for credits and "ensure that a substantial portion of any applicable wind or solar facility. . . is built by the beginning of construction deadline." *Id.*

These assertions are wholly conclusory. The IRS provides no reasoning as to *why* it believes use of the Safe Harbor would "circumvent" the statutory credit termination date or result in the "artificial manipulation" of credit eligibility. Nor does it explain why it believes such concerns arise *only* for wind and large solar projects, but not for other clean energy technologies governed by the same statutory framework. The Notice likewise points to no data, evidence, or analysis to support these claims or to justify abandoning the agency's longstanding approach. In

fact, nothing in the Notice suggests that the IRS exercised any independent judgment here at all, as opposed to merely repeating nearly verbatim the Executive Order's characterizations.

Moreover, the agency's unexplained disparate treatment of similarly situated renewable energy projects is a textbook example of arbitrary decision-making. When an "agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases." *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013). Here, the IRS does neither. The Notice offers no basis for distinguishing between large and small solar projects, and no basis for distinguishing wind and solar projects from other clean energy technologies—such as hydropower, geothermal, or nuclear—that are subject to the same statutory framework.

The IRS also fails to acknowledge, let alone address, the serious reliance interests created by its prior policy. As discussed above, for more than a decade the Safe Harbor has served as a foundational element of the renewable energy industry's financial and operational planning. This objective, cost-based standard provides the bright-line certainty necessary for developers to commit billions of dollars to long-lead-time energy projects. Yet the Notice summarily eliminates the Safe Harbor without any meaningful analysis of the massive, existing capital commitments made in reliance on the prior regime. This failure to identify, assess, and weigh these reliance interests independently renders the Notice arbitrary and capricious. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 5 (2020) (agency action is arbitrary and capricious where it fails to "assess the existence and strength of any reliance interests and weigh them against competing policy concerns").[48]

---

[48] Perhaps the IRS would have better considered such reliance interests had it not also failed to meet its procedural obligation to solicit comments on it. *See Green Rock v. IRS*, 104 F. 4th 220 (11th Cir. 2024) (finding IRS notice to be legislative rule requiring notice-and-comment).

The Notice is additionally arbitrary in yet another respect: it disregards Congress' express direction in OBBBA that the IRS maintain and apply guidance "similar" to its prior guidance.  As discussed above, Congress chose to phase out wind and solar projects more quickly than other clean energy projects, but nothing in OBBBA suggests that Congress intended—during the remaining eligibility period—to subject wind and solar projects to different beginning-of-construction rules. To the contrary, the statutory text and legislative record reflect Congress' intent to ensure that solar and wind projects would be able to benefit from the tax credits if they began construction prior to July 5, 2026, applying the same construction-commencement framework long utilized.

The Notice relies heavily on Executive Order 14315—lifting phrasing from that Order.  But executive orders are "not law," and an agency may consider them only to the extent they are consistent with—and do not override—statutory directives. An agency therefore "cannot change position solely based on compliance with an [executive order] without further explanation." *Housing Auth. of City and County of San Francisco v. Turner*, 2025 WL 3187761 at *19 (N.D. Cal. Nov. 14, 2025); s*ee also California by & through Becerra v. U.S. Dep't of the Interior*, 381 F. Supp. 1153, 1169-70 (N.D. Cal. 2019) ("conclusory assertions" regarding compliance with Executive Order were inadequate "given that [the agency] failed to provide any data or analysis to support them.").

Further, the text of the Executive Order in question makes very explicit that the agency has subordinated Congress's statutory framework to impermissible policy objectives falling outside the tax code. Section 1 of the Order, for example, claims that "for too long, the Federal Government has forced American taxpayers to subsidize expensive and unreliable energy sources like wind and solar," and claims that wind and solar projects "compromise[] our electric grid"

17

and "denigrate the beauty of our Nation's natural landscape," and "threaten[]national security." This kind of assault on clean energy is badly misguided, but more to the point, it is misguided policy entirely detached from the Internal Revenue Code provisions the IRS is tasked with administering.

In sum, the Notice cannot be reconciled with the requirements of reasoned decision-making under the APA. The IRS abandoned a longstanding regulatory framework without adequate explanation, treated similarly situated projects differently without justification, disregarded serious and foreseeable reliance interests, and relied on considerations Congress did not authorize it to weigh—while ignoring Congress's express instruction to maintain guidance similar to the prior regime. Because these defects independently and collectively render the Notice arbitrary and capricious, the Notice must be vacated. *See* 5 U.S.C. § 706(2)(A).

## CONCLUSION

For all the reasons stated here, the Court should grant the Plaintiffs' motion for summary judgment.

Dated: February 20, 2026

Respectfully submitted,

By: /s/ _____
TOMÁS CARBONELL
Tomás Carbonell (D.C. Bar No. 989797)
Environmental Defense Fund
555 12th Street NW, Suite 400
Washington, D.C. 20004
T: (919) 449-4600
tcarbonell@edf.org

Counsel for Environmental Defense Fund

## CERTIFICATE OF COMPLIANCE

Pursuant to LCvR 7(o), I hereby certify that this brief conforms to the requirements of

LCvR 5.4, complies with the requirements set forth in Fed. R. App. P. 29(a)(4), and does not

exceed 25 pages in length.

DATED this 20th day of February 2026.

/s/ Tomás Carbonell
Tomás Carbonell (D.C. Bar No. 989797)

## CERTIFICATE OF SERVICE

I hereby certify that on February 20th, 2026, I electronically filed the original of this brief

with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all

attorneys of record by operation of the Court's electronic filing system.

DATED this 20th day of February 2026.

/s/ Tomás Carbonell
Tomás Carbonell (D.C. Bar No. 989797)