**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| OREGON ENVIRONMENTAL COUNCIL, et al., | **Case No.  25-cv-04400 (CKK)** |
| *Plaintiffs*, |  |
| v. | **COMBINED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT AND REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| INTERNAL REVENUE SERVICE OF THE UNITED STATES, et al., |  |
| *Defendants*. |  |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

I.      Plaintiffs have shown standing ........................................................................................... 2

        A.      Energy market participants HUC, Woven, NRDC, and San
                Francisco have demonstrated standing ..................................................................... 3

                1.      Plaintiffs produced uncontroverted evidence of
                        present injuries .............................................................................................. 3

                2.      Plaintiffs' injuries constitute injury-in-fact ................................................. 5

                3.      The Notice is the cause of Plaintiffs' injuries ............................................. 7

                4.      Plaintiffs satisfy the "zone of interests" test ............................................. 10

        B.      Electricity Price Increases and Pollution Impacts
                Demonstrate Standing ............................................................................................ 10

                1.      Plaintiffs have demonstrated imminent harm ............................................ 11

                2.      Plaintiffs' harms are particularized ........................................................... 13

                3.      Plaintiffs have established causation and
                        redressability .............................................................................................. 15

II.     The AIA does not bar Plaintiffs' lawsuit .......................................................................... 17

        A.      The Purpose of Plaintiffs' Suit is to Vacate Notice
                2025-42—Not to Restrain the Assessment or Collection of
                a Tax ....................................................................................................................... 18

        B.      The *South Carolina v. Regan* exception applies to all
                plaintiffs .................................................................................................................. 21

        C.      Plaintiffs' suit falls within the *Williams Packing* exception
                to the AIA ............................................................................................................... 25

        D.      Plaintiffs have no alternative remedies, so their APA
                challenge is not precluded ...................................................................................... 26

i

III.    Notice 2025-42 is arbitrary and capricious ......................................................... 26

    A.    The arbitrary and capricious standard applies and requires
reasoned decisionmaking ................................................................................ 27

    B.    Defendants ignored serious reliance interests ........................................ 28

    C.    Defendants have offered no reasoned explanation for the
Notice, and one cannot be discerned from the record ............................ 33

        1.    Defendants fail to explain how the OBBBA's new
deadlines support eliminating the Five Percent Safe
Harbor ................................................................................................ 33

        2.    Defendants' arguments about circumvention and
stockpiling are unsupported by the record—and
inadequate .......................................................................................... 35

        3.    Defendants have provided no reasoned explanation
for treating small solar facilities differently ............................... 40

IV.    The Notice should be vacated in its entirety .................................................... 40

CONCLUSION ................................................................................................................. 44

# TABLE OF AUTHORITIES

## Cases

*520 Mich. Ave. Assocs. v. Devine*,
433 F.3d 961 (7th Cir. 2006) ........................................................................................ 11

*Alexander v. Ams. United Inc.*,
416 U.S. 752 (1974).......................................................................................................... 20

*Alley Cat Allies, Inc. v. U.S. Nat'l Park Serv.*,
No. 25-4269-CKK, 2026 WL 221343 (D.D.C. Jan. 28, 2026) ........................................... 6

*Allied-Signal, Inc. v. Dir., Div. of Taxation*,
504 U.S. 768 (1992)........................................................................................................... 42

*\*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
988 F.2d 146 (D.C. Cir. 1993) ................................................................................... 41, 43

*Am. Great Lakes Ports Ass'n v. Schultz*,
962 F.3d 510 (D.C. Cir. 2020) ........................................................................................ 41

*Am. Mun. Power, Inc. v. FERC*,
86 F.4th 922 (D.C. Cir. 2023) ........................................................................................... 6

*Amgen, Inc. v. Smith*,
357 F.3d 103 (D.C. Cir. 2004) ........................................................................................ 10

*Arpaio v Obama*,
797 F.3d 11 (D.C. Cir. 2015)............................................................................................ 15

*Belmont Mun. Light Dep't v. FERC*,
38 F.4th 173 (D.C. Cir. 2022) ......................................................................................... 14

*Biden v. Nebraska*,
600 U.S. 477 (2023)........................................................................................................... 17

*Bill Barret Corp. v. DOI*,
601 F. Supp. 2d 331 (D.D.C. 2009) ................................................................................. 38

*BNSF Ry. Co. v. Surface Transp. Bd.*,
526 F.3d 770 (D.C. Cir. 2008) ........................................................................................ 38

*Bob Jones Univ. v. Simon*,
416 U.S. 725 (1974)..................................................................................................... 23, 25

*Bost v. Ill. State Bd. of Elections*,
607 U.S. ---, 146 S. Ct. 513 (2026)................................................................................... 17

*Bowen v. Massachusetts*,
 487 U.S. 879 (1988)..................................................................................................... 26

*Bridgeport Hospital v. Becerra*,
 108 F.4th 882 (D.C. Cir. 2024) ...................................................................................... 40

*Burke v. Gould*,
 286 F.3d 513 (D.C. Cir. 2002) ....................................................................................... 16

*\*Carpenters Industrial Council v. Zinke*,
 854 F.3d 1 (D.C. Cir. 2017) ................................................................................ 11, 15, 16

*Chamber of Comm. v. IRS*,
 No. 1:16-cv-944-LY, 2017 WL 4682049 (W.D. Tex. Sep. 29, 2017) .............................. 19

*Chaplaincy of Full Gospel Churches v. England*,
 454 F.3d 290 (D.C. Cir. 2006) ....................................................................................... 26

*\*CIC Serv., LLC v. IRS*,
 593 U.S. 209 (2021)........................................................................................ 18, 19, 20, 21

*Clapper v. Amnesty Int'l*,
 568 U.S. 398 (2013)......................................................................................................... 7

*Clarke v. Sec. Indus. Ass'n*,
 479 U.S. 388 (1987)....................................................................................................... 10

*Clean Wisconsin v. EPA*,
 964 F.3d 1145 (D.C. Cir. 2020)...................................................................................... 33

*\*Cohen v. United States*,
 650 F.3d 717  (D.C. Cir. 2011)............................................................................ 17, 18, 19

*Comcast Corp. v. FCC*,
 579 F.3d 1 (D.C. Cir. 2009) ........................................................................................... 42

*Competitive Enter. Inst. v. FCC*,
 970 F.3d 372 (D.C. Cir. 2020) ....................................................................................... 15

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*,
 901 F.2d 107 (D.C. Cir. 1990) ......................................................................................... 4

*Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax &*
 *Trade Bureau*,
 843 F.3d 810 (9th Cir. 2016)........................................................................................... 24

*Consumer Fed'n of Am. v. FCC*,
 348 F.3d 1009 (D.C. Cir. 2003) ..................................................................................... 14

*Corner Post, Inc. v. Bd. of Govs. of Fed. Reserve Sys*,
  603 U.S. 799 (2024) ................................................................................. 40

*Crowley Caribbean Transp., Inc. v. Pena*,
  37 F.3d 671 (D.C. Cir. 1994) ..................................................................... 28

*CSL Plasma Inc. v. U.S. Customs & Border Prot.*,
  33 F.4th 584 (D.C. Cir. 2022) .................................................................... 10

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
  698 F. Supp. 3d 39 (D.D.C. 2023) .............................................................. 27

*Daimler Trucks North America LLC v. EPA*,
  737 F.3d 95 (D.C. Cir. 2013) ..................................................................... 42

*Deloatch v. Harris Teeter, Inc.*,
  797 F. Supp. 2d 48 (D.D.C. 2011) .............................................................. 17

*Dep't of Com. v. New York*,
  558 U.S. 752 (2019) .................................................................................. 15

*Department of Homeland Security v. Regents of the University of California*,
  591 U.S. 1 (2020) ...................................................................................... 32

*\*Diamond Alt. Energy, LLC v. EPA*,
  606 U.S. 100 (2025) ........................................................................ 6, 7, 8, 15

*Direct Mktg. Ass'n v. Brohl*,
  575 U.S. 1 (2015) ...................................................................................... 18

*Dynalantic Corp. v. Dep't of Def.*,
  115 F.3d 1012 (D.C. Cir. 1997) .................................................................. 15

*\*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) .............................................................................. 28, 29

*\*Enochs v. Williams Packing & Navigation Co.*,
  370 U.S. 1 (1962) .................................................................................. 17, 25

*Env't Action v. FERC*,
  996 F.2d 401 (D.C. Cir. 1993) .................................................................... 14

*Equal Rts. Ctr. v. Post Props., Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011) ................................................................... 7

*\*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ........................................................................ 27, 28, 29

v

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)................................................................................................ 8

*FEC v. Akins*,
  524 U.S. 11 (1998).................................................................................................. 13

*Fl. Bankers Ass'n v. U.S. Dep't of Treasury*,
  4799 F.3d 1065 (D.C. Cir. 2015) ........................................................................... 17

*Grayscale Invs., LLC v. Sec. & Exchange Comm'n*,
  82 F.4th 1239 (D.C. Cir. 2023) .............................................................................. 41

*Gustafson v. Alloyd Co., Inc.*,
  513 U.S. 561 (1995)................................................................................................ 34

*Hamilton v. Howard Univ.*,
  960 A.2d 308 (D.C. Cir. 2008)............................................................................... 10

*Hibbs v. Winn*,
  542 U.S. 88 (2004).................................................................................................. 18

*Hill Dermaceuticals, Inc. v. FDA*,
  709 F.3d 44 (D.C. Cir. 2013) ................................................................................. 27

*Holistic Candlers & Consumers Ass'n v. FDA*,
  664 F.3d 940 (D.C. Cir. 2012) ............................................................................... 17

*Humane Soc. v. Hodel*,
  840 F.2d 45 (D.C. Cir. 1988) ................................................................................... 5

*In re Korean Air Lines Disaster of Sept. 1, 1983*,
  829 F.2d 1171 (D.C. Cir. 1987).............................................................................. 25

*Int'l Org. of Masters, Mates, & Pilots, ILA, AFL-CIO v. Nat'l Labor Rel. Bd.*,
  61 F.4th 169 (D.C. Cir. 2023) ................................................................................ 32

*Kingdom v. Trump*,
  No. 25-cv-691-RCL, 2025 WL 1568238 (D.D.C. June 3, 2025).......................... 36

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)................................................................................................ 10

*\*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)............................................................................................. 5, 7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)................................................................................................ 16

*Maze v. IRS*,
	206 F. Supp. 3d 1 (D.D.C. 2016) ................................................................. 17

*Michigan v. EPA*,
	576 U.S. 743 (2015) ..................................................................................... 27

*\*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*,
	463 U.S. 29 (1983) ......................................................................... 27, 28, 36

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
	145 F.3d 1399 (D.C. Cir. 1998) .................................................................. 40

*Nat'l Parks Conservation Ass'n v. Semonite*,
	422 F. Supp. 3d 92 (D.D.C. 2019) .............................................................. 41

*National Taxpayers Union, Inc. v. United States*,
	862 F. Supp. 531 (D.D.C. 1994) ................................................................. 23

*Newdow v. Roberts*,
	603 F.3d 1002 (D.C. Cir. 2010) .................................................................. 11

*\*Orangeburg, S.C. v. FERC*,
	862 F.3d 1071 (D.C. Cir. 2017) .................................................................. 11

*RYO Mach. LLC v. U.S. Dep't of Treasury*,
	696 F.3d 467 (6th Cir. 2012) ...................................................................... 24

*Sierra Club v. DOT*,
	125 F.4th 1170 (D.C. Cir. 2025) ................................................................. 40

*Silver v. IRS*,
	No. 19-cv-247-APM, 2019 WL 7168625 (D.D.C. Dec. 24, 2019) ................ 18

*\*South Carolina v. Regan,*
	465 U.S. 367 (1984) .................................................. 17, 21, 22, 23, 24, 25

*Spokeo, Inc. v. Robins*,
	578 U.S. 330 (2016) ..................................................................................... 13

*Stilwell v. Off. of Thrift Supervision*,
	569 F.3d 514 (D.C. Cir. 2009) .................................................................... 11

*Teton Historic Aviation Found. v. U.S. Dep't of Defense*,
	785 F.3d 719 (D.C. Cir. 2015) ...................................................................... 9

*Trump v. CASA, Inc.*,
	606 U.S. 831 (2025) ..................................................................................... 41

*United States v. Texas*,
    599 U.S. 670 (2023) ................................................................................................ 6

*Vill. of Bensenville v. FAA*,
    376 F.3d 1114 (D.C. Cir. 2004) ...................................................................... 11, 13

*WildEarth Guardians v. Salazar*,
    741 F. Supp. 2d 89 (D.D.C. 2010) ...................................................................... 38

*Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of Pres.*,
    784 F. Supp. 3d 127 (D.D.C. 2025) ..................................................................... 7

*Wis. Pub. Power, Inc. v. FERC*,
    493 F.3d 239 (D.C. Cir. 2007) ............................................................................ 38

*\*Z St., Inc. v. Koskinen*,
    44 F. Supp. 3d 48 (D.D.C. 2014), *aff'd*, 791 F.3d 24 (D.C. Cir. 2015) ...................... 19, 22

**Statutes**

26 U.S.C. § 45Y ................................................................................................ 32, 34

26 U.S.C. § 48E ........................................................................................... 32, 34, 39

26 U.S.C. § 6103 ..................................................................................................... 37

26 U.S.C. § 6203 ..................................................................................................... 18

26 U.S.C. § 6213 ................................................................................................ 22, 26

26 U.S.C. § 7421 ................................................................................................ 17, 22

26 U.S.C. § 7422 ................................................................................................ 22, 26

26 U.S.C. § 7426 ..................................................................................................... 23

26 U.S.C. § 7701 ..................................................................................................... 39

5 U.S.C. § 704 ........................................................................................................ 26

5 U.S.C. § 706 ................................................................................................... 27, 40

American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 407, 126 Stat. 2313 (2013) ...... 29

Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242 (2015) .......... 29, 34

Declaratory Judgment Act (DJA), 28 U.S.C. § 2201 ................................................... 17

Pub. L. 119-21, tit. VII, ch. 5 § 70512 (2025) ......................................................... 34

Pub. L. 119-21, tit. VII, ch. 5 § 70513 (2025) ................................................................ 34

**Other Authorities**

168 Cong. Rec. H7577-02 (daily ed. Aug. 12, 2022) ........................................ 10, 29, 31

168 Cong. Rec. S4212-01 (daily ed. Aug. 6, 2022) ................................................... 32

171 Cong. Rec. S4618 (daily ed. July 23, 2025) ........................................................ 35

89 Fed. Reg. 47,792 (June 3, 2024) ............................................................................ 29

90 Fed. Reg. 2224 (Jan. 10, 2025) ............................................................................. 31

**INTRODUCTION**

Defendants issued Notice 2025-42 not based on careful reasoning or a close examination of relevant data, but because the President issued an Executive Order directing them to do so. Nothing in the administrative record suggests otherwise.

Defendants ask this Court to dismiss Plaintiffs' case for lack of standing, or to hold that Plaintiffs must pursue their case, if at all, years from now through alternative avenues available only to those disputing their own tax liability. The Court should do neither. Plaintiffs have submitted uncontroverted evidence that the Notice is harming energy market participants and will soon harm electricity consumers and individuals living near polluting power plants. These injuries are neither abstract nor speculative: the Notice is right now—today—making it harder and costlier for the Hopi Utilities Corporation (HUC) to provide electricity to tribal members who have none; forcing Woven Energy to expend resources and forgo client-education and capacity-building work central to its client-services model; and causing the City and County of San Francisco difficulty in procuring new energy that it urgently needs to meet growing electricity demand. Plaintiffs Oregon Environmental Council (OEC), Natural Resources Defense Council (NRDC), Public Citizen, and Maryland Office of People's Counsel will soon suffer their own concrete harms as they, and their members and clients, experience rising electricity prices and increased pollution loads. There is no triable issue of fact as to Plaintiffs' standing.

Nor is this case barred by the Anti-Injunction Act's (AIA's) prohibition on suits brought for the purpose of restraining the assessment or collection of a tax. As is evident from the face of Plaintiffs' complaint and throughout their briefing, the purpose of this suit is to vacate Notice 2025-42 as unlawful agency action under the Administrative Procedure Act (APA). Plaintiffs do not ask this Court to adjudicate the ultimate tax obligations of either themselves or others. And because the alternative judicial avenues that Defendants identify are available only to those who

dispute their own tax liability, they offer no remedy for Plaintiffs. There will be no second bite at the apple for Plaintiffs: relief will come through this case, or not at all.

On the merits, Defendants point to nothing in the administrative record that satisfies the APA's requirement of reasoned decisionmaking. The extra-record statements of journalists and industry watchers are not properly before the Court. Even if they were, they provide no insight into *why* Defendants chose the path they did. Counsel's post hoc justifications cannot substitute for a contemporaneous explanation—by the agency, and in the record—for the agency's action.

The record produced by Defendants lacks not only a reasoned basis for issuing the Notice, but also any acknowledgment of the serious reliance interests engendered by the agency's prior policy. While Defendants attempt to trivialize those interests, the record tells— and common sense confirms—a different story.

Vacatur—the APA's default remedy—is appropriate here. The Notice suffers from serious legal deficiencies, and vacatur would redress Plaintiffs' injuries with minimal disruptive consequences. For these reasons and those set forth below, the Court should grant Plaintiffs' motion for summary judgment and deny Defendants' cross-motion and motion to dismiss.

## ARGUMENT

### I.    Plaintiffs have shown standing

To demonstrate standing, Plaintiffs produced 17 sworn declarations recounting actual and impending harm the Notice is causing them and, in some instances, their members and clients. Defendants have not introduced any contrary evidence. Rather, they challenge Plaintiffs' injuries as not legally cognizable, and as neither caused by Notice 2025-42 nor redressable by a favorable order from this Court.

Defendants' arguments rest on a mischaracterization of Plaintiffs' injuries. Though Defendants construe Plaintiffs' filings as being about the injury of "uncertainty," Defs.' Br. at 7-

8, ECF No. 35-1, Plaintiffs nowhere assert standing on that basis. Rather, Plaintiffs rely on evidence of current monetary injuries, current business harms resulting from diversion of resources, imminent monetary injury from impending electricity price increases, and imminent aesthetic and recreational harm from pollution. These injuries—all of which are established by uncontroverted evidence, caused by the Notice, and redressable by a favorable decision— demonstrate standing.

> **A.    Energy market participants HUC, Woven, NRDC, and San Francisco have demonstrated standing**

> **1.    Plaintiffs produced uncontroverted evidence of present injuries**

Plaintiffs HUC, Woven, NRDC, and San Francisco have put forth evidence of injuries the Notice is currently causing to them (or, in NRDC's case, to a member) as energy market participants. These injuries take two primary forms: (1) economic/monetary harm, and (2) organizational harm caused by diversion of resources.[1]

*Economic harm*. The Energy Manager for HUC submitted testimony about an eight megawatt (MW) solar project HUC has been developing since 2022. "Until last August, HUC intended to use the Five Percent Safe Harbor to demonstrate eligibility for federal tax credits." Wilkinson Decl. ¶ 16, ECF No. 26-19. "Because the IRS Notice eliminated our ability to demonstrate eligibility for the tax credit using the Five Percent Safe Harbor, . . . [w]e have had to give up our planned approach to this project and come up with a new approach that includes doing work that clearly fulfills the Physical Work Test, like completing significant on-site construction, before July 4, 2026 . . . ." *Id.* ¶ 22. "[R]edesigning our plan and timeline to

---

[1] HUC and Woven's reputational harms, Pls.' Br. in Supp. of Summ. J. at 18-19, are less certain than their current injuries. In an effort to narrow the issues this Court must consider on an expedited timeline, Plaintiffs do not focus on those harms for purposes of summary judgment.

commence construction has resulted in significant additional expenses, including fees for expedited reviews and approvals, and increased legal and staffing costs." *Id.* ¶ 24; *see also id.* ¶ 28 (describing harms from "increased project expense").

Similarly, a Partner and Development Executive at Woven Energy stated that, "[b]ecause of Notice 2025-42, we are having to change our practices. We are expediting work, completing tasks out of order, and making decisions without the usual amount of time for consideration and deliberation." Schueller Decl. ¶ 14, ECF No. 26-13. "Seeking expedited approvals, as well as expedited permits, interconnection agreements, environmental, cultural, and historic reviews[,] and any number of other project-specific hurdles as a result of Treasury's decision to eliminate the Five Percent Safe Harbor represents a significant, unplanned expenditure in resources and staff time for both Woven and our clients." *Id.* ¶ 16.

Plaintiff San Francisco and NRDC member Tam Hunt are also suffering economic harm. San Francisco needs to add 150 MW of new renewable energy capacity to meet anticipated load growth, and it is actively procuring energy through long-term power purchase agreements. Hyams Decl. ¶ 7, ECF No. 26-6. The Notice is impacting San Francisco's procurement process: "developers have increasingly declined to respond to solicitations," "withdrawn active bids," and proposed unfavorable contract terms. *Id.* ¶ 8. Tam Hunt is a consultant on two solar and battery projects that he has been working on since 2022. Hunt Decl. ¶¶ 4-5, ECF No. 26-5. Prior to IRS Notice 2025-42, both projects were poised to qualify for tax credits using the Five Percent Safe Harbor to demonstrate beginning of construction. *Id.* ¶ 7. Due to the Notice, both projects are in "hibernation," largely eliminating Hunt's ongoing work and affecting his revenue. *Id.* ¶¶ 11-14.[2]

---

[2] Hunt's injuries easily clear the low bar for germaneness, which is "satisfied by a 'mere pertinence' between litigation subject and an organization's purpose." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 111-12 (D.C. Cir. 1990) (quoting *Humane*

*Organizational harm from diversion of resources*: Plaintiffs HUC and Woven also demonstrated organizational harm. HUC is "rushing to hire an Engineering, Procurement, and Construction (EPC) contractor and to break ground on the site." Wilkinson Decl. ¶ 23. "Navigating the changes to our project development plan and timeline as a result of the guidance has also taken considerable time and effort from myself and my team, diverting attention away from other work we would normally be doing." *Id*. ¶ 24.

Woven's declarant explains that "we have had to redeploy a tremendous amount of our time and staff capacity to help our clients comply with Notice 2025-42. This reallocation diverts resources and effort we would otherwise be expending on new client development. When this rush to keep existing wind and solar projects alive has passed, we will face a project backlog cliff that will further harm our company's financial prospects." Schueller Decl. ¶ 18. Moreover, "[b]ecause we are having to make quick and complicated changes to projects, we are investing far less time and far fewer resources in the education and capacity-building efforts that are typically central to our client services model." *Id.* ¶ 12.

### 2. Plaintiffs' injuries constitute injury-in-fact

Plaintiffs' harms satisfy the first element of standing—injury-in-fact. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (defining injury-in-fact as "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent"). Plaintiffs introduced uncontroverted evidence of increased monetary expenditures and interference with their ability to perform core business activities. Courts routinely recognize both as legally cognizable.

---

*Soc. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)); *contra* Defs.' Br. at 13. The subject of this litigation is closely connected to NRDC's "work to accelerate the use of renewable energy" and "goals of thwarting harmful public health and environmental impacts from pollution and climate change; lowering consumer energy bills; and ensuring that clean energy is affordable and accessible to all." Trujillo Decl. ¶ 8, ECF No. 26-16.

*Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 113-14 (2025) ("Monetary costs are of course an injury." (quoting *United States v. Texas*, 599 U.S. 670, 676 (2023))); *Alley Cat Allies, Inc. v. U.S. Nat'l Park Serv.*, No. 25-4269-CKK, 2026 WL 221343, at *8 (D.D.C. Jan. 28, 2026) (recognizing standing where "expenditure of resources subjects organization to operational costs beyond those normally expended" (cleaned up)). And contrary to Defendants' contentions, those injuries result from what Notice 2025-42 made clear, not what it left uncertain.

The Notice definitively stated that the Five Percent Safe Harbor "is not available" to wind and solar projects, and that the Physical Work Test is "the sole method that a taxpayer may use" to prove credit eligibility. AR00006.[3] As Defendants' merits arguments make plain, Defendants *expected* the Notice to influence developer behavior. *See* Defs.' Br. at 36. And it did. For projects that had planned to prove eligibility using the longstanding Five Percent Safe Harbor, the Notice left no doubt that developers would need to change their plans to qualify for the credit. *That* is why Plaintiffs have incurred monetary harm and redeployed staff time and resources.

To be sure, Defendants' action has also created significant uncertainty, because, for example, developers are unfamiliar with the Physical Work Test. *See* Wilkinson Decl. ¶ 25. But Plaintiffs' other injuries are not "derivative" of that uncertainty, *contra* Defs.' Br. at 8. Instead, they are the predictable effects of eliminating the Five Percent Safe Harbor. And in any event, the uncertainty that Plaintiffs face is nothing like the "broad-based market effects stemming from regulatory uncertainty" that Defendants invoke. *Am. Mun. Power, Inc. v. FERC*, 86 F.4th 922, 931 (D.C. Cir. 2023) (cited in Defs.' Br. at 8). Here, Plaintiffs have submitted evidence of

---

[3] On March 9, Defendants produced what they initially certified as the "administrative record." Upon review, Plaintiffs identified many documents known to have been before the agency that Defendants omitted from the initially certified record. Plaintiffs' counsel therefore sought a complete record. Defendants produced a corrected record on March 17. All record citations herein refer to pagination in Defendants' corrected record.

specific effects on specific projects. Their injuries are thus far more similar to the injuries in *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of Pres.*, 784 F. Supp. 3d 127, 143-44 (D.D.C. 2025), where the court found the economic injuries that a law firm suffered as a result of uncertainty created by an Executive Order to be cognizable injuries-in-fact.

### 3.    The Notice is the cause of Plaintiffs' injuries

Defendants' true quarrel appears to be with the "causation" and "redressability" prongs of standing. *See Lujan,* 504 U.S. at 560-61. Defendants challenge the causal chain in two ways: first, they argue that Plaintiffs' harms are self-inflicted injuries reflecting energy project developers' "independent choices," Defs.' Br. at 8; second, they argue that other governmental actions caused Plaintiffs' injuries, *id*. at 10-11.

Neither argument has merit. HUC is an energy project proponent seeking the benefit of the tax credit. Wilkinson Decl. ¶¶ 11-12, 16. It is the object of the Notice. Where a plaintiff challenging government action is "an object of the action," "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Diamond Alt.*, 606 U.S. at 112 (quoting *Lujan,* 504 U.S. at 561-62).

Defendants assert that "HUC's voluntary decision to change its plans" makes HUC the cause of its injuries. Defs.' Br. at 9. But the fact that a plaintiff incurs costs "voluntarily" does not make the costs "self-inflicted." *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140-41 (D.C. Cir. 2011). Rather, when plaintiffs expend resources or change behavior "in response to, and to counteract, the effects of . . . the defendants' alleged conduct," *id.*, courts ask whether they did so based on "certainly impending," not just "hypothetical," future harm. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 416 (2013). HUC changed its plans not because of a hypothetical future event, but because Defendants eliminated the Five Percent Safe Harbor, and HUC could not

7

satisfy the Physical Work Test without changing its project design. Far from an "independent choice," HUC's behavior shows the Notice is doing what Defendants designed it to do: "[e]liminating the safe harbor, and requiring developers to meet the Physical Work Test." Defs.' Br. at 37.

Nor can there be any genuine dispute that the Notice is causing injuries to Woven, San Francisco, and NRDC member Tam Hunt. Those injuries are the result of energy project developers reacting "in predictable ways" to the government action. *Diamond Alt.*, 606 U.S. at 112 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024)). In assessing causation and redressability, courts "distinguish the 'predictable' from the 'speculative' effects of government action or judicial relief on third parties." *Id.* (quoting *All. for Hippocratic Med.*, 602 U.S. at 383). In the "familiar circumstance where government regulation of a business may be likely to cause injuries to other linked businesses," courts may draw "commonsense inferences" about "predictable" "third party behavior." *Id*. at 116 (cleaned up).

This is exactly such a case. It is entirely predictable that cutting off access to a widely relied upon methodology for demonstrating eligibility for tax credits would cause many project proponents to scramble to qualify in a different way, and would cause other project proponents to pause or cancel projects that are no longer financially viable. *See* AR04358 (comment from construction company stating that changing beginning of construction guidance would "upend projects that are already underway" and cause "many if not most of these clean, affordable shovel-ready projects [to] stall, be delayed or canceled"); AR04385 (comment from Weyerhaeuser that "U.S. companies have invested billions of dollars based on the well-settled rules" on beginning of construction and, "[i]f those rules change now, the impact would be severe: higher power bills, lost jobs, stalled investment"). And it is equally predictable that, if

access to the Five Percent Safe Harbor were restored, project proponents would no longer need to spend money and staff time scrambling to meet the Physical Work Test, and some project proponents would restart paused or canceled projects. *See Teton Historic Aviation Found. v. U.S. Dep't of Defense*, 785 F.3d 719, 728 (D.C. Cir. 2015) (confirming that a third party's "pecuniary interest" and "the basic dynamic of naked capitalism" can show redressability (citation modified)). Thus, the injuries of Woven, San Francisco, and Tam Hunt are all caused by the Notice and redressable by a favorable decision in this Court.

Finally, Defendants are wrong to suggest that the One Big Beautiful Bill Act (OBBBA) and other governmental actions are the true causes of Plaintiffs' injury. *See* Defs.' Br. at 9-10. Plaintiffs have identified the Notice as the cause in sworn (and uncontroverted) statements. *See, e.g.*, Wilkinson Decl. ¶ 16 ("But for Notice 2025-42," HUC's 8 MW project "would already have qualified for federal tax credits."); Schueller Decl. ¶ 18 ("[W]e have had to redeploy a tremendous amount of our time and staff capacity to help our clients comply with Notice 2025-42."); Hunt Decl. ¶ 7 (explaining that "[p]rior to IRS Notice 2025-42," he expected his projects to qualify for tax credits "despite the accelerated termination deadlines for solar facilities in OBBBA"); Hyams Decl. ¶ 8 (stating that "[t]he SFPUC's procurement process is seeing the effects of the Notice"). Defendants produced no evidence to the contrary. They cite a reference to a *different* solar project as evidence that OBBBA is the real cause of HUC's harm. Defs.' Br. at 10. But Plaintiffs do not base standing on that project.[4] And that reference proves that, where statutory changes contributed to HUC's altered plans, the declarant acknowledged that contribution. *See* Wilkinson Decl. ¶ 18. Similarly, Plaintiffs' expert declaration explains how she

---

[4] Though HUC was affected by the Government's separate decision to cancel $7 billion in grants for solar programs in low-income communities, HUC's terminated grant was not intended for the 8 MW project at issue in this case.

controlled for effects from other government actions in order to isolate the consequences from the Notice. Levin Decl. ¶¶ 23, 25, 36, ECF 26-9. Defendants cannot create an issue of material fact by alleging, without evidence, that Plaintiffs' sworn statements are wrong. *Hamilton v. Howard Univ.*, 960 A.2d 308, 313 (D.C. Cir. 2008).

### 4. Plaintiffs satisfy the "zone of interests" test

Defendants assert that injuries to Woven and Mr. Hunt fall outside the "zone of interests" of the clean energy tax credits because "Congress never intended" the tax credits to benefit consultants. Defs.' Br. at 12-13. "The zone of interests test does not require . . . specific congressional intent to benefit the plaintiff." *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 589 (D.C. Cir. 2022). All it requires is that Plaintiffs' interests are not "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Amgen, Inc. v. Smith*, 357 F.3d 103, 108 (D.C. Cir. 2004) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). Here, §§ 45Y and 48E "were drafted with the goal of unleashing clean energy deployment." 168 Cong. Rec. H7577-02 at H7664 (daily ed. Aug. 12, 2022) (statement of Rep. Richard Neal). Woven and Mr. Hunt both provide services that directly advance that goal. They "easily clear the low hurdle of pleading injuries within the zone of interests" of the statute. *CSL Plasma*, 33 F.4th at 590-91; *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130-31 (2014) (describing a "lenient approach" and "not especially demanding" test (cleaned up)).

### B. Electricity Price Increases and Pollution Impacts Demonstrate Standing

Plaintiffs OEC, NRDC, Public Citizen, and San Francisco have independent bases for standing: looming electricity cost increases and, for NRDC members, heightened pollution

burdens.[5] Electric prices are almost certain to rise in the coming years, creating imminent injury. Similarly, uncontroverted evidence shows the Notice will cause specific power plants to run more than they otherwise would, increasing pollution in neighboring communities. Plaintiffs and their members or clients will suffer particularized harm as a result. And a clear, predictable causal chain runs straight from the Notice to these impacts.

### 1.    Plaintiffs have demonstrated imminent harm

Defendants argue electricity price increases are not "immediate." Defs.' Br. at 14. But "[s]tanding depends on the probability of harm, not its temporal proximity." *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1078 (D.C. Cir. 2017) (alteration in original) (quoting *520 Mich. Ave. Assocs. v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006)). Imminence does not require that an injury occur "within a certain number of days, weeks, or months." *Newdow v. Roberts*, 603 F.3d 1002, 1015 (D.C. Cir. 2010) (Kavanaugh, J., concurring) (citation modified). The D.C. Circuit has found standing based on harm that will occur "in the next few years," *Orangeburg*, 862 F.3d at 1079, or even longer, *Vill. of Bensenville v. FAA*, 376 F.3d 1114, 1119 (D.C. Cir. 2004) (finding standing based on fee due in 13 years).

To demonstrate imminence, plaintiffs must show injury that is "substantially probable." *Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 518 (D.C. Cir. 2009).[6] Plaintiffs have done so

---

[5] Only one Plaintiff need demonstrate standing for this suit to proceed. Thus, this Court need not reach Defendants' argument about Maryland Office of People's Counsel's independent standing.

[6] Plaintiffs have been unable to find any cases in which courts have applied the D.C. Circuit's "risk of harm" test in the context of economic harm. *Contra* Defs.' Br. at 15. Because any monetary harm is a cognizable injury, the sole relevant question is whether such injury is sufficiently likely. *See, e.g.*, *Carpenters Industrial Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) (stating that "[a] dollar of economic harm is still an injury-in-fact," and where "a plaintiff alleges that it will suffer future economic harm," it must "demonstrate a substantial probability of injury-in-fact"). But even if the risk-of-harm standard applies, Plaintiffs' unrebutted evidence shows both a substantial probability that prices increase, Levin Decl. ¶ 9, and a substantial increase in that risk, *see id*. at ¶ 8.

here. Demand for energy is projected to grow considerably in the next few years. Levin Decl. ¶ 44; AR04374 (comment letter from Data Center Coalition referencing "rapidly escalating demand for electricity"). New energy supply, including wind and solar energy, is necessary to meet that demand. *See* Hyams Decl. ¶ 7; AR04403 (comment letter from Texas Energy Buyers Alliance, stating that "Texas needs the generation" from wind and solar projects); AR04405 (comment from Clean Energy Buyers Association noting that "near-term capacity growth will come primarily from wind and solar, given their deployment speed and proven scalability"). Notice 2025-42 has caused wind and solar project developers to pause or cancel planned projects, Hunt Decl. ¶ 23, and placed nearly one-third of planned wind and solar projects at increased risk of cancellation, Levin Decl. ¶ 8. *See also* AR04358 (comment letter from construction company stating that if methodology is changed, "many if not most of these clean, affordable, shovel-ready projects will stall, be delayed or canceled"); AR4358 (comment letter from law firm stating that changing methodology could "disrupt projects already in development and place billions of dollars of American investment at risk"). Expert analysis of electricity prices in three regional markets show that the Notice "is likely to have substantial impact on electricity costs" in all three regions. Levin Decl. ¶ 9; *see also* AR04402 (comment letter from Texas Energy Buyers Alliance stating that "[a]bruptly changing the Treasury's 'beginning of construction' guidance" would "increase costs"). Plaintiffs and their members pay electricity bills in these regions. *E.g.*, White Decl. ¶ 6-9, ECF No. 26-18; Penwell Decl. ¶¶ 1-5, ECF No. 26-12. Increased electricity prices will cause them monetary harm.[7]

---

[7] Evidence cited in amici's briefs reinforces both the likelihood and the scale of these effects. A report by Princeton Zero Lab found that, by shortening the eligibility period for tax credits, OBBBA would substantially reduce new wind and solar projects in the coming years, even as electricity demand hits record highs, causing residential electricity prices to rise. The Notice, which further limits tax credit eligibility for the same wind and solar facilities, will similarly

Defendants have introduced no evidence to the contrary.[8] Because the uncontroverted evidence shows that Plaintiffs are substantially likely to experience increased electricity costs in the next several years, Plaintiffs have demonstrated an imminent injury.

### 2.    Plaintiffs' harms are particularized

Defendants construe Plaintiffs' harms as "shared with the public at large" and argue they are not particularized. Defs.' Br. at 17. But "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 n.7 (2016); *see also Vill. of Bensenville*, 376 F.3d at 1119 ("The widespread character of an alleged injury does not demean the standing of those who are in fact injured.") (quotation omitted). Rather, concerns about particularity arise "in cases where the harm at issue is not only widely shared, but is also of an abstract and indefinite nature—for example, harm to the 'common concern for obedience to law.'" *FEC v. Akins*, 524 U.S. 11, 23 (1998). "Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found 'injury in fact.'" *Id.* at 24.

Plaintiffs will experience harm "in a personal and individual way." *Spokeo*, 578 U.S. at 339. Plaintiffs' expert analyzed the Notice's likely impacts on wholesale electricity prices and power plant operations in three specific geographic areas: Texas, the Pacific Northwest, and the Southwest. Levin Decl. ¶ 18-20. Plaintiffs OEC, NRDC, and Public Citizen have members who live and purchase energy in those regions, and who will suffer individualized harm. For instance,

---

reduce new projects and increase electricity costs. These effects are so predictable that states have issued executive orders to mitigate their impact. *See* States' Amicus Br. at 10-11.

[8] Defendants' assertion that these injuries depend on third-party decisions, Defs.' Br. at 14, goes to the element of causation, not imminence, and is addressed below. *See infra*, at 14-16.

OEC member Doris Penwell pays an additional rate for renewable energy, and thus is likely to be especially affected by increased clean energy prices. Penwell Decl. ¶ 3. NRDC member Jillian McFarland lives less than 10 miles away from the Handley Power Plant, McFarland ¶ 3, ECF No. 26-10, and frequently visits family within a mile of the plant, *id.* ¶ 5. She and her family recreate outside but go out far less when air quality is bad. *Id.* ¶ 9. The Handley Power Plant is likely to run more as a result of wind and solar project cancelations caused by Notice 2025-42, exposing her family to greater pollution and reducing their use of the outdoors. Levin Decl. ¶ 97; McFarland ¶ 13. San Francisco anticipates higher renewable energy procurement costs, which will lead to higher rates for customers, including city properties. Hyams ¶ 9. These are not generalized grievances.

In addition to being contrary to *Akins*, Defendants' implication that consumer injuries from electricity prices cannot support standing because they are "held in common by all members of the public," Defs.' Br. at 15, proves too much: the D.C. Circuit has repeatedly found consumer injury cognizable, including in cases involving electricity rates. *Env't Action v. FERC*, 996 F.2d 401, 406-07 (D.C. Cir. 1993); *see also Belmont Mun. Light Dep't v. FERC,* 38 F.4th 173, 185 (D.C. Cir. 2022) (finding injury where petitioners "represent the interests of the states in protecting their citizens and electric ratepayers"); *Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009, 1012 (D.C. Cir. 2003) (finding standing based on impacts to consumer's ability to select internet provider).[9] Plaintiffs' unrebutted evidence demonstrates injuries that are both personal and individualized, and are thus particularized.

---

[9] Many of Defendants' objections to the particularity of Plaintiffs' injuries appear to be, in fact, objections to causation. *See, e.g.*, Defs.' Br. at 16. Causation and redressability are separate requirements from particularity, and Plaintiffs address them separately below.

### 3.    Plaintiffs have established causation and redressability

Defendants contest that the Notice will cause electricity rates to rise and pollution to increase. Defs.' Br. at 14. Relatedly, they contest that vacatur would redress those injuries. *Id.* at 16. "Causation and redressability typically 'overlap as two sides of a causation coin.'" *Carpenters Indus. Council*, 854 F.3d at 6 n.1 (quoting *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997)). "[I]f a government action causes an injury, enjoining the action usually will redress that injury." *Id.* It is true that a party invoking this Court's jurisdiction cannot "rest on mere speculation about the decisions of third parties." *Dep't of Com. v. New York*, 558 U.S. 752, 768 (2019). But that does not mean, as Defendants suggest, that a causal chain that includes third party conduct is always too attenuated. "When third party behavior is predictable, commonsense inferences may be drawn." *Diamond Alt.*, 606 U.S. at 116. "In considering the likely reaction of third parties," courts "consider a variety of evidence," including "affidavits submitted by the parties," "evidence in the administrative record," and "arguments firmly rooted in the basic laws of economics." *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 382 (D.C. Cir. 2020) (cleaned up).

The causal chain that leads from Notice 2025-42 to higher electricity rates and increased pollution is straightforward and predictable: (1) Notice 2025-42 eliminated a widely relied upon method for wind and solar projects to demonstrate tax credit eligibility → (2) many wind and solar projects that were depending on credits for financial viability will not be built → (3) the electricity those projects would have generated will instead be supplied by more expensive electricity produced by dirtier power sources.

The third-party decisions in this case are entirely different from those in *Arpaio v Obama*, 797 F.3d 11 (D.C. Cir. 2015). There, the plaintiff's theory of standing "depend[ed] on large numbers of people having the same unlikely experiences and behaviors." *Id.* at 15. Here,

15

"common sense and basic economics," *Carpenters Indus. Council*, 854 F.3d at 6, along with Plaintiffs' uncontroverted evidence and the administrative record, indicate that each step in the causal chain is predictable. It is highly predictable that cutting off eligibility for tax credits that offset up to fifty percent of a project's cost, Hunt Decl. ¶ 14, will make some projects financially unviable. Hunt Decl. ¶¶ 11, 22; Schueller Decl. ¶ 13; AR04358 (comment from construction company stating that changing beginning of construction guidance would "upend projects that are already underway"); AR04369 (comment from Monarch Private Capital stating that changes to beginning of construction standards outlined in the Executive Order would "disrupt development of solar and wind projects"); AR04385 (comment from Weyerhaeuser stating that undermining start of construction certainty would result in "stalled investment"). It is also highly predictable that, as new electricity demand outpaces supply, older power plant units—which are both more expensive and more polluting than newer units, Levin Decl. ¶ 72 —will bridge the supply gap. *See also* AR004287 (comment from rural electric cooperative explaining "all costs are passed through directly to their consumer-members").

Defendants cite no contrary evidence. Nor do they assert any reason, other than the presence of third parties, that the causal chain is not predictable. The closest they come is their litigation counsel's unsupported speculation that "it is possible the investment that otherwise would have gone to wind and solar projects will now go to other clean energy technologies." Defs.' Br. at 18 n.10. But Plaintiffs' expert analysis considered a comprehensive database of all existing and planned energy sources. *See* Levin Decl. ¶ 11. To defeat summary judgment, a party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002) (party cannot rely on "mere allegations or denials" to

16

defeat summary judgment ); *Deloatch v. Harris Teeter, Inc.*, 797 F. Supp. 2d 48, 57 (D.D.C. 2011) ("[L]egal memoranda . . . cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion.").

The Notice's predictable effects on electricity prices and pollution are not speculative, and Plaintiffs have demonstrated causation and redressability.

****

"[O]nly one plaintiff needs standing for a suit to proceed." *Bost v. Ill. State Bd. of Elections*, 607 U.S. ---, 146 S. Ct. 513, 519 n.3 (2026) (citing *Biden v. Nebraska*, 600 U.S. 477, 489 (2023)); *see also Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 n.3 (D.C. Cir. 2012). Here, based on uncontroverted evidence, multiple plaintiffs have standing. Nothing further is needed.

## II.     The AIA does not bar Plaintiffs' lawsuit

This action is not barred by either the AIA, 26 U.S.C. § 7421(a), or the Declaratory Judgment Act (DJA), 28 U.S.C. § 2201(a).[10] Plaintiffs' suit does not seek to restrain the assessment or collection of tax, so it falls outside the scope of the AIA. Moreover, Plaintiffs have no other avenues for challenging Notice 2025-42, so even if this case somehow *did* fall within the scope of the AIA, the judicial exception recognized in *South Carolina v. Regan,* 465 U.S. 367 (1984), applies. Finally, because equity jurisdiction otherwise exists and "under no circumstances could the Government ultimately prevail," the judicial exception to the AIA recognized in *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1 (1962), also applies.

---

[10] The DJA prohibits most declaratory suits "with respect to Federal taxes." 28 U.S.C. § 2201(a). The D.C. Circuit construes the AIA and DJA as "coterminous," *Cohen v. United States*, 650 F.3d 717, 730-31 (D.C. Cir. 2011) (en banc). Thus, "the scope of the [AIA] governs the outcome of this case." *Maze v. IRS*, 206 F. Supp. 3d 1, 10-11 (D.D.C. 2016) (citing *Fl. Bankers Ass'n v. U.S. Dep't of Treasury*, 4799 F.3d 1065, 1067 (D.C. Cir. 2015)).

17

A.      The Purpose of Plaintiffs' Suit is to Vacate Notice 2025-42—Not to Restrain the Assessment or Collection of a Tax

The purpose of this suit is to "target the Notice's" change in methodology as arbitrary and capricious, "asking that it be set aside as a violation of the APA." *See CIC Serv., LLC v. IRS*, 593 U.S. 209, 223 (2021); *see also* Compl. ¶¶ 10, 127, ECF No. 1. Plaintiffs do not seek to restrain the assessment or collection of a tax. Thus, this is not the kind of action the AIA proscribes.

"The AIA, as its plain text states, bars suits concerning the 'assessment or collection of any tax.'" *Cohen v. United States*, 650 F.3d 717, 727 (D.C. Cir. 2011). "[A]s the D.C. Circuit has explained, the [AIA] does not bar any and all lawsuits that might ultimately impact the amount of revenue in the U.S. treasury." *Silver v. IRS*, No. 19-cv-247-APM, 2019 WL 7168625, at *3 (D.D.C. Dec. 24, 2019) (citing *Cohen*, 650 F.3d at 726). It proscribes only those actions that fall within its plain terms—suits that "seek to restrain the assessment or collection of tax." *Cohen*, 650 F.3d at 727. Assessment "is not 'synonymous with the entire plan of taxation[,]'" *Id.* at 725 (citing *Hibbs v. Winn*, 542 U.S. 88, 102 (2004)); it is the formal "recording" of a taxpayer's liability, 26 U.S.C. § 6203, after which collection, or "the act of obtaining payment of taxes due[,]" occurs. *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 10 (2015). "[W]hether the [AIA] prohibits a suit depends on whether the action is fundamentally a 'tax collection claim,' which the court must determine based upon 'a careful inquiry into the remedy sought, the statutory basis for that remedy, and any implication the remedy may have on assessment and collection[.]'" *Silver,* 2019 WL 7168625, at *3 (citing *Cohen*, 650 F.3d at 727). To identify a suit's purpose, courts consider "the face of the . . . complaint" and "most especially," the "relief requested[.]" *CIC Serv.*, 593 U.S. at 218 (internal citations omitted).

In Defendants' view, the target of this suit is a "tax obligation"—they assert that "Plaintiff HUC is suing for the purpose of restraining assessment and collection of the additional tax" if

18

HUC "does not qualify for tax credits," and "[a]ll other Plaintiffs are suing for the purpose of restraining the assessment and collection of the same tax that might be owed in the future by HUC and other non-party energy project developers." Defs.' Br. at 19-20. Tellingly, Defendants nowhere cite to either "the face of the . . . complaint" or "the relief requested" to support this view. *CIC Serv.*, 593 U.S. at 218 (internal citations omitted). Looking to both is instructive, *see Cohen*, 650 F.3d at 727: Plaintiffs' complaint challenges the legality of Notice 2025-42 under the APA. Compl. ¶ 10 ("Notice 2025-42 is arbitrary and capricious agency action in violation of the [APA]"). It seeks to "[d]eclar[e] the notice . . . arbitrary and capricious; hold[] unlawful and vacat[e] the Notice; and grant[] such other relief the Court considers just and proper." *Id.*

Nowhere do Plaintiffs request judicial determination of their, or anyone's, eligibility for tax credits. *See generally id*. They challenge the legality of the Notice and seek relief from its unlawful removal of the Five Percent Safe Harbor and the attendant harms therefrom, *supra*, at 3-13, which are distinct from the imposition of a tax. *See Chamber of Comm. v. IRS*, No. 1:16-cv-944-LY, 2017 WL 4682049, at *1, 3 (W.D. Tex. Sep. 29, 2017) (finding that plaintiffs' APA challenge to Treasury rule did not seek to restrain assessment or collection of a tax; "[r]ather, [p]laintiffs challenge the validity of the Rule so that a reasoned decision can be made about whether to engage in a potential future transaction that would subject them to taxation under the Rule.").

Defendants characterize Plaintiffs' action as seeking elimination of uncertainty surrounding tax credit eligibility. *See* Defs.' Br. at 21. But "victory in this action would not provide an answer to the fundamental question of whether or not" any taxpayers are "entitled" to clean energy tax credits, nor do Plaintiffs "ask[] for any judicial determination to that effect." *Z St., Inc. v. Koskinen*, 44 F. Supp. 3d 48, 60 (D.D.C. 2014), *aff'd*, 791 F.3d 24 (D.C. Cir. 2015).

19

Thus, this suit will not "restore advance assurance" of anyone's credit eligibility. *See Alexander v. Ams. United Inc.,* 416 U.S. 752, 761 (1974). Indeed, in challenging Plaintiffs' standing, Defendants argue the Notice "is *not* determinative of whether any developer will qualify for a tax credit or not." Defs.' Br. at 7 (emphasis added). Defendants cannot have it both ways.

Defendants attempt to distinguish *CIC Services*, Defs.' Br. at 22, but the Court's reasoning is instructive. There, the petitioner, "a material advisor to taxpayers," challenged IRS Notice 2016-66 as arbitrary and capricious under the APA. 593 U.S. at 214-15. The Notice required material advisors and taxpayers to report certain transactions; failure to do so resulted in a tax penalty and potential criminal liability. *Id.* at 213-14. Even though the challenged Notice was likely to impact tax revenue, the Court rejected the government's contention that the petitioner's suit was a "tax action in disguise." *Id.* at 219. To reach its ruling, the Court considered the objective of the suit—"essentially, the relief the suit requests." *Id.* at 217. As in the instant suit, the petitioner sought relief from the Notice. *Id.* at 219.

Three considerations informed the Court's view that the petitioner's suit targeted Notice 2016-66, not the tax penalty. *Id.* at 219-23. First, as is true here, Notice 2016-66 imposed costs on the petitioner that were "separate and apart from" the tax penalty, and the petitioner's suit attempted "to get out from under" such "(non-tax) burdens." *Id.* at 220. Second, the reporting requirement and any ultimate tax liability were multiple steps apart from one another. *Id.* at 220-21. This attenuation decreased the likelihood that the aim of the suit was to restrain the assessment or collection of a tax. *Id.* There is an even more attenuated chain of connection between Notice 2025-42 and any tax liability for Plaintiffs. Plaintiffs OEC, NRDC, Woven, Public Citizen, San Francisco, and Maryland Office of People's Counsel do not expect to incur tax liability connected to Notice 2025-42. And even HUC, the only Plaintiff seeking to qualify

20

for a tax credit, is conforming its behavior to the Notice's requirements and is expending significant resources to qualify for the credit using the Physical Work Test to ensure no change to its ultimate tax treatment. *See CIC Services*, 593 U.S. at 220 (noting as one contingency that CIC disclaimed any intent to withhold the information the reporting rule required).[11] Finally, in *CIC Services,* the Court considered that violation of Notice 2016-66 was punishable, not just by the tax penalty, but also by criminal penalties, rendering it impractical to expect the petitioner to disobey the notice and later bring a refund suit. *Id.* at 221-22. Here, though Plaintiffs face no potential criminal liability, the fact that a refund suit is not even an option for them similarly "necessitate[s] a pre-enforcement, rather than a refund, suit." *Id.* at 222; *see infra*, at 19-23.

Because Plaintiffs seek vacatur of Notice 2025-42 as arbitrary and capricious, not restraint of the assessment or collection of any tax, their suit is beyond the reach of the AIA.

### B.    The *South Carolina v. Regan* exception applies to all plaintiffs

This case is the only opportunity Plaintiffs will have to challenge Notice 2025-42. Thus, to the extent the case is subject to the AIA, the judicial exception articulated in *South Carolina v. Regan* applies. 465 U.S. 367 (1984). In *South Carolina*, the Supreme Court held "that Congress intended the [AIA] to bar a suit only in situations in which Congress had provided the aggrieved party with an alternative legal avenue by which to contest the legality of a particular tax." *Id.* at

---

[11] According to the Defendants, if HUC faces no tax liability from Notice 2025-42, it faces no harms at all, and therefore lacks standing. Defs.' Br. 24. This misconception is flatly contradicted by the substantial non-tax harms HUC is experiencing, *supra*, at 3-7. Similarly, Defendants' suggestion that HUC could bring a refund suit if it fails to meet the Physical Work Test is wrong. HUC intends to fund the project by collateralizing the credit—that is, borrowing against it. Wilkinson Decl. ¶ 25. "Strict compliance with Treasury's [beginning of construction] requirements is a prerequisite to securing funding. . . ." AR04352. If HUC cannot meet the Physical Work Test, it simply will not receive funding.

373.[12] Where no other legal remedy is available to the party bringing suit, the AIA does not bar pre-enforcement judicial review. *Id*. at 378.

In *South Carolina*, the State of South Carolina challenged an amendment to the Internal Revenue Code section governing the tax treatment of state bonds. 465 U.S. at 372. Although the amendment negatively impacted the state by requiring it to either pay bondholders a higher interest rate on bearer bonds or issue only registered bonds, it imposed no tax liability on South Carolina. *Id*. at 372, 378. South Carolina challenged the amendment as unlawfully eliminating the state's freedom to issue bond obligations in the form it chose. *Id.* at 371-72. The Court determined the AIA did not bar the suit because, as a non-taxpayer, South Carolina could not pay the tax and seek a refund, and thus had no other opportunity to bring suit. *Id.* at 380.

So too, here. Plaintiffs will have no opportunity to bring a post-enforcement challenge to Notice 2025-42. As detailed above, HUC is endeavoring to retain credit eligibility, and the other Plaintiffs will incur no tax liability because of Notice 2025-42. Much like South Carolina, they cannot route their dispute through a refund suit, nor can they file a return documenting noncompliance to set up a challenge in Tax Court. *See South Carolina,* 465 U.S. at 376.

Defendants incorrectly argue Plaintiffs' reading of *South Carolina* "would write out" the last clause of the AIA—"whether or not such person is the person against whom such tax was assessed[,]" 26 U.S.C. § 7421(a). Defs.' Br. at 23. Plaintiffs are not among the individuals contemplated in that clause, which Congress added in a 1966 amendment. "The central focus of the added phrase . . . was on third parties whose property rights competed with federal tax liens"

---

[12] Alternatives for taxpayers to challenge the assessment or collection of any tax include paying the disputed tax and suing for a refund, or filing a petition in Tax Court upon receipt of an IRS deficiency notice. 26 U.S.C. § 7422(a); *id.* § 6213(a). In either instance, the court would review the "taxpayer's tax liability[.]" *Z St.*, 791 F.3d at 31.

and who were ultimately provided an exclusive right of action under 26 U.S.C. § 7426. *South Carolina*, 465 U.S. at 377 (citing *Bob Jones Univ. v. Simon*, 416 U.S. 725, 732 n.6 (1974)).

Defendants lean on Justice O'Connor's concurring opinion in *South Carolina* to support their contention that the AIA bars this case. Defs.' Br. at 26. But Justice O'Connor's proposed interpretation of the AIA—as blocking all tax-related cases except those arising under the Supreme Court's original jurisdiction, 465 U.S. at 399-400—was not adopted by the majority.

Nor are Defendants correct that either the majority opinion in *South Carolina* or this Circuit's precedent prohibits suits by organizational plaintiffs based on a defendant's bare conjecture that some unknown and unnamed member might have an alternative remedy. *Contra* Defs.' Br. at 26-27. In *South Carolina*, the majority made clear that their opinion would not allow taxpayers to evade the AIA simply "by forming organizations to litigate their tax claims." 465 U.S. at 381 n.19 (explaining that, because "taxpayers have alternative remedies, . . . . such organizations could not successfully argue that the [AIA] does not apply because they are without alternative remedies"). The district court in *National Taxpayers Union, Inc. v. United States* applied the majority's reasoning to bar a suit by a "taxpayer group" as "an example of the sort of taxpayer group suit the *South Carolina* court anticipated and wished to leave barred by the AIA." 862 F. Supp. 531, 535 (D.D.C. 1994). But none of the organizational Plaintiffs involved in this case were formed to represent taxpayers or litigate members' tax claims. *See* Gastellum Decl. ¶ 5, ECF No. 26-4 ("OEC was founded in 1968 to advance innovative, collaborative, equitable solutions to address Oregon's environmental challenges and benefit people's health and quality of life."); Trujillo Decl. ¶ 7, ECF No. 26-16 ("NRDC's mission is 'to safeguard the earth—its people, its plants and animals, and the natural system on which all life depends.'"); Weissman Decl. ¶ 4, ECF No. 26-17 (describing "Public Citizen's organizational

23

mission" to include promoting governmental policies and actions "that promote actions and behaviors to address the adverse impact of climate change and protect the interests of consumers."). Plaintiffs are not the type of organization, formed for the purpose of evading the AIA, whose suits the *South Carolina* majority sought to bar.

Defendants alternately contend that the *South Carolina* exception does not apply because Plaintiffs other than HUC can rely on third party developers to raise Plaintiffs' claims in an eventual refund suit. Defs.' Br. at 25. The Court's ruling is not so narrow. The Court held that "Congress did not intend the Act to apply where an aggrieved party would be required to depend on the mere possibility of persuading a third party to assert his claims. Rather, the Act was intended to apply only when Congress has provided an alternative avenue *for an aggrieved party to litigate its claims on its own behalf.*" *South Carolina*, 465 U.S. at 381 (emphasis added).

Defendants point to Ninth and Sixth Circuit cases to support their argument. *See Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau*, 843 F.3d 810 (9th Cir. 2016), and *RYO Mach. LLC v. U.S. Dep't of Treasury,* 696 F.3d 467 (6th Cir. 2012). Defs.' Br. at 25-26. Both cases are distinguishable, as the plaintiffs were closely related to a known taxpayer who had initially sued alongside them and who had altered tax obligations that would give them the opportunity to raise identical claims in a refund suit. *Yakama Indian Nation*, 843 F.3d. at 815-16; *RYO Mach.*, 696 F.3d at 472. The cases were thus more akin to the scenario Justice O'Connor warned about in her concurrence. *South Carolina*, 465 U.S. at 386-87. To the extent either case stands for the proposition that plaintiffs with no alternative avenue to litigate their claims must depend on a third party to do so, they are wrongly decided, as that outcome conflicts with the express holding of *South Carolina*. In any event,

24

neither decision is binding on this Court. *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987).

The Plaintiffs are in precisely the scenario that *South Carolina* contemplates; construing otherwise "risk[s] that the [AIA] would entirely deprive" the Plaintiffs "of any opportunity to obtain review of [their] claims." *See* 465 U.S. at 380-81. Thus, the AIA poses no barrier to this litigation. *See id.*; *see also Bob Jones Univ.*, 416 U.S. at 746 ("This is not a case in which an aggrieved party has no access at all to judicial review. Were that true, our conclusion"—that the AIA bars the suit—"might well be different.").

## C.     Plaintiffs' suit falls within the *Williams Packing* exception to the AIA

Plaintiffs' is the rare suit that also falls within the *Williams Packing* exception to the AIA. 370 U.S. at 7. Plaintiffs satisfy both prongs of the test: Defendants cannot prevail on the merits of this case, and the substantial harms Plaintiffs are suffering give rise to equity jurisdiction.

Even "under the most liberal view of the law and the facts," Defendants cannot prevail on the merits. *See Williams Packing,* 370 U.S. at 7; *see infra*, at 25-37. Neither Notice 2025-42 nor any record document provides any reasoned basis for eliminating the Five Percent Safe Harbor. And Defendants completely ignored serious reliance interests, on the scale of "billions of dollars," AR04358, that their prior policy had engendered. *Infra*, at 26-30. The post hoc arguments Defendants' counsel now offers do not explain their choice. Because black letter law makes clear the Notice was issued in blatant violation of the APA, Defendants cannot prevail on the merits.

Plaintiffs also meet the second prong of the *Williams Packing* test through their robust showing of irreparable harm without an adequate alternative forum. Across multiple sworn declarations, Plaintiffs presented evidence of an array of concrete harms they are experiencing, many of which are irreparable. *Supra*, at 3-13. They have demonstrated injuries that are "both

25

certain and great," and "actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation modified). Because Plaintiffs do not dispute their tax liability, the instant suit is the only forum for Plaintiffs to vindicate their APA claim. *Supra*, at 19-23. Thus, the *Williams Packing* exception to the AIA applies.

### D.    Plaintiffs have no alternative remedies, so their APA challenge is not precluded

Defendants repackage their AIA arguments to contend that taxpayer refund and deficiency proceedings under 26 U.S.C. §§ 6213(a) and 7422(a) offer adequate remedies, thereby precluding Plaintiffs from bringing the instant APA challenge. Defs.' Br. at 28-29. This argument, too, is without merit.

Where "Congress has provided special and adequate review procedures," the adequate remedy bar set forth in 5 U.S.C. § 704 precludes an APA suit. *See Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (citation modified). But here, Plaintiffs have no other adequate remedies. Plaintiffs are not subject to additional tax liability due to Notice 2025-42 and will not be able to pursue a refund suit or deficiency suit, as such alternative avenues are only available to those disputing their own tax liability. *See* 26 U.S.C. §§ 6213(a), 7422(a). Though Defendants insist Plaintiffs should channel their suit through these "special statutory review" mechanisms, they acknowledge, in the same breath, that such mechanisms "limit judicial review to claims *brought by taxpayers*." Defs.' Br. at 31 (emphasis added). Because Plaintiffs will have no opportunity to pursue either route, this challenge is not precluded under 5 U.S.C. § 704.

## III.    Notice 2025-42 is arbitrary and capricious

Defendants' first merits defense is not that Notice 2025-42 is reasonable, but that they did not need to provide any "reasoned explanation." Defs.' Br at 32. But the APA applies to the Notice, and Defendants do not argue otherwise. Their secondary defense—that their explanation

26

was sufficient because their path can be discerned from extra-record news articles—conflicts

with "black-letter administrative law" that a court should review the merits of an agency's

decision based on the record certified by the agency. *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d

44, 47 (D.C. Cir. 2013). Defendants have not cited record support for their decision—and indeed,

the record does not support it. Their decision is arbitrary and capricious.

> **A.      The arbitrary and capricious standard applies and requires reasoned decisionmaking**

Defendants do not appear to dispute that the Notice must comply with the APA, 5 U.S.C.

§ 706(2)(A). Nor could they—there are few more basic principles in administrative law than that

agency action must be supported by reasoning, and that the agency must explain that reasoning.

*See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) ("the

agency must examine the relevant data and articulate a satisfactory explanation for its action

including a rational connection between the facts found and the choice made" (citation

modified)); *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (agencies must "engage in reasoned

decisionmaking" and rest "on a consideration of the relevant factors" (quoting *State Farm*, 463

U.S. at 43)).

Defendants argue that because their prior decision offered no explanation, they were

under no obligation to offer one here. Defs.' Br. at 33. That argument is wrong as a legal matter.

Even the cases Defendants cite make clear that every agency action is subject to the

"requirement that an agency provide reasoned explanation." *FCC v. Fox Television Stations, Inc.*,

556 U.S. 502, 515 (2009) (both "initial agency action" and "subsequent agency action" must be

supported by a "reasoned explanation"); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife*

*Serv.*, 698 F. Supp. 3d 39, 74 (D.D.C. 2023) (stating principle that agency "must cogently explain

why it has exercised its discretion in a given manner" "applies equally to fresh and reconsidered

decisions" (citation modified)). Though Defendants contort the holding in *Fox* to argue there is "essentially no burden at all" to provide an explanation here, Defs.' Br. at 32-33, that case directs agencies to "examine the relevant data" and "articulate [] satisfactory explanation[s]" for their actions. *Fox Television Stations*, 556 U.S. at 513 (quoting *State Farm*, 463 U.S. at 43); *see id.* at 515 (stating "of course the agency must show that there are good reasons for the new policy").[13]

Defendants alternately contend the Notice is "a pure exercise of the IRS's enforcement discretion." Defs.' Br. at 33. But it is not. It is a general statement of agency policy, applicable to all wind and solar projects, about "how the IRS will administer the tax credits." Defs.' Br. at 1; *see id.* at 29 (describing notice as guidance "about how the IRS will process credit claims"). It is not even about enforcement—let alone the kind of "single-shot non-enforcement decision" that precludes review. *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994).

Notice 2025-42 is subject to the APA's requirement of reasoned decision-making.

## B.    Defendants ignored serious reliance interests

Defendants acknowledge an agency must provide "a more detailed justification" for its decision if its "prior policy has engendered serious reliance interests." Defs.' Br. at 34 (quoting *Fox Television*, 556 U.S. at 515); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (agencies must "be cognizant that longstanding policies may have 'engendered serious reliance interests,'" and provide "'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.'" (quoting *Fox Television*, 556 U.S. at 515-16)). They nonetheless argue, incorrectly, that no such justification was needed.

---

[13] While Defendants name only the agency's prior 2022 decision in their brief, Defs.' Br. at 33, Notice 2025-42 lists thirteen prior notices that established and affirmed the Five Percent Safe Harbor, dating back to 2013. *See* AR00005 & n.2 (acknowledging that the IRS has issued "several notices" on the Five Percent Safe Harbor). The administrative records for those thirteen notices have not been made available to plaintiffs or the Court, and it is not possible to determine what analysis or explanation accompanied those decisions.

Defendants do not dispute that Notice 2025-42 entirely failed to consider reliance interests. Nor do they argue that industry lacked such interests. Rather, they offer the post hoc argument, found nowhere in the record, that any reliance was not *serious* reliance, because the §§ 45Y and 48E tax credits are "of recent vintage." Defs.' Br. at 35; *id.* (arguing that "agencies only need to consider '*serious* reliance interests' when changing position" (quoting *Encino Motorcars*, 579 U.S. at 222) (emphasis in original)).

Defendants' argument is, itself, unserious. Congress has provided clean energy tax credits that condition eligibility on the beginning of construction for more than a decade. American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 407(a)(3), (b), 126 Stat. 2313, 2340-41 (2013). Wind projects have been eligible since 2013; solar projects have been eligible since 2015. *See id.*; *see also* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. P, tit. III, § 303; div. Q tit. I § 187, 129 Stat. 2242, 3039, 3074 (2015). The legislative history of the Inflation Reduction Act confirms what is obvious from the statutory texts—that the credits enacted in § 45Y and § 48E were "successor credits" to existing "tax credits for renewable technologies such as solar, wind, geothermal, and hydropower." 168 Cong. Rec. H7577-02 at H7664 (daily ed. Aug. 12, 2022) (statement of Rep. Neal). When Defendants first proposed rules for §§ 45Y and 48E, they too noted that these sections "generally replace sections 45 and 48 of the Code." 89 Fed. Reg. 47,792, 47,792 (June 3, 2024). Thus, the current credits are but the latest chapter in a long history of tax credits for wind and solar projects.

Defendants' instructions to industry about how to demonstrate beginning of construction for clean energy tax credits, including the Five Percent Safe Harbor, also date back more than a decade. The administrative record makes clear that the clean energy industry has viewed this as an established and consistent practice over that time. *See, e.g.*, AR04240 (*Tax Notes* article

29

quoting lawyer summarizing that "[t]here has been very little variation in the fundamental rules for the physical work test and the 5 percent safe harbor since Notice 2013-29.")[14] And it makes even more clear that industry has, in fact, relied on both the credits and the IRS's longstanding standard for qualifying in making investment decisions. *See, e.g.*, AR04250-51 (comment from renewable energy group explaining that a change in beginning of construction requirements "would jeopardize the financial viability of many projects, undermining American energy dominance," which "would also cause significant economic consequences for communities, local workers, and project developers, including both immediate and protracted job losses, business closures, and the delay or cancellation of power plants urgently needed to increase power grid capacity and energy security").[15]

---

[14] *See also* AR04248 (comment letter from real estate groups referencing "the IRS's longstanding methods to determine 'beginning of construction'"); AR04250-51 (comment letter from renewable energy group explaining that the IRS standards for "beginning of construction" were developed "over more than a decade); AR04403 (comment letter from Texas Energy Buyers Alliance urging Defendants to "[k]eep the longstanding IRS 'Beginning of Construction' guidance in place"); AR04378 (comment letter from the Information Technology Industry Council stating that since 2013, the beginning of construction standard has "served as a consistent regulatory foundation," "allowing projects to move forward with confidence")"; AR4390-91 (comment letter from National Electrical Manufacturers Association describing beginning of construction notices as "IRS standards [that] represent industry norms that companies have been operating under for over a decade").

[15] *See also* AR04403 (comment letter from Texas Energy Buyers Alliance urging Defendants to "[k]eep the longstanding IRS 'Beginning of Construction' guidance in place" because "since 2013," the guidance "has provided the clarity and predictability we need to plan investments and manage costs," and "[c]hanging it midstream would jeopardize projects already in permitting or construction, many of which are tied to Texas economic development commitments"); AR04375 (Letter from the Data Center Coalition commenting that "hundreds of billions of dollars" of investment in energy infrastructure is enabled by energy tax credits "but only if the policy environment remains stable, consistent, and timely"); AR04358 (comment letter from construction company stating that beginning of construction guidance "has provided clear, predictable rules that enable developers and EPC's to plan and commit to multi-billion-dollar projects"); AR04378 (comment letter from the Information Technology Industry Council stating that since 2013, the beginning of construction standard has "served as a consistent regulatory foundation," "allowing projects to move forward with confidence"); AR04385 (comment from Weyerhaeuser Company stating that "U.S. companies have invested billions of dollars based on

30

Defendants accuse Plaintiffs of conflating current tax credits with earlier ones, Defs.' Br. at 34. But Notice 2025-42 itself includes a string cite of thirteen past IRS Notices, AR00005 & n.2. Defendants included all thirteen in the administrative record, AR04117-222, and summarized them in their own documents leading up to the issuance of Notice 2025-42, *see* AR04267-285. Defendants cannot genuinely contest that industry—like Defendants—understood beginning of construction to be "an established, defined concept in tax law." 90 Fed. Reg. 2224, 2246 (Jan. 10, 2025).[16]

Defendants claim not to understand how anyone could have seriously relied on the tax credits without "assurance that a particular technology type would be eligible," which they claim was only clarified in 2025. Defs.' Br. at 35. But the lawmakers who enacted §§ 45Y and 48E made clear they would apply to wind and solar technologies. 168 Cong. Rec. H7577-02 at H7664

---

the well-settled rules in place since 2013…. If those rules change now, the impact would be severe: higher power bills, lost jobs, stalled investment, and major risks to grid reliability."); AR04405 (comment letter from Clean Energy Buyers Association stating that beginning of construction guidance starting with Notice 2013-29 "have underpinned nearly a decade of investment certainty, enabling billions in private capital commitments and timely project delivery. Altering it now would undermine those gains and slow urgently needed generation for critical industries."); AR04383 (letter from company in West Virginia stating that for decades, "industry has relied upon" the Five Percent Safe Harbor, which "allow a company to begin work in earnest," and provide "certainty . . . before committing to an expansive set of liabilities"); AR04390-91 (comment from National Electrical Manufacturers Association stating that Notice 2013-29 established "industry norms that companies have been operating under for over a decade" and changes "will cause significant disruption"); *see also* AR04396 (Solar and Farming Association comment expressing concern about changes to the Five Percent Safe Harbor); AR04355 (ConservAmerica noting the "longstanding use of cost safe harbors").

[16] Defendants also accuse Plaintiffs of implying that, for every deadline for every tax credit in the history of the Tax Code, Defendants have allowed both the Five Percent Safe Harbor and the Physical Work Test. Defs.' Br at 33 (quoting Pls.' Br. at 30). Plaintiffs did no such thing. What Plaintiffs contend is that, for the clean energy credits that Congress has provided since 2013, the IRS has consistently allowed taxpayers to establish beginning of construction using either the Five Percent Safe Harbor or the Physical Work Test. Defendants' ability to point to other areas of the Tax Code that provide different safe harbors, or old or obsolete regulations that provide no safe harbors, *see* Defs.' Br. at 33, is irrelevant to that unchanging history.

31

(statement by House Ways and Means Committee chair Rep. Neal) (explaining that §§ 45Y and 48E would be available to "renewable technologies such as solar, wind, geothermal, and hydropower"); 168 Cong. Rec. S4212-01 at S4212 (Aug. 6, 2022) (statement by Senate Finance Committee chair Sen. Wyden) (confirming §§ 48E and 45Y provide incentives for "electricity produced by solar, wind and other renewable resources"). And the plain text of both sections allows any facilities "for which the greenhouse gas emissions rate" is "not greater than zero" to claim the credits. 26 U.S.C. §§ 45Y(b)(1)(A)(iii); 48E(b)(3)(A)(iii). Operation of wind and solar energy generation facilities generate zero greenhouse gas emissions—a fact that is obvious to those in the industry. Wind and solar developers reasonably expected that they would qualify for the § 48E and § 45Y tax credits long before the IRS published the final list of eligible technologies.

The Supreme Court rejected a similar argument by the Government in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 31 (2020). There, the Government argued it did not need to consider reliance interests when revoking the Deferred Action for Childhood Arrivals program because recipients had no legally cognizable interests and the program "provided benefits only in two-year increments." *Id*. The Court made clear "that consideration [of reliance interests] must be undertaken by the agency in the first instance, subject to normal APA review." *Id*. It held the agency "*was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns" in the record—not in later litigation. *Id*. at 33. The Government's failure to do so in that case rendered its decision arbitrary and capricious. So too, here.

32

Because Defendants issued the notice "with no regard for" reliance interests, *Int'l Org. of Masters, Mates, & Pilots, ILA, AFL-CIO v. Nat'l Labor Rel. Bd.*, 61 F.4th 169, 180 (D.C. Cir. 2023), their actions were unlawful.

### C. Defendants have offered no reasoned explanation for the Notice, and one cannot be discerned from the record

Defendants' litigation counsel now assert multiple inconsistent rationales for the Notice: the agency changed its policy because Congress changed the law, Defs.' Br. at 34, 38-39; because thinktanks suggested it should, *id*. at 36-37; to address a known problem of stockpiling, *id*. at 37; or to implement a predictive judgment about future conduct, *id*. at 34, 38. The only thing these purported reasons have in common is that they are nowhere expressed in the administrative record. Notably, while the explanations litigation counsel offers in their brief are varied, the one explanation never offered by counsel is that an Executive Order directed the agency to issue new guidance—which is the only reason given anywhere in the administrative record for changing the beginning of construction rules. AR00037; *see also* AR00005-06, AR00035.

Defendants' arguments should all be rejected because they are post hoc rationalizations articulated only by litigation counsel and supported in large part by citations not properly before this Court. *See Clean Wisconsin v. EPA*, 964 F.3d 1145, 1167 (D.C. Cir. 2020) ("The soundness of an agency's decision must rest on the reasoning contained therein, and not on any post hoc justifications offered by counsel.") (cleaned up); But even if this Court evaluates Defendants' purported reasons, they fail to justify the Notice.

### 1. Defendants fail to explain how the OBBBA's new deadlines support eliminating the Five Percent Safe Harbor

Defendants argue that "Congress changed the law, so Treasury changed the policy," asserting that statutory changes in OBBBA's deadlines "prompted Treasury to consider whether

the subregulatory safe harbor remained an appropriate exercise of discretion to effectuate the statutory scheme." Defs.' Br. at 34. But the administrative record shows no indication of any such considerations, or of the conclusions the agency purports to have drawn from them. That alone is fatal to this explanation.

But even if the agency did consider the OBBBA's changed eligibility deadlines, those changes do not support the decisions made in the Notice. Congress used the same statutory phrase in referencing the timeline for commencement of construction in the context of wind and solar, *see* Pub. L. 119-21, tit. VII, ch. 5 §§ 70512(l)(4) (2025) (referencing "facilities the construction of which begins" on a particular timeline), 70513(g)(5) (same), as in the context of all other facilities, *see* 26 U.S.C. § 45Y(d)(1)-(2) (referencing facilities "the construction of which begins" on a particular timeline), *id.* § 48E(e)(1)-(2) (same). The same language was used repeatedly in the OBBBA, including in provisions that sped up credit termination for other technologies. *E.g.*, Pub. L. 119-21, tit. VII, ch. 5 §§ 70507, 70509, 70512(c), 70513(b)(1)(B), 70513(d), 70513(f). The "normal rule of statutory construction" is that "identical words used in different parts of the same act are intended to have the same meaning." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 568 (1995) (internal quotation marks omitted); *see* AR4316 (presentation by Holland & Knight attorneys stating "[i]t is uncertain how Treasury would propose to change the established [beginning of construction] rules 'consistent with applicable law'"). It makes little sense that, where Congress used the same phrase repeatedly across multiple technologies, Defendants' takeaway was that Congress meant for the agency to interpret the words differently in the context of wind and solar.[17]

---

[17] Tax credit eligibility deadlines have changed many times over the last thirteen years. Defendants have issued beginning of construction guidance after each statutory change, and have maintained the Five Percent Safe Harbor in each instance. *See, e.g.*, Consolidated Appropriations

Statements from legislators—both in the legislative history and in the record—further call into question Defendants' purported rationale. As Senator Grassley explained, the new, shorter deadline for wind and solar was "intended to grant the wind and solar industries a yearlong transition to confidently move forward with planned projects under the existing continuity safe harbor and the beginning of construction guidance in effect at the time of the law's enactment." 171 Cong. Rec. S4618 (daily ed. July 23, 2025) (statement of Sen. Grassley); *see also* AR04400 (further statement by Sen. Grassley); AR04401 (email from office of the Hon. Gabe Evans expressing hope that the new guidance adheres to "longstanding precedent in the energy tax credit space"); AR04236 (Bloomberg article concerning efforts by Sens. Grassley and Curtis to ensure beginning of construction guidance adheres to "the law and congressional intent"). While the statements of individual legislators are not conclusive evidence of legislative intent, they warrant careful consideration—consideration that is entirely absent from the record.

The credit deadline changes in the OBBBA do not support the weight of Defendants' post hoc arguments. If anything, they demonstrate that Congress meant for the credits to remain available, in their current form, for a full year—not for Defendants to prematurely cut them off.

### 2. Defendants' arguments about circumvention and stockpiling are unsupported by the record—and inadequate

Defendants next assert that the reasoned explanation for the Notice can be found in the Notice itself—that eliminating the Five Percent Safe Harbor was "necessary and appropriate to properly enforce the credit termination date," to prevent "circumvent[ion of] the statutory credit

---

Act, 2016, Pub. L. No. 114-113, div. P, tit. III, § 301(a)-(b), 302(a)-(b), 303(a)-(b); div. Q tit. I § 187, 129 Stat. 2242, 3038-3039, 3074 (2015) (providing separate phaseout timelines for solar and wind from other technologies, which took effect after 2019 and 2016 respectively); AR04140-45 (IRS Notice 2016-31, 2016-23 I.R.B. 1025 (showing no change to Five Percent Safe Harbor). They nowhere explain why this time is different.

termination date" and "artificial manipulation of eligibility," and to "ensure that a substantial portion of any applicable wind or solar facility . . . is built by the [beginning of construction] deadline," Defs.' Br. at 36. But that language is simply a recitation of the Executive Order that directed Treasury to issue new guidance; it is not a reasoned explanation of the agency's decision. *See* Pls. Br. at 26-27; *Kingdom v. Trump*, No. 25-cv-691-RCL, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025) (holding that agency explanation for new policies that relied only on Executive Order did not satisfy arbitrary-and-capricious standard). Nowhere in the record do Defendants explain *why* it was necessary and appropriate, what circumvention or manipulation the agency was concerned about, or how eliminating the safe harbor would protect against such activities. Indeed, Defendants elsewhere concede that the elimination of the Five Percent Safe Harbor "was not based on a factual finding at all." Defs.' Br. at 34.

Defendants cherry-pick three news articles issued after the Notice's release as evidence that "the Notice was referring to stockpiling." Defs.' Br. at 37. These articles are not part of the administrative record and not properly before the Court. Even if they were, they are of no help to Defendants: courts may not consider "a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43. It in no way satisfies the APA to say, that, because some commentators interpreted the Notice as being intended to prevent stockpiling, the Notice adequately explained that the agency's rationale was based on stockpiling. While an agency's rationale need not be of "ideal clarity," *id.*, it also cannot be nonexistent.

Counsel also point to two comment letters as evidence that Defendants eliminated the Five Percent Safe Harbor to prevent stockpiling, Defs.' Br. at 36-37 (citing AR04254-57), but neither suffice. The first does not even mention stockpiling. AR04256. The second, a comment letter from a renewable energy group, which Defendants quote for the proposition that "[t]he 5%

36

Safe Harbor has been recently criticized by some as too lenient," AR04252 (quoted in Defs.' Br. at 37), *actually* says:

> The 5% Safe Harbor has recently been criticized by some as too lenient. However, in practice for developers and investors, it reflects a very substantial investment that must be thoroughly evidenced by commitments, activity, and substantial documentation. Across Novogradac projects with certified costs data, the average total expenditure to construct a utility-scale solar installation is approximately $50 million, meaning a 5% outlay represents approximately $2.5 million in real capital spent. *That is not an insubstantial commitment; it demonstrates a clear commitment and intent to proceed with a project.*

*Id.* (emphasis added) The letter, which urged Defendants to "[p]reserve [e]xisting '[b]eginning of [c]onstruction [s]tandards," *id.*, in no way supports Defendants' argument that they eliminated the Five Percent Safe Harbor to prevent stockpiling.[18]

Defendants vaguely invoke IRS examinations as supporting their concerns about stockpiling. Defs.' Br. at 37 n.16. This assertion conflicts with Defendants' admission elsewhere that the Notice "was not based on a factual finding at all." Defs.' Br. at 34. To the extent Defendants suggest that the drafters of Notice 2025-42 had access to confidential information not before this Court, it is also misleading. The privacy protections of 26 U.S.C. § 6103 apply with equal force to disclosures *within* the IRS as they do to disclosures to the public. *Id.* § 6103(b)(8) (defining prohibited "disclosure" as "the making known to any person in any manner"). And they do not protect against disclosure of data "in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer." 26 U.S.C. § 6103(b)(2). To the extent the drafters had access to de-identified information from IRS examinations that showed a "known

---

[18] Defendants may, on reply, cite three additional comment letters produced as part of the corrected record, which reference stockpiling. Nowhere in the record does the agency refer to those comments or cite them as a basis of the Notice. In any event, they *all* reference stockpiling as a concern arising from the foreign material assistance restrictions that took effect on January 1, 2026, AR04289-94; AR04318-22; AR04392-95. They do not provide support for eliminating the Five Percent Safe Harbor.

problem" of "abusive stockpiling transactions," Defs.' Br. at 37, nothing prevented the agency

from including that information in the record.

Defendants alternately argue the Notice was based not on evidence that circumvention

was already happening, but rather a "predictive judgment[]" that such conduct would occur.

Defs.' Br. at 38. But predictive judgments are entitled to deference only "so long as they are

reasonable." *BNSF Ry. Co. v. Surface Transp. Bd.*, 526 F.3d 770, 781 (D.C. Cir. 2008) (quoting

*Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 260 (D.C. Cir. 2007)). A prediction not based on

any facts is just a wild guess, and is not owed deference. *Id*. Moreover, in order for a court to

defer to such predictive judgments, the agency must have explained in the record what it was

predicting and why. *See, e.g.*, *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 105-06

(D.D.C. 2010) (CKK) (summarizing evidence relied upon by the agency and the conclusion it

reached based on the data); *Bill Barret Corp. v. DOI*, 601 F. Supp. 2d 331, 335-36 (D.D.C. 2009)

(analyzing evidence the agency considered and noting how the agency weighed it). An agency

cannot avoid the APA's requirements simply by labeling its decision a predictive judgment.

Finally, the record does not support Defendants' assertion that the Notice was based on

the agency's consideration of a new statutory section in OBBBA that references stockpiling in

the context of addressing the influence of foreign entities. Defs.' Br. at 38. That argument

appears nowhere in the record. Indeed, the Notice itself states outright that "[t]he guidance in this

notice is not intended to address the beginning of construction rules for the purpose of [] foreign

entity restrictions." AR00006 n.3. The only record evidence that Defendants provide to support

their argument that they considered the statute is to a copy of the full text of the OBBBA that is

clearly marked as having been downloaded in 2026. Defs.' Br. at 38 (citing AR00140 through

AR00585). An agency cannot hang its hat on having included the text of the statute in the

38

administrative record when it has not cited to any specific provision of that statute or explained how its action is justified by that statute in the Notice or any other record document.

Nor *could* OBBBA's reference to stockpiling be a reasonable basis for eliminating the Five Percent Safe Harbor. That reference occurs in a separate statutory section that governs involvement with certain foreign entities. AR00006 n.3. Moreover, Congress defined "beginning of construction" in that section by *expressly incorporating the IRS's prior guidance.* 26 U.S.C. § 7701(a)(51)(J); *see also id.* § 7701(a)(52)(F). In other words, Defendants point to a section of the OBBBA where Congress expressly ratified the Five Percent Safe Harbor as justification for their decision to eliminate the Five Percent Safe Harbor. And they fail to even acknowledge that they have issued a *separate* Notice—Notice 2026-15—that purports to exercise the authority under 26 U.S.C. § 7701(a)(52)(D)(v) that Defendants invoke here. That rationale, even if it had been presented in the record, is arbitrary.

Defendants have never attempted to explain why the Notice is a reasonable response to alleged stockpiling. Defendants do not cite any information to suggest that the Five Percent Safe Harbor gave rise to stockpiling, or that stockpiling is limited to wind and larger solar projects. Even in briefing, Defendants describe stockpiling as a problem "with these and other credits," Defs.' Br. at 37—in other words, a problem not limited to wind and solar. Thus, even Defendants' post hoc explanation for purposes of litigation bears no connection to the choice they made to eliminate the Five Percent Safe Harbor only for wind and most solar projects. Despite counsel's best efforts, Defendants *still* have not offered a reasoned explanation for their decision.

### 3. Defendants have provided no reasoned explanation for treating small solar facilities differently

Finally, Defendants still have not explained their choice to treat solar projects of 1.5 MW or less differently from the rest of the solar and wind industries. Their brief points to provisions of § 48E that apply to facilities that are less than 5 MW, but those provisions draw a line at 5 MW—not 1.5 MW, as Defendants did here. The only agency document in the record that addresses solar facility sizes is an undated, and largely redacted, memorandum. Defs.' Br. at 40 (citing AR00023-29). The unredacted portion includes a random assortment of facts about solar facilities of 1, 2, 3, 4, and 5 megawatts, none of which address stockpiling, and none of which concern projects that are 1.5 MW or smaller. AR00025-26.

Defendants again argue that extra-record news stories show that "industry watchers" understood the exemption to accommodate rooftop and community solar projects. Defs.' Br. at 40 n.18. This Court's review is limited to the record before the agency. And the question is not whether industry press could discern *what* the agency had done, but rather whether the agency provided a reasoned explanation for *why* it made that choice. Here, it plainly did not.

Defendants' decision was arbitrary.

## IV. The Notice should be vacated in its entirety

"Remand with vacatur is the ordinary remedy for unlawful agency action." *Sierra Club v. DOT*, 125 F.4th 1170, 1186 (D.C. Cir. 2025); *see also Bridgeport Hospital v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024); 5 U.S.C. § 706(2) (reviewing courts "*shall . . .* hold unlawful and set aside agency action[s]" that violate the APA (emphasis added)). Because vacatur "acts directly" on the agency action under review, *Corner Post, Inc. v. Bd. of Govs. of Fed. Reserve Sys.*, 603 U.S. 799, 829 (2024) (Kavanaugh, J., concurring), it is not a party-specific remedy, *see Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("[W]hen a

reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." (cleaned up)).[19]

"[I]n limited circumstances," a court may remand without vacating the agency's action. *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020). To determine whether this unusual remedy is warranted, courts consider first, "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and second, any "disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150-1 (D.C. Cir. 1993). Defendants bear the burden to prove vacatur is unnecessary. *See Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019).

Defendants have not demonstrated that either factor warrants a departure from the ordinary remedy here. As to the first factor, they assert that any deficiency is not "serious," there is no real doubt that the agency chose correctly, and they could make this decision again and explain why in short order. Defs.' Br. at 42. But Defendants' wholly unjustified "dissimilar treatment of evidently identical cases" is a serious error, of the type the D.C. Circuit has called "the quintessence of arbitrariness and caprice." *Grayscale Invs., LLC v. Sec. & Exchange Comm'n*, 82 F.4th 1239, 1245 (D.C. Cir. 2023) (quotation omitted). And their brief concedes that their decision "was not based on a factual finding at all." Defs.' Br. at 34. Because Defendants

---

[19] Defendants' argument that vacatur should be limited to Plaintiffs has no merit. Though Defendants cite to *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), that decision's reasoning is not applicable to the APA, which establishes the kind of statutory remedy the Court found absent in *CASA*. Moreover, the Supreme Court explicitly declined to extend its holding in *CASA* to actions for vacatur under the APA. *Id.* at 847 n.10. Even if courts could, under certain circumstances, limit the scope of vacatur under the APA, it is not possible to remedy Plaintiffs' harm with the limited vacatur Defendants suggest. This Court should vacate Notice 2025-42 in its entirety.

provided absolutely no explanation for its decision, it is, at best, a rank guess that the agency could reach the same conclusion on remand based on a reasoned assessment of the facts before the agency. This is thus not the kind of failure to explain case that warrants remand without vacatur. Courts in this circuit "have not hesitated to vacate a rule" when the agency "has not responded to empirical data or to an argument inconsistent with its conclusion." *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009).

Defendants' complete failure to consider reliance interests further underscores the seriousness of the legal deficiencies here. *See supra*, at 26-30. Comments in the administrative record detail how changing beginning of construction rules would undermine "multi-billion-dollar projects" that "create thousands of jobs, bring new manufacturing to the U.S., and lower electricity costs," AR04358. Changing those rules "disrupt[s] development of solar and wind projects," especially necessary "during this critical time of generation constraint," AR04369. *See also supra*, at 11-13. These reliance interests are substantial and raise serious doubts as to whether Defendants could reach the same result on remand. *See, e.g.*, *Allied-Signal, Inc. v. Dir., Div. of Taxation*, 504 U.S. 768, 785 (1992) (declining to "abandon [its] settled jurisprudence" in part because of "the reliance interest of those corporations that have structured their activities and paid their taxes based upon the well-established rules" at issue). Defendants' complete failure to consider reliance interests is akin to the kind of categorical failure to complete a procedural step for which courts regularly grant vacatur. *See Daimler Trucks North America LLC v. EPA*, 737 F.3d 95, 103 (D.C. Cir. 2013). To maintain their decision, Defendants would need to collect evidence they do not have, that evidence would need to support the choices they have already made, and they would need to reconcile those choices with reliance interests they did not

consider. There is nothing but doubt that they would be able to issue this decision again, especially in the thirty-day time period Defendants contemplate. Defs.' Br. at 33.

Nor have Defendants produced compelling evidence that vacating the Notice would have disruptive consequences. Defendants' argument that there are disruptive consequences because there is potential for "an interim change that may itself be changed," Defs.' Br. at 43 (quoting *Allied-Signal*, 988 F.2d at 151, is tautological—there is always that potential when a court vacates agency action. The *Allied-Signal* factors ask not whether such potential exists, but rather whether that potential would cause disruptive consequences. Defendants have not met their burden of demonstrative disruptive consequences. They invoke unspecified effects on "tax administration and industry," but vacatur here would simply revert conditions to the longstanding status quo as of August 14, 2025—that is, longstanding beginning of construction methodology would continue to apply to solar and wind projects, as it does to all other projects. Clean energy developers are familiar and comfortable with those stable and established rules, and would quickly be able to incorporate their return into their business decisions. And the public would benefit from the additional energy projects that would move forward after vacatur—especially when they pay their electricity bills.

Defendants propose a time-limited remand without vacatur of thirty days. But Defendants' proposal would substantially interfere with the relief that a victory in this case would offer to Plaintiffs. The deadline for wind and solar projects to establish eligibility for tax credits is July 4, 2026, and briefing in this case is not set to conclude until April 6, 2026. Thus, even assuming an extremely expeditious resolution of the case by this Court, Defendants' proposal could deny Plaintiffs the relief they seek, and render any subsequent notice that Defendants issue effectively unreviewable.

43

**CONCLUSION**

Plaintiffs respectfully ask the Court to deny Defendants' motion to dismiss or motion for summary judgment, grant Plaintiffs' motion for summary judgment, and vacate Notice 2025-42.

Dated: March 23, 2026

Respectfully submitted,

_Sarah V Fort_

_____

Sarah Fort (DC Bar #1032192)
Sitara Witanachchi (DC Bar #1023007)
Thomas Zimpleman (DC Bar #1049141)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
Phone: (202) 513-6244
Fax: (415) 795-4799
sfort@nrdc.org
switanachchi@nrdc.org
tzimpleman@nrdc.org

_Simi Bhat_

_____

Simi Bhat (*admitted pro hac vice*)
Natural Resources Defense Council
111 Sutter Street, 21st Fl.
San Francisco, CA 94104
Phone: (415) 875-6110
Fax: (415) 795-4799
sbhat@nrdc.org

*Counsel for Plaintiffs Oregon Environmental Council, Natural Resources Defense Council, Inc., Public Citizen, Hopi Utilities Corporation, and Woven Energy*

44

*/s/ Sophia L. Cai*
David Chiu (*admitted pro hac vice*)
San Francisco City Attorney
Yvonne R. Meré (*admitted pro hac vice*)
Chief Deputy City Attorney
Sophia L. Cai (*admitted pro hac vice*)
Sushil C. Jacob
Deputy City Attorneys
City and County of San Francisco
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102
Phone: (415) 554-4274
sophia.cai@sfcityatty.org

*Counsel for Plaintiff City and County of San Francisco*

*/s/ David S. Lapp*
David S. Lapp (*admitted pro hac vice*)
People's Counsel
Maryland Office of People's Counsel
6 St. Paul Street, Suite 2102
Baltimore, MD 21201
Phone: (410) 767-8171
Davids.lapp@maryland.gov

*Counsel for Plaintiff Maryland Office of People's Counsel*

45