UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OREGON ENVIRONMENTAL COUNCIL,
*et al.*,

       Plaintiffs,

       v.

INTERNAL REVENUE SERVICE, *et al.*,

       Defendants.

Civil Action No. 25-4400 (CKK)

**MEMORANDUM OPINION**
(June 6, 2026)

The Plaintiffs in this Administrative Procedure Act case challenge a Notice issued by the Internal Revenue Service that affects the availability of two significant tax credits for wind and solar energy projects. Now pending before the Court are a [26] Motion for Summary Judgment filed by the Plaintiffs and a [35] Motion to Dismiss or, in the Alternative, for Summary Judgment filed by the Defendants. Upon consideration of the parties' submissions,[1] the relevant legal authority, and the entire record, the Court concludes that it may decide the claims of five of the seven Plaintiffs, that the Notice is arbitrary and capricious, and that the appropriate remedy is to vacate the Notice in full and remand the matter to the agency for further consideration. Court shall therefore **GRANT** the Plaintiffs' [26] Motion, **GRANT IN PART** and **DENY IN PART** the Defendants' [35] Motion, **VACATE** the Notice at issue, and **REMAND** to the agency.

---

[1] The Court's consideration has focused on the following documents, including the attachments and exhibits thereto: the Plaintiffs' Motion for Summary Judgment ("Pls.' Mot."), Dkt. No. 26, and the Plaintiffs' Memorandum in Support of their Motion ("Pls.' Mem."), Dkt. No. 26-1; the Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Mot."), Dkt. No. 35, and the accompanying Memorandum ("Defs.' Mem."), Dkt. No. 35-1; the Plaintiffs' Combined Opposition and Reply ("Pls.' Reply & Opp'n"), Dkt. No. 38; the Defendants' Reply ("Defs.' Reply"), Dkt. No. 42; the Plaintiffs' Surreply ("Pls.' Surreply"), Dkt. No. 48; and the Joint Appendix to the Administrative Record ("J.A."), Dkt. No. 46. In an exercise of its discretion, the Court concludes that oral argument is not necessary to the resolution of the issues pending before the Court. *See* LCvR 7(f).

## I. BACKGROUND

This case is about clean energy tax credits.  Under current law, two significant tax credits for new clean energy projects are available only for projects that either begin construction on or before July 4, 2026, or are completed and placed in service on or before December 31, 2027.  *See* 26 U.S.C. §§ 45Y, 48E (as amended by Pub. L. No. 119-21, tit. VII, §§ 70512–70513, 139 Stat. 72, 252–73 (2025)).  The central issue in this case is what a taxpayer must do by the upcoming July 4 deadline to "begin" a project and qualify for these soon-to-expire tax credits.

Before introducing the specific Internal Revenue Service ("IRS") action at issue here, the Court begins by briefly summarizing the statutory and regulatory context for that action.

### A.    Statutory and Regulatory Background

#### 1.    The "Physical Work Test" and the "Five Percent Safe Harbor"

For many years, Congress has shaped federal energy policy in part by providing tax credits for clean energy production and investment.  Some of the earliest clean energy tax credits required that projects be "placed in service" (that is, completed) by a certain date.[2]  However, because energy infrastructure projects are complex undertakings that often take multiple years to complete, some developers found it challenging to plan around these completion dates.[3]

In response to the practical difficulties presented by "placed in service" deadlines, Congress has more recently used "beginning of construction" dates to set the outer limits of eligibility for clean energy tax credits.[4]

---

[2] *See, e.g.*, Energy Policy Act of 1992, Pub. L. No. 102-486, tit. XIX, § 1914(a), 106 Stat. 2776, 3020–23 (1992); American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 1102(a), 123 Stat. 115, 319–20 (2009).

[3] *See* Staff of Joint Comm. on Taxation, 112th Cong., General Explanation of Tax Legislation Enacted in the 112th Congress, at 212 (Comm. Print 2013) (explaining that, under the completion-date regime, "certain renewable power projects do not move forward because developers and investors are concerned that those projects cannot be completed before the [relevant tax credit] expires").

[4] *See, e.g.*, American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 407(a)(3), (b), 126 Stat. 2313, 2340-41 (2013); *see also* Staff of Joint Comm. on Taxation, 112th Cong., General Explanation of Tax Legislation Enacted in

Since 2013, the IRS has recognized two ways that a taxpayer can "begin" a project to satisfy a statutory beginning-of-construction requirement for a clean energy tax credit. *See* IRS Notice 2013-29, 2013-20 I.R.B. 1085 (2013), https://perma.cc/DLV3-BHDX. First, a taxpayer can establish eligibility by starting "physical work of a significant nature" before the statutory deadline. *Id.* § 4.01. This method is known as the "Physical Work Test." *See id.* Second, a taxpayer can establish eligibility by "pay[ing] or incur[ring] . . . five percent or more of the total cost of the facility" before the statutory deadline. *Id.* § 5.01. This method is known as the "Five Percent Safe Harbor." *See id.* Both methods require a taxpayer to make continuous progress towards completion of the facility once construction has begun. *See id.* §§ 4.06, 5.02.

Between 2013 and 2022, the IRS repeatedly reaffirmed that both the Physical Work Test and the Five Percent Safe Harbor were available means of establishing the beginning of construction for clean energy projects.[5] During the same period, Congress enacted several new statutes creating or extending clean energy tax credits with eligibility deadlines linked to the beginning of construction, without directing any changes to the IRS's approach to determining when construction begins.[6]

---

the 112th Congress, at 212–13 (Comm. Print 2013) (explaining that Congress intended to "reduce . . . uncertainty" about whether a given project would qualify for a tax credit "by replacing the placed-in-service expiration date with an expiration date based on when construction begins").

[5] *See* IRS Notice 2013-60, 2013-44 I.R.B. 431 (2013), https://perma.cc/5CLS-6LGB; IRS Notice 2014-46, 2014-36 I.R.B. 520 (2014), https://perma.cc/M4GS-PFGQ; IRS Notice 2015-25, 2015-13 I.R.B. 814 (2015), https://perma.cc/F497-PM8S; IRS Notice 2016-31, 2016-23 I.R.B. 1025 (2016), https://perma.cc/MF4S-6VDA; IRS Notice 2017-04, 2017-4 I.R.B. 541 (2017), https://perma.cc/VXU8-UHSP; IRS Notice 2018-59, 2018-28 I.R.B. 196 (2018), https://perma.cc/47F8-2G9V; IRS Notice 2019-43, 2019-31 I.R.B. 487 (2019), https://perma.cc/2RQJ-AFN5; IRS Notice 2020-12, 2020-11 I.R.B. 495 (2020), https://perma.cc/7GKQ-UDAX; IRS Notice 2020-41, 2020-25 I.R.B. 954 (2020), https://perma.cc/VSU4-GRYH; IRS Notice 2021-5, 2021-3 I.R.B. 479 (2021), https://perma.cc/7P4C-2XZV; IRS Notice 2021-41, 2021-29 I.R.B. 17 (2021), https://perma.cc/XU2V-XHNT; IRS Notice 2022-61, 2022-52 I.R.B. 560 (2022), https://perma.cc/DF6R-GNC8; *see also* 90 Fed. Reg. 2224, 2246 (Jan. 10, 2025) (describing the "beginning of construction date" as "an established, defined concept in tax law").

[6] *See, e.g.*, Tax Increase Prevention Act of 2014, Pub. L. No. 113-295, div. A, tit. I, § 155, 128 Stat. 4010, 4021 (2014); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. P, tit. III, §§ 301–303, div. Q, tit. I, § 187, 129 Stat. 2242, 3038–39, 3074 (2015); Bipartisan Budget Act of 2018, Pub. L. No. 115-123, div. D., tit. I, §§ 40409, 40411, 132 Stat. 64, 150–51 (2018); Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, div. Q, tit. I, § 127,

2.    The Inflation Reduction Act and the Section 45Y and 48E Tax Credits

In the 2022 budget reconciliation bill known as the Inflation Reduction Act ("IRA"), Congress created the two clean energy tax credits that are at issue in this case: the Clean Electricity Production tax credit, which is codified at 26 U.S.C. § 45Y, and the Clean Electricity Investment tax credit, which is codified at 26 U.S.C. § 48E. *See* Pub. L. No. 117-169, tit. I, §§ 13701(a), 13702(a), 136 Stat. 1818, 1982–96 (2022).

These two tax credits are "technology-neutral," meaning that they are equally available to all taxpayers who develop and finance any electricity-generating facility with zero greenhouse gas emissions, regardless of whether the facility uses solar, wind, nuclear, hydropower, or another technology. *Id.* at 136 Stat 1983–84, 1992. As originally enacted, the full value of these credits was available to qualifying facilities that began construction before the end of 2033. *See id.* at 136 Stat. 1984–85, 1993–94.

Later in 2022, the IRS issued guidance stating that taxpayers could establish eligibility for these new tax credits using either the Physical Work Test or the Five Percent Safe Harbor. Notice 2022-61, § 2.02(2), 2022-52 I.R.B. 560, 561–62 (2022), https://perma.cc/DF6R-GNC8; *see also* 87 Fed. Reg. 73580, 73581–82 (Nov. 30, 2022), *as corrected by* 87 Fed. Reg. 75141 (Dec. 7, 2022).

3.    The One Big Beautiful Bill Act

On July 4, 2025, Congress enacted the budget reconciliation bill commonly known as the "One Big Beautiful Bill Act" ("OBBBA"), Pub. L. No. 119-21, 139 Stat. 72 (2025). The OBBBA altered both the Section 45Y production tax credit and the Section 48E investment tax credit by

---

133 Stat. 2534, 3231–32 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. EE, tit. I, §§ 131–132, 134 Stat. 1182, 3052–53 (2020); Act of Aug. 16, 2022 ("Inflation Reduction Act"), Pub. L. No. 117-169, tit. I, §§ 13101(a)-(e), 13102(a)-(c), (d)(2), (f)(3), 13701(a), 13702(a), 136 Stat. 1818, 1906, 1913–16, 1982–96 (2022).

shortening the period in which solar and wind energy projects could qualify for the credits. *See* Pub. L. No. 119-21, tit. VII, §§ 70512–70513, 139 Stat. 72, 252–73 (2025). As amended, both tax credits remain available for wind and solar projects that begin construction on or before July 4, 2026. *See id.* §§ 70512(*l*)(4), 70513(g)(5) (making relevant changes effective for "facilities the construction of which begins after the date which is 12 months after the date of the enactment of [the OBBBA]"). However, wind projects and solar projects that begin construction after that date are not eligible for the credits unless the eligible facilities are placed in service on or before December 31, 2027. *See id.* §§ 70512(a)(2), (*l*)(4), 70513(a)(2), (g)(5).

The OBBBA also includes new rules that limit tax credit eligibility for projects that receive material assistance from certain "prohibited foreign entities" and begin construction after December 31, 2025. *See* Pub. L. No. 119-21, tit. VII, §§ 70512(b)–(c), 70513(b), 139 Stat. 72, 253–66, 270–72. For these rules, Congress expressly adopted the IRS's then-existing approach to defining the beginning of construction. *See id.* § 70512(c), 139 Stat. 260 (codified at 26 U.S.C. § 7701(a)(51)(J)). Specifically, for purposes of these foreign-assistance rules, the OBBBA provides that the beginning of construction "shall be determined pursuant to rules similar to the rules under Internal Revenue Service Notice 2013-29 and Internal Revenue Service Notice 2018-59 (as well as any subsequently issued guidance clarifying, modifying, or updating either such Notice), as in effect on January 1, 2025." *Id.*; *see also id.* at 139 Stat. 265 (codified in relevant part at 26 U.S.C. § 7701(a)(52)(F)).

### 4.    Executive Order No. 14,315

Shortly after Congress enacted the OBBBA, President Donald J. Trump issued Executive Order No. 14,315, "Ending Market Distorting Subsidies for Unreliable, Foreign Controlled Energy Sources." 90 Fed. Reg. 30821 (July 7, 2025). The Executive Order states, among other things, that "[i]t is the policy of the United States" to "rapidly eliminate the market distortions and costs

imposed on taxpayers by so-called 'green' energy subsidies," to "build upon and strengthen the repeal of, and modifications to, wind, solar, and other 'green' energy tax credits in the One Big Beautiful Bill Act," and to "end taxpayer support for unaffordable and unreliable 'green' energy sources and supply chains built in, and controlled by, foreign adversaries." *Id.* § 2.

The Executive Order directs several actions to implement its stated policies. As relevant here, it directs the Secretary of the Treasury to "take all action as the [Secretary] deems necessary and appropriate to strictly enforce the termination of the clean electricity production and investment tax credits under sections 45Y and 48E of the Internal Revenue Code for wind and solar facilities." *Id.* § 3(a). The Executive Order states that these actions "include[] issuing new and revised guidance as the [Secretary] deems appropriate and consistent with applicable law to ensure that policies concerning the 'beginning of construction' are not circumvented, including by preventing the artificial acceleration or manipulation of eligibility and by restricting the use of broad safe harbors unless a substantial portion of a subject facility has been built." *Id.*

### 5.    Public Comments

Soon after the President issued Executive Order No. 14,315, multiple interested parties provided comments to the Secretary of the Treasury and various IRS officials with input and recommendations regarding the "new and revised guidance" contemplated by the Executive Order. *See generally* J.A. at 250–409. Commenters expressed a variety of perspectives on the approach the IRS should take in developing this guidance.

Some commenters, including several Members of Congress, encouraged the IRS to revise its guidance to ensure that clean energy tax credits only support projects for which significant physical construction begins before the statutory deadline.[7]

Several other commenters, including organizations representing clean energy developers and investors, urged the Treasury Department to maintain its existing guidance regarding the Five Percent Safe Harbor.[8]  Commenters noted that "[t]axpayers have relied on" the availability of both the Physical Work Test and the Five Percent Safe Harbor "for more than twelve years," ever since the publication of the first IRS Notice addressing these concepts.[9]  One commenter described the existing beginning-of-construction standards as "long-established rules" and urged the Treasury Department to "focus on minimizing disruption of the pipeline of projects that have relied on long-standing interpretations" of the beginning-of-construction requirement.[10]  Multiple commenters urged the IRS to ensure that any changes to these standards would be applied only "prospectively,"

---

[7] *See, e.g.*, Letter from Rep. Scott Perry, *et al.* to Treasury Secretary Scott Bessent (Aug. 1, 2025), J.A. at 347–48; Letter from Tom Pyle, President of the American Energy Alliance, *et al.* to Treasury Secretary Scott Bessent (Aug. 6, 2025), J.A. at 258–61.

[8] *See, e.g.*, Letter from The Real Estate Roundtable, *et al.* to Treasury Secretary Scott Bessent ("RER Letter") (Aug. 11, 2025), J.A. at 250–51; Letter from Novogradac & Co. LLP to Treasury Secretary Scott Bessent and IRS Commissioner William Long ("Novogradac Letter") (Aug. 1, 2025), J.A. at 253–56; Letter from Jeffrey Kupfer, President, ConservAmerica, to Assistant Treasury Secretary Ken Kies ("ConservAmerica Letter") (Aug. 11, 2025), J.A. at 350–58; Letter from Moss & Associates (Aug. 5, 2025), J.A. at 360–61; Comments of Monarch Private Capital (received July 14, 2025), J.A. at 363; Letter from Cy McNeill, Director, Federal Affairs, Data Center Coalition, to Treasury Secretary Scott Bessent ("Data Center Coalition Letter") (Aug. 4, 2025), J.A. at 370–72; Letter from Lara C. Muldoon, Vice President, Government Affairs, Tax, Information Technology Industry Council, to Treasury Secretary Scott Bessent ("ITIC Letter") (Aug. 14, 2025), J.A. at 374–78; Comments of Zander Bischof (received Aug. 11, 2025), J.A. at 379–82; Comments of Weyerhauser Co. (received Aug. 11, 2025), J.A. at 384–85; Letter from Eric Bursch, Director, Government Relations, National Electrical Manufacturers Association, to Treasury Secretary Scott Bessent ("NEMA Letter") (Aug. 14, 2025), J.A. at 387–88; Letter from Lucy Bullock-Sieger, Chair, Solar and Farming Association, *et al.* to Assistant Treasury Secretary Ken Kies (July 29, 2025), J.A. at 397–98; Letter from the Texas Energy Buyers Alliance to Treasury Secretary Scott Bessent ("TEBA Letter") (Aug. 12, 2025), J.A. at 404–05; Letter from Clean Energy Buyers Association to Treasury Secretary Scott Bessent ("CEBA Letter") (Aug. 12, 2025), J.A. at 407–09.

[9] RER Letter, J.A. at 251; *see also* Data Center Coalition Letter, J.A. at 371; ITIC Letter, J.A. at 375; Comments of Z. Bischof, J.A. at 381; TEBA Letter, J.A. at 405.

[10] Data Center Coalition Letter, J.A. at 371.

after the publication of new guidance, in part to avoid "stranding capital already invested" in reliance on the Five Percent Safe Harbor and other prior guidance.[11]

Multiple commenters also urged the Treasury Department to maintain a "technology-neutral" approach to beginning-of-construction standards, without drawing distinctions among wind, solar, and other eligible technologies.[12]  One of these commenters noted that applying different standards to wind and solar projects "could introduce legal risk, fragment policy implementation, and delay the deployment of other critical firm resources."[13]

At least two commenters encouraged the Treasury Department to adopt guidance that would address the Executive Order's concerns about foreign suppliers without limiting the availability of the Five Percent Safe Harbor for projects that begin with purchases of solar modules and other custom components from U.S.-based manufacturers.[14]  One of these commenters expressed concern about "Chinese solar suppliers and manufacturers . . . flooding the U.S. market with cheap, subsidized solar products to evade tax credit phaseouts and restrictions."  Comments of First Solar Inc., J.A. at 288–89.  However, this commenter proposed that the IRS should address this problem by preventing taxpayers from relying on purchases of products or components sourced from "*a prohibited foreign entity*" to satisfy the Five Percent Safe Harbor.  *Id.* at 289 (emphasis added).  This commenter opined that beginning a project under the Five Percent Safe Harbor by making purchases from U.S.-based manufacturers and other non-prohibited entities

---

[11] RER Letter, J.A. at 251; *see also* Novogradac Letter, J.A. at 256; ConservAmerica Letter, J.A. at 351; Comments of Monarch Capital, J.A. at 363; ITIC Letter, J.A. at 375; Comments of Z. Bischof, J.A. at 382; TEBA Letter, J.A. at 405.

[12] *See* Data Center Coalition Letter, J.A. at 371; ITIC Letter, J.A. at 376; CEBA Letter, J.A. at 409.

[13] CEBA Letter, J.A. at 409.

[14] *See* Comments of First Solar, Inc. (received July 22, 2025), J.A. at 287–92; Email from Joseph Mendelson, Vice President of Public Policy and Government Relations, Qcells North America, to Deputy Assistant Secretary Mason Champion, *et al.* (Aug. 1, 2025), J.A. at 318–20.

"does not reflect artificial acceleration or manipulation of the beginning of construction and [foreign entity of concern] rules." *Id.* at 290.

Another commenter suggested multiple ways that the IRS could prevent stockpiling and other transactions perceived to be "gaming" the beginning-of-construction standards without changing the standards themselves. ConservAmerica Letter, J.A. at 351–53. Although this commenter opined that concerns about gaming were "unfounded" and that existing guardrails around the Five Percent Safe Harbor were "virtually impossible to exploit," the commenter suggested that the IRS could further reduce the risk of improper transactions by implementing new reporting requirements and audit procedures. *Id.* at 352–53, 357–58.

The Treasury Department also considered a presentation by the law firm Holland & Knight that addressed the Executive Order and how the IRS might implement it.[15] *What Does it Mean to Begin Construction Post-OBBBA and EO*, Presentation by Holland & Knight (July 24, 2025), J.A. at 294–316. This presentation opined that if the Treasury Department were to adopt different beginning-of-construction rules for wind and solar projects as compared to other technologies, "that would be in contrast to" the Executive Order's requirement that the new guidance "must be 'in accordance with applicable law'" because the OBBBA applies the same beginning-of-construction language to all technologies. *Id.* at 314.

At least two Members of Congress also conveyed comments to the Treasury Department about the beginning-of-construction requirement.[16] One of those Members, Senator Charles E.

---

[15] Because this presentation appears in the Administrative Record, it is among "the non-privileged documents that were directly or indirectly considered in connection with the publication of Notice 2025-42." *See* Certification of Administrative Record, Dkt. No. 34-1, ¶ 4. However, the record does not explain the context of the presentation other than to identify it as a "Webinar Slide Deck presented by Holland & Knight on July 24, 2025." J.A. at 3.

[16] *See* Email from Chris Conlin to Jonathan Blum and Mason Champion ("Conlin Email") (Aug. 1, 2025), J.A. at 400 (conveying views of Senator Grassley); Email from Scott Watson to Derek Theurer and Francis Brooke (Aug. 8, 2025) (conveying views of Congressman Evans of Colorado, including the Congressman's hope that the forthcoming

Grassley, made a statement about the matter on the Senate Floor on July 23, expressing his view that the tax credit changes under the OBBBA reflected a "sensible compromise" under which wind and solar projects would have "a yearlong transition to confidently move forward with planned projects under the existing continuity safe harbor and the beginning of construction guidance in effect at the time of the law's enactment." 171 Cong. Rec. S4618 (daily ed. July 23, 2025). On August 1, 2025, Senator Grassley made another statement on this topic, explaining that he had "worked with [his] colleagues to provide wind and solar an appropriate glidepath for the orderly phase-out of the tax credits" and opining that "[w]hat it means for a project to 'begin construction' has been well established by Treasury guidance for more than a decade." 171 Cong. Rec. S5201 (daily ed. Aug. 1, 2025). Senator Grassley further stated that, in his view, "both the law and congressional intent are clear." *Id.* He announced that he had placed a hold on three Treasury Department nominees that would continue until he was "certain" that the Treasury Department's guidance would "adhere to the law and congressional intent." *Id.* Senator Grassley's staff emailed a copy of this statement to staff at the Treasury Department the same day.[17]

### B. IRS Notice 2025-42

In response to Executive Order No. 14,315, the Treasury Department and the IRS eventually issued the Notice that is at issue in this case: Notice 2025-42, "Beginning of Construction Requirements for Purposes of the Termination of Clean Electricity Production Credits and Clean Electricity Investment Credits for Applicable Wind and Solar Facilities." *See* 2025-36 I.R.B. 351 (2025), https://perma.cc/H998-PXKX (*also available at* J.A. at 10–15).

---

beginning-of-construction guidance would "faithfully maintain[] the spirit and intent of the language included in the OBBBA" and "longstanding precedent in the energy tax credit space").

[17] Conlin Email, J.A. at 400.

The Notice provides that for all wind projects and most solar projects, the "beginning of construction" for tax credit eligibility under Sections 45Y and 48E will be determined based on the Physical Work Test alone. *Id.* § 3.01. Under the Notice, the Five Percent Safe Harbor will remain available only for relatively small solar projects—those with a maximum net output of no more than 1.5 megawatts. *Id.* §§ 3.01, 6.02. Under this guidance, all wind and most solar projects completed after the end of 2027 will be eligible for the Section 45Y production tax credit and the Section 48E investment tax credit only if "physical work of a significant nature begins" on or before July 4, 2026. *See id.* § 3.02.

The Notice contains one paragraph explaining the IRS's reasoning for removing the Five Percent Safe Harbor for wind and large-scale solar projects. That paragraph reads:

> The Treasury Department and the IRS have determined that the guidance contained in this notice is necessary and appropriate to properly enforce the credit termination date for applicable wind and solar facilities. Congress provided a beginning of construction deadline after which the new credit termination date for applicable wind and solar facilities applies. This notice provides beginning of construction guidance to prevent taxpayers from circumventing the statutory credit termination date, prevent the artificial manipulation of eligibility for the § 45Y credit and § 48E credit for applicable wind and solar facilities, and ensure that a substantial portion of any applicable wind or solar facility not subject to the credit termination date is built by the beginning of construction deadline. Accordingly, except as provided in section 6 of this notice, the Five Percent Safe Harbor provided under the IRS notices is not available for purposes of determining whether an applicable wind or solar facility has met the beginning of construction deadline and, thus, is not subject to the credit termination date.

*Id.* § 1.03. The Notice does not directly address any of the comments the IRS received between the issuance of the Executive Order and the publication of the Notice. *See id.*

### C.    Later Developments

In February 2026, Senator Catherine Cortez Masto introduced a resolution under the Congressional Review Act ("CRA"), 5 U.S.C. §§ 801–808, that proposed to disapprove Notice 2025-42. S.J. Res. 107, 119th Cong. (2026); *see* 172 Cong. Rec. S610 (daily ed. Feb. 12, 2026).

11

If this joint resolution had been enacted, it would have effectively vacated the Notice.  *See* 5 U.S.C. § 801(b)(1) (providing that "[a] rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval" under the CRA).

On March 25, 2026, the Office of Management and Budget issued a statement opposing the resolution and stating that, if the resolution were presented to the President, "his advisors would recommend that he veto it."  Office of Mgmt. and Budget, Statement of Administration Policy on S.J. Res. 107 (Mar. 25, 2026), https://perma.cc/HS9C-7GFU.

The same day, the Senate held a floor debate on the resolution.  *See* 172 Cong. Rec. S1596–97 (daily ed. Mar. 25, 2026).   During this debate, Senator Michael D. Crapo argued that overturning the Notice under the CRA "would create more uncertainty and unpredictability for current projects and discourage focus on more reliable and affordable energy sources."  *Id.* at S1597.  The Senate then held a procedural vote and, by a vote of 47–53, failed to advance the resolution.  *Id.* at S1599.  Since this vote, there have been no further proceedings on the resolution.

### D.      Proceedings in this Court

#### 1.      Parties

The Plaintiffs in this case are a collection of governmental and private organizations that allege that the Notice is harming them—or will soon do so—by making electricity more expensive, by causing increased air pollution, and by interfering with or preventing the development of projects in which they have economic interests.  *See* Compl., Dkt. No. 1; Pls.' Mot. at 14–24.

Plaintiffs Oregon Environmental Council ("OEC"), Natural Resources Defense Council, Inc. ("NRDC") and Public Citizen are membership organizations.[18]  OEC's stated mission is to

---

[18] *See* Decl. of Jana Gastellum ("Gastellum Decl."), Dkt. No. 26-4, ¶ 4 (OEC); Decl. of Gina Trujillo ("Trujillo Decl."), Dkt. No. 26-16, ¶ 3 (NRDC); Decl. of Robert Weissman ("Weissman Decl."), Dkt. No. 26-17, ¶ 3 (Public Citizen).

"advance innovative, collaborative, and equitable solutions to address Oregon's environmental challenges and benefit people's health and quality of life," and its goals include supporting "renewable energy advancement" and "energy affordability."[19]   NRDC's stated mission is to "safeguard the earth—its people, its plants, and animals, and the natural systems on which all life depends," and its goals include "accelerat[ing] the use of renewable energy," "lowering consumer energy bills," and "ensuring that clean energy is affordable and accessible to all."[20]   Public Citizen's stated mission includes "advocating for the interests of its members in the promotion, adoption, and implementation of governmental policies and actions that promote actions and behaviors to address the adverse impact of climate change and protect the interests of consumers."[21]

These organizations have individual members who consume electricity.[22]  Plaintiffs Public Citizen and NRDC are also direct consumers of electricity at their own offices.[23]  NRDC's Director of Policy Analysis, Amanda Levin, has prepared and filed a detailed analysis examining how Notice 2025-42 will affect clean energy product development, wholesale electricity prices, and the operation of other power plants.[24]  One finding of this report is that Notice 2025-42 will contribute

---

[19] Gastellum Decl. ¶ 5.

[20] Trujillo Decl. ¶¶ 7–8.

[21] Weissman Decl. ¶ 4.

[22] *See, e.g.*, Decl. of Paul F. Kaplan ("Kaplan Decl."), Dkt. No. 26-7, ¶ 3 (NRDC); Decl. of Doris I. Penwell ("Penwell Decl."), Dkt. No. 26-12, ¶ 3 (OEC); Decl. of Kaiba White ("White Decl."), Dkt. No. 26-18, ¶ 7 (Public Citizen).

[23] *See* Decl. of Noyan Eyigor ("Eyigor Decl."), Dkt. No. 26-3, ¶¶ 4–7 (Public Citizen); Decl. of Toya Shumake-Lampley ("Shumake-Lampley Decl."), Dkt. No. 26-8, ¶¶ 6–10 (NRDC).

[24] Decl. of Amanda Levin ("Levin Decl."), Dkt. No. 26-9.

to substantially increased electricity prices throughout the country, including in some of the markets where these organizations and their members purchase electricity.[25]

One of Plaintiff NRDC's members, Tam Hunt, provides legal counsel and consulting services to clean energy developers and nonprofit advocacy groups.[26]  Mr. Hunt reports that he is advising on two active integrated solar and battery energy storage projects affected by Notice 2025-42.[27]  According to Mr. Hunt's analysis, these projects were on track to qualify for federal clean energy tax credits worth several million dollars, even under the earlier termination deadlines adopted in the OBBBA.[28]  Both projects planned to qualify for these credits under the Five Percent Safe Harbor.[29]  Mr. Hunt reports that Notice 2025-42's elimination of that option has "created immediate and severe uncertainty regarding" the projects' ability to qualify for tax credits.[30]  As a result, Mr. Hunt's client has placed the projects into "hibernation" pending resolution of legal questions about their tax credit eligibility, eliminating some of Mr. Hunt's work.[31]  Because Mr. Hunt's compensation is tied to project completion and tax credit qualification, if the projects do not qualify and move forward, his compensation will be reduced or eliminated.[32]

Plaintiff NRDC also has individual members who live and recreate in close proximity to pollution-generating power plants, such as the Handley Power Plant in Texas, that burn

---

[25] *Id.* ¶ 9.

[26] Decl. of Tam Hunt ("Hunt Decl."), Dkt. No. 26-5, ¶¶ 1, 3–4.

[27] *Id.* ¶¶ 5–6.

[28] *Id.* ¶ 7.

[29] *Id.*

[30] *Id.* ¶¶ 7–9.

[31] *Id.* ¶¶ 11–12.

[32] *Id.* ¶ 13.

conventional fuels like natural gas.[33]  One finding of NRDC Policy Analysis Director Amanda Levin's report is that if clean energy projects placed at risk by Notice 2025-42 are not completed, the Handley Power Plant will need to operate at higher levels in the future.[34]

Plaintiff Hopi Utilities Corporation ("HUC") is a Tribal Corporation chartered in 2017 by the Hopi Tribal Government.[35]  HUC has two utility-scale solar projects in development.[36]  Like many developers, HUC intends to finance these projects in part by borrowing against the anticipated amount of federal tax credits that HUC plans to claim once the projects are placed in service.[37]  For one of its ongoing projects, HUC intended to use the Five Percent Safe Harbor to establish eligibility for federal tax credits.[38]  As of December 2025, HUC had spent five percent of its estimated costs for this project, meaning that, "[b]ut for Notice 2025-42," the project "would already have qualified for federal tax credits."[39]  To avoid losing these tax credits based on Notice 2025-42, HUC is now incurring "significant additional expenses" to accelerate the project and satisfy the Physical Work Test.[40]  These additional expenses include "fees for expedited reviews and approvals, and increased legal and staffing costs."[41]  Because of the tax credit deadline changes

---

[33] *See, e.g.*, Decl. of Jillian McFarland ("McFarland Decl."), Dkt. No. 26-10, ¶¶ 3–6, 9; Decl. of Mary Kathryn Mrgudic ("Mrgudic Decl."), Dkt. No. 26-11, ¶¶ 4–5; Decl. of Nathan South ("South Decl."), Dkt. No. 26-14, ¶¶ 4–7.

[34] *Id.* ¶ 97 & App. D.

[35] Decl. of Fletcher Wilkinson ("Wilkinson Decl."), Dkt. No. 26-19, ¶ 11.

[36] *Id.* ¶¶ 12–13.

[37] *See id.* ¶ 25

[38] *Id.* ¶¶ 15–16.

[39] *Id.* ¶ 16.

[40] *See id.* ¶¶ 22–24.

[41] *Id.* ¶ 24.

adopted in the OBBBA and the elimination of the Five Percent Safe Harbor in Notice 2025-42, HUC "no longer anticipates" that its second project will qualify for the tax credits at issue here.[42]

Plaintiff Woven Energy LLC ("Woven") is a consulting firm that partners with Tribes to help them plan, design, and deploy energy infrastructure.[43] Woven has multiple clients, including HUC, that intended to use the Five Percent Safe Harbor to qualify for clean energy tax credits for wind and solar energy projects.[44] Like HUC, Woven anticipates "a significant, unplanned expenditure in resources and staff time" as a result of the additional work required to reconfigure projects to qualify for these tax credits—if at all—under the Physical Work Test.[45] Meanwhile, Woven anticipates that the cancellation or scaling-down of projects that will be unable to qualify for these credits will lead to "reduced or cancelled contracts" and "a reduced pipeline for project implementation work" in the future.[46] Because of the time that Woven is reallocating to support projects that have been reconfigured in response to Notice 2025-42, it is dedicating less time to client development, which it anticipates will lead to a "project backlog cliff" that will further harm the company's future financial prospects.[47]

Plaintiff City and County of San Francisco ("San Francisco"), through its agency the San Fransisco Public Utilities Commission ("SFPUC"), is a purchaser and provider of electricity.[48] SFPUC procures renewable energy for San Francisco through Power Purchase Agreements

---

[42] *Id.* ¶ 21.

[43] Decl. of Jacob Schueller ("Schueller Decl."), Dkt. No. 26-13, ¶¶ 4–5.

[44] *Id.* ¶ 9.

[45] *Id.* ¶ 16.

[46] *Id.* ¶ 17.

[47] *Id.* ¶ 18.

[48] Decl. of Michael Hyams ("Hyams Decl."), Dkt. No. 26-6, ¶ 2.

("PPAs").[49]  Because of projected demand growth and state and local policy mandates that require the use of power-generating technologies with zero greenhouse gas emissions, SFPUC is actively procuring additional supply and negotiating PPAs with clean energy providers.[50]  SFPUC reports that it is already "seeing the effects of" Notice 2025-42 in these negotiations: "developers have increasingly declined to respond to solicitations; have withdrawn active bids; or have approached SFPUC about new terms that pass costs on to SFPUC in the event that they do not receive anticipated tax credits due to the uncertainty caused by the IRS Notice."[51]  SFPUC anticipates raising rates in response to these changes, resulting in increased costs to the City of San Francisco and other ratepaying customers.[52]

Plaintiff Maryland Office of People's Counsel ("OPC") is a state agency charged under Maryland law with representing the "the public safety, economic welfare, and environmental interests" of Maryland residential and noncommercial utility consumers.[53]  *See* Md. Code Ann. Pub. Util. § 2-204(a)(1) (West 2021).  Maryland has authorized the OPC to appear in federal court "to protect the interests of" these consumers.  *Id.* § 2-205(b).

The Defendants in this case are the Internal Revenue Service, the Department of the Treasury, and Scott Bessent, named in an official capacity as Secretary of the Treasury and as Acting Commissioner of the IRS.[54]  Compl. ¶¶ 22–24.

---

[49] *Id.* ¶ 4.

[50] *Id.* ¶¶ 5–7.

[51] *Id.* ¶ 8.

[52] *Id.* ¶ 9.

[53] Decl. of Mark C. Syzbist ("Szybist Decl."), Dkt. No. 26-15, ¶ 5.

[54] The IRS announced in March 2026 that Secretary Bessent is no longer serving as Acting IRS Commissioner.  *See* Internal Revenue Serv., *Update on IRS Commissioner Position* (Mar. 13, 2026), https://perma.cc/Q9HN-LKYC.  The position of Commissioner has not been filled, and the IRS has indicated that Secretary Bessent "retains the authority

2.    Procedural History

The Plaintiffs filed this action in December 2025, alleging that Notice 2025-42 is arbitrary and capricious and should therefore be vacated and set aside under the Administrative Procedure Act.  Compl., Dkt. No. 1.  About two months after filing their Complaint, the Plaintiffs filed a motion for summary judgment, accompanied by a motion for an accelerated briefing schedule and expedited consideration of this case.  Pls.' Mots., Dkt. Nos. 25–26.  Over the Defendants' objection, the Court granted the Plaintiffs' motion for an accelerated briefing schedule and expedited its consideration of the issues presented so that the case could be resolved before the July 4 beginning-of-construction deadline for the relevant tax credits.  Minute Order (Feb. 27, 2026).  The Defendants then filed a motion to dismiss or, in the alternative, for summary judgment. Defs.' Mot., Dkt. No. 35.  The parties' dispositive motions are now ripe for decision.

## II. LEGAL STANDARD

A motion to dismiss for lack of jurisdiction under Rule 12(b)(1) requires the Court to assess whether it has subject-matter jurisdiction over the claims asserted.  Fed. R. Civ. P. 12(b)(1).  In response to such a motion, the party invoking the Court's jurisdiction "has the burden of establishing it." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006).  In assessing its own jurisdiction in this posture, a court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).

A motion to dismiss under Rule 12(b)(6) tests whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

---

and responsibility to perform the functions and duties" of this office.  *See id.*  Because no "successor" to the office of Commissioner has been identified, there has been no automatic substitution of parties.  *See* Fed. R. Civ. P. 25(d).

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). As with a motion under Rule 12(b)(1), a reviewing court must accept the complaint's allegations as true and draw all reasonable inferences in the plaintiffs' favor when resolving a motion under Rule 12(b)(6). *Ho v. Garland*, 106 F.4th 47, 50 (D.C. Cir. 2024).

A court must grant a motion for summary judgment under Rule 56 if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In an Administrative Procedure Act ("APA") case, "the district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quoting *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).

## III. ANALYSIS

### A. Standing

The Defendants vigorously contest the Plaintiffs' Article III standing to challenge Notice 2025-42, arguing that the Plaintiffs' claims rest primarily on injuries that are not cognizable and that their theories of direct harm involve long and unduly speculative chains of causation. *See generally* Defs.' Mem. at 5–19. But as the Supreme Court recently instructed, "[c]ourts should not 'make standing law more complicated than it needs to be.'" *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 125 (2025) (quoting *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020)). The Plaintiffs in this case are not "unaffected bystanders" seeking to resolve an abstract grievance. *Id.* Instead, many of them are actual and foreseeable beneficiaries of a consequential federal energy policy that the Defendants have abruptly changed. Because "commonsense economic inferences" and record evidence show that Notice 2025-42 will cause concrete harm to these Plaintiffs that will be redressed if the Court vacates the Notice, these Plaintiffs have satisfied the requirements of Article III. *See id.* at 120.

19

1.    Legal Framework

To have Article III standing—that is, the requisite "personal stake" in the outcome of a case—a party must show an "injury in fact that is concrete, particularized, and actual or imminent," that this injury "was likely caused by the defendant," and that it "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The asserted injury does not need to be unique to the plaintiff. A "widely shared" injury that is concrete can still be an injury in fact. *FEC v. Akins*, 524 U.S. 11, 24 (1998); *see also Massachusetts v. EPA*, 549 U.S. 497, 526 n.24 (2007) ("[S]tanding is not to be denied simply because many people suffer the same injury." (quoting *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 687 (1973))); *Campaign for Accountability v. DOJ*, 155 F.4th 724, 735 (D.C. Cir. 2025) ("The fact that many people could be similarly injured does not render the claim an impermissible generalized grievance."). The injury also does not need to be one for which the Court can provide complete redress. If judicial relief would afford a plaintiff even "one dollar," the injury is redressable for purposes of the standing analysis. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021).

An organization can show standing in much the same way as an individual. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982); *Am. Anti-Vivisection Soc'y v. United States Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020). If an organization shows "an actual or threatened injury in fact" to its own interests "that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision," it has "organizational standing" to advance claims on its own behalf. *Am. Anti-Vivisection Soc'y*, 946 F.3d at 618 (quoting *American Society for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011)). Like an individual plaintiff, "[t]o demonstrate injury in fact, an organization must allege a 'concrete and demonstrable injury to the organization's activities' that

20

is 'more than simply a setback to [its] abstract social interests.'" *Id.* (quoting *Havens*, 455 U.S. at 379); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

An organizational plaintiff that is a voluntary membership organization may also show "associational standing" to proceed on behalf of its members by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 111 (D.C. Cir. 2021).

The party asserting standing must show it "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To satisfy Article III's case-or-controversy requirement under the motion-to-dismiss standard, plaintiffs need only "state a plausible claim" that they have standing. *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). When evaluating whether plaintiffs have satisfied this requirement, the Court "must accept as true all material allegations of the complaint." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). However, at the summary judgment stage, plaintiffs "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" sufficient to establish their standing. *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)).

When, as in this case, a party's theories of standing "depend on the conduct of a third party not before the court, 'standing is not precluded, but it is ordinarily substantially more difficult to establish.'" *Competitive Enter. Inst. v. FEC*, 970 F.3d 372, 381 (D.C. Cir. 2020) (quoting *Lujan*, 504 U.S. at 562). Under those circumstances, "[t]he party invoking [the court's] jurisdiction must

show that the third party will act 'in such manner as to produce causation and permit redressability of injury.'" *Id.* (quoting *Lujan*, 504 U.S. at 562).  A theory of standing that rests on predictions about third-party conduct is permissible if it "does not rest on mere speculation about the decisions of third parties," but rather "relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).

2.    <u>Plaintiffs</u>

A case can proceed in federal court as long as at least one plaintiff has standing.  *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 76 n.3 (2026).  However, because "standing is not dispensed in gross," a court cannot grant relief unless at least one plaintiff with standing shows an entitlement to relief against one or more defendants.  *See Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion*, 594 U.S. at 431).  Because the Defendants have raised other jurisdictional arguments that apply differently to different Plaintiffs, the Court shall analyze each Plaintiff's standing individually.  *See* Defs.' Reply at 12.

a.    *Oregon Environmental Council*

OEC asserts associational standing on behalf of its members, who are energy consumers in the state of Oregon.  Pls.' Mem. at 21–22.  OEC's theory of standing is that Notice 2025-42 will harm its members by causing them to pay higher electricity prices in the future.  *Id.*; *see* Gastellum Decl. ¶ 3; Penwell Decl. ¶¶ 1–8.  The Defendants argue that this asserted injury cannot support Article III standing because it is too speculative, not particularized, not fairly traceable to Notice 2025-42, and not redressable by a favorable decision from this court.  Defs.' Mem. at 13–18.

The Court agrees with the Plaintiffs that the foreseeable effect of Notice 2025-42 on future electricity prices inflicts a cognizable injury on electricity consumers.  A "pocketbook injury" of this kind "is a prototypical form of injury in fact."  *Collins v. Yellen*, 594 U.S. 220, 243 (2021).

22

Contrary to the Defendants' arguments, the asserted injury to OEC's members and other Plaintiffs from higher electricity prices is not unduly speculative. Although the Plaintiffs cannot predict with certainty when or by how much electricity prices may rise because of the Notice, "commonsense economic inferences" support the conclusion that narrowing important tax credits for building and financing electricity projects will ultimately cause electricity prices to increase. *See Diamond Alternative Energy*, 606 U.S. at 120; *see also, e.g.*, *Kōloa Rum Co. v. Noem*, No. 25-cv-0554, ___ F. Supp. 3d. ___, 2026 WL 145882, at *7 (D.D.C. Jan. 20, 2026) (JEB) (concluding that plaintiffs had adequately alleged standing based on "[f]undamental economic principles," including "the law of supply and demand"). Reducing the availability of these tax credits will foreseeably make some projects non-viable, causing them to be paused or cancelled. This change will foreseeably reduce the future supply of electricity generation capacity. For other projects, developers will likely expend additional resources to ensure that their projects can qualify for the tax credits under the Physical Work Test. *See, e.g.*, Wilkinson Decl. ¶ 24 (explaining that HUC has incurred additional costs in this manner). The net result will be less electricity generation capacity, completed at higher cost, with those costs foreseeably be passed on to ratepayers in the form of higher prices. Contrary to the Defendants' framing of the Plaintiffs' injury as flowing abstractly from "the uncertainty caused by" Notice 2025-42, OEC relies on a straightforward, commonsense theory: the Notice will cause OEC's members to pay higher prices because of its "predictable effects" on "specific projects" that will no longer qualify for tax credits. *Compare* Defs.' Mem. at 17 (quoting Hyams Decl. ¶ 8), *with* Pls.' Reply & Opp'n at 2, 6–7. That theory of injury is sufficient to support standing.

Critically, the Plaintiffs' theory of injury does not rest on inferences alone. The Plaintiffs have also filed a detailed analysis examining how the Notice will affect wholesale electricity

markets throughout the country.  *See* Levin Decl. ¶¶ 6–10.  This analysis includes an examination of the likely effects in the Northwest Power and Conservation Council ("NWPCC") region that includes Oregon, where OEC's members are located.  *See* Levin Decl. ¶¶ 9, 49, 73, 76.  The analysis concludes that wholesale electricity prices in the NWPCC will rise between 4 percent and 38 percent because of the Notice.  *Id.* ¶ 9.  Because "transactions that occur on the wholesale market have natural consequences at the retail level," it is a fair inference that these wholesale price increases will eventually translate into higher electricity prices for retail consumers like OEC's members.  *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 281 (2016).  Meanwhile, as further support for their contentions about the Notice's effects, the Plaintiffs have filed declarations from participants in the clean energy market explaining that the Notice has already delayed or prevented the completion of some clean energy projects and will continue to do so in the future.  *See, e.g.*, Hunt Decl. ¶¶ 21–23; Schueller Decl. ¶ 13; Wilkinson Decl. ¶ 26.  Taken together, "commonsense economic inferences" and the Plaintiffs' evidence adequately establish that Notice 2025-42 will cause a concrete economic injury to OEC's members by raising the price of electricity.  *See Diamond Alternative Energy*, 606 U.S. at 120.

The Defendants object that the Plaintiffs' theory of harm is unduly speculative because it "depends on independent third-party decisions made by 'dozens of individual actors, each of whom must react to other market or regulatory inputs.'"  *See* Defs.' Mem. at 14 (quoting *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) (en banc)).  But that contingency does not make the Plaintiffs' injury speculative or otherwise inadequate.  The Supreme Court has made clear that "the predictable effect of Government action on the decisions of third parties" can be a basis for standing.  *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).  When the "entire purpose" of a policy is to induce certain behavior from market participants, it is often "predictable"

24

that the policy will have its intended effect, even if the chain of causation runs through multiple intermediaries. *See Diamond Alternative Energy*, 606 U.S. at 112–13. Here, it is undisputed that the tax credits at issue were intended to, and in fact did, encourage the development of clean energy projects. *See, e.g.*, Schueller Decl. ¶¶ 9–10; Wilkinson Decl. ¶ 14. By limiting the availability of those tax credits, the Notice will predictably reduce the amount of clean energy generation capacity in the future, pushing up electricity prices. *See* Hunt Decl. ¶ 21; Levin Decl. ¶¶ 6–10. Unlike the case on which the Defendants rely, this case is not one in which injury is uncertain because "sound economic reasoning" supports the possibility of an alternative outcome in which the Plaintiffs suffer no injury. *Cf. Fla. Audubon Soc.*, 94 F.3d at 671. The natural economic consequence of the Notice is less clean electricity generation capacity and higher electricity prices. Although the Plaintiffs cannot predict with certainty *when* these higher prices will arrive, the imminence prong of the standing analysis "depends on the probability of harm, not its temporal proximity." *See Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1078 (D.C. Cir. 2017) (quoting *520 Mich. Ave. Assocs. v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006)). Accordingly, the Plaintiffs' asserted injury is not too speculative to support standing.

The Court is similarly unpersuaded by the Defendants' argument that the Plaintiffs' assertions about future electricity prices fall short of establishing standing under this Circuit's precedents because they do not demonstrate "both (i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account." Defs.' Mem. at 15 (quoting *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007)) (emphasis omitted). The risk-of-harm test that the Defendants invoke applies to cases involving allegations of small but significant increases in *risks* of rare harms, "such as death, physical injury, or property damage." *See Public Citizen*, 489 F.3d at 1295, 1298. However,

25

when—as in this case—a plaintiff's theory of standing rests on an assertion of *actual* future economic harm rather than a mere *risk* of harm, the inquiry is more straightforward. Under these circumstances, the only question is whether the Plaintiffs' complaint and declarations show a "substantial probability" that the challenged action will cause "some" economic harm. *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017) (Kavanaugh, J.). And because even "[a] dollar" of economic harm is a sufficient injury to establish standing, "the amount is irrelevant." *Id.* at 5. As the Court has already explained, the Plaintiffs have introduced ample evidence that electricity consumers face at least "some" future economic harm in this case. *See id.*; Levin Decl. ¶¶ 6–10. Because the Plaintiffs' allegations and evidence, considered in the context of "[c]ommon sense and basic economics," show a substantial probability that Notice 2025-24 will cause at least "some" economic harm from higher electricity prices, the Plaintiffs' theory is consistent with this Circuit's standing precedents. *See Carpenters Indus. Council*, 854 F.3d at 6.

For similar reasons, the Court rejects the Defendants' argument that the injuries that ratepayers will suffer from higher electricity prices are not fairly traceable to Notice 2025-42. The Defendants suggest that the "true catalyst" of changes to clean energy project developers' plans "is likely the OBBBA itself," not the Notice. Defs.' Mem. at 9–10 & n.4. However, the fact that an injury has multiple contributing causes does not preclude a litigant from establishing standing to challenge each of them. The causation prong of the standing analysis "does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries; it requires only that those injuries be 'fairly traceable' to the defendant." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017) (quoting *Lexmark Int'l, Inc. v. Static Control Components*, Inc., 572 U.S. 118, (2014)). "When a litigant's injury-in-fact stems from two independently sufficient causes, it may separately challenge both of them, even though success in only one

26

proceeding might not fully redress its injury." *Cap. Power Corp. v. FERC*, 156 F.4th 644, 650 (D.C. Cir. 2025); *see also Orangeburg*, 862 F.3d at 1080 (noting that the "existence of . . . an equally important player in the story does not erase [an agency's] role" in the causal chain for standing purposes). The fact that the OBBBA may have contributed significantly to developers' changed plans does not negate the additional effect of Notice 2025-42 as a cause of the Plaintiffs' asserted injuries. Because the Plaintiffs have adequately established that the Notice will cause at least "some" economic injury, the coinciding effects of the OBBBA do not negate their theory of standing. *See Carpenters Indus. Council*, 854 F.3d at 5–6.

OEC's asserted injury to its members is also sufficiently particularized. The Defendants argue that because the Plaintiffs' asserted interest in minimizing their electricity costs is "shared with the public at large," it cannot support standing. Defs.' Mem. at 17. However, "standing is not to be denied simply because many people suffer the same injury." *Massachusetts*, 549 U.S. at 526 n.24. An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560 n.1). The particularity requirement precludes claims based only on "a collective political interest" rather than "an individual legal interest" and ensures that federal courts "do[] not become 'a forum for generalized grievances'" about policy matters untethered from the litigants' own concrete interests. *Gill v. Whitford*, 585 U.S. 48, 70 (2018). Applying this principle, the Supreme Court has denied standing to assert "generalized grievance[s]" primarily in cases in which "the harm at issue is not only widely shared, but is also of an abstract and indefinite nature." *Akins*, 524 U.S. at 23–24. Given the enormous size of the federal budget, courts treat the diffuse, practically imperceptible "economic harm" to taxpayers that theoretically results from every expenditure of federal dollars as an abstract or indefinite injury of this kind. *Hein v. Freedom From Religion*

*Found., Inc.*, 551 U.S. 587, 593 (2007).  However, when—as in this case—the harm at issue is "concrete," it is no barrier to standing that the harm is also "widely shared."  *Akins*, 524 U.S. at 24.  Because the Plaintiffs assert a concrete economic injury, the harms on which their theory of standing relies are sufficiently particularized even though many others share similar injuries.

Finally, OEC's asserted injury is redressable by a favorable decision from this Court.  This conclusion follows naturally from the Court's conclusion regarding causation.  "[I]f a government action causes an injury, enjoining the action usually will redress that injury."  *Zinke*, 854 F.3d at 6.  Although a decision vacating Notice 2025-42 is unlikely to provide complete relief to OEC or other Plaintiffs because some project developers may already have irreversibly delayed or cancelled projects while the Notice was in effect, there is a substantial likelihood that vacating the Notice will provide at least some economic benefit to the Plaintiffs and their members.  Vacating the Notice will likely allow some projects to resume, accelerate, or finish at less total cost to developers, which eventually will be passed along to ratepayers in the form of lower electricity prices.  The possibility that vacatur will help the Plaintiffs in this way makes their asserted injuries redressable, regardless of whether the Defendants might later replace the Notice by adopting a similar interpretation of the "beginning of construction" requirement in a separate action.  *See Planned Parenthood of Greater New York v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-2453, 2025 WL 2840318, at *12 (D.D.C. Oct. 7, 2025) (BAH) ("The possibility that [an agency] may choose to enforce similar requirements through different means does not render . . . plaintiffs' present injury not redressable."); *Corbett v. Transportation Sec. Admin.*, 19 F.4th 478, 484 (D.C. Cir. 2021) (explaining that a plaintiff is not required to "solve all roadblocks simultaneously" to establish redressability); *see also Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 828–29 (D.C. Cir. 2000) (noting that an injury may be redressed by vacating a challenged action and "giving the

28

aggrieved party the opportunity to participate" in the agency's process of crafting a replacement). In short, because vacating the Notice would benefit the Plaintiffs and even "one dollar" of benefit from a favorable decision is enough to make an injury redressable for standing purposes, the Plaintiffs' asserted price-related injuries are redressable. *Uzuegbunam*, 592 U.S. at 292.

In sum, the Plaintiffs have established that at least one of OEC's members is an electricity consumer who will pay higher prices because of Notice 2025-42. Gastellum Decl. ¶ 3; Penwell Decl. ¶¶ 1–8. That injury is concrete, particularized, traceable to the Notice, and redressable by a favorable decision from this Court. Accordingly, at least one of OEC's members "would otherwise have standing to sue in their own right." *See Hunt*, 432 U.S. at 343. The interests that OEC seeks to protect are also "germane to the organization's purpose" of advocating for solutions to environmental challenges and energy affordability, and individual OEC members' participation is not required to resolve this suit. *See id.*; Gastellum Decl. ¶ 5; *see also Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 111 (D.C. Cir. 1990) (explaining that the "[g]ermaneness" requirement "is satisfied by a 'mere pertinence' between litigation subject and an organization's purpose" (quoting *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)). OEC therefore has associational standing to challenge Notice 2025-42 on behalf of its members.

b.    *Natural Resources Defense Council, Inc.*

NRDC has associational standing to challenge the Notice's effects on its members' future electricity prices for the same reasons that OEC has standing to advance a similar challenge: "commonsense economic inferences" and the Plaintiffs' evidence support the conclusion that the Notice will cause electricity prices to rise, concretely harming NRDC's members who are electricity consumers. *See Diamond Alternative Energy*, 606 U.S. at 120; Kaplan Decl. ¶¶ 2–4; McFarland Decl. ¶ 17; Mrgudic Decl. ¶¶ 11–15; South Decl. ¶ 7. These price increases will cause

29

concrete and particularized economic harms to NRDC's members, and a favorable decision from this Court would provide at least some redress for those injuries.

NRDC also has organizational standing as a direct electricity consumer.  *See* Shumake-Lampley Decl. ¶¶ 2, 6–12.  Because NRDC purchases electricity to support its operations at its offices, like its members, it faces future economic injury because of the higher electricity prices that will result from the Notice.  *See id.*  These economic injuries are concrete, particularized, imminent, and redressable by a favorable decision from this Court.  Accordingly, NRDC has organizational standing to challenge the Notice based on its likely effects on electricity prices.

Finally, NRDC has associational standing to represent its members' interests in averting the Notice's local environmental effects around at least one specific power plant.  NRDC's declarations establish that the Handley Power Plant in Texas, which produces electricity primarily by burning natural gas and secondarily by burning oil, will likely need to operate at higher capacity in the future because of the Notice's effect on clean energy projects that would otherwise provide that capacity.  *See* Levin Decl. ¶ 97 & App'x D.  Like other power plants that burn conventional fuels, when it is operating, the Handley Power Plant emits air pollutants with the potential to affect public health.  *See id.* ¶ 97.  At least one NRDC member lives and recreates near the Handley Power Plant and experiences health effects from air pollution in the area.  *See* McFarland Decl. ¶¶ 2–13.  Although the Defendants argue that the Notice's effects on pollution are too speculative to support standing, the Plaintiffs' evidence and the same sorts of "commonsense economic inferences" that support the Plaintiffs' standing based on increased electricity prices provide ample support for the conclusion that the Notice will increase pollution around the Handley Power Plant.  *See Diamond Alternative Energy*, 606 U.S. at 120.  "Harms to aesthetic and recreational enjoyment" of outdoor spaces can support Article III standing, so long as they are "particularized

and concrete." *The Wilderness Soc. v. Norton*, 434 F.3d 584, 590 (D.C. Cir. 2006). The Plaintiffs' unrebutted evidence shows that the Notice will cause the Handley Power Plant to operate at higher capacity and generate more pollution, affecting at least one specific NRDC member's health and opportunities for outdoor recreation. *See* Levin Decl. ¶ 97 & App'x D; McFarland Decl. ¶¶ 2–13. This evidence shows that at least one NRDC member would have standing to challenge the Notice based on its effects on local pollution.

In sum, the NRDC has organizational standing to challenge the Notice based on its effect on the electricity prices that NRDC pays. NRDC also has members who would have standing to challenge the Notice's effects on their own electricity prices and on local pollution from power plants burning conventional fuels. Because NRDC members' interests in averting higher energy prices and local pollution are "germane to the organization's purpose" of protecting natural resources and access to clean, affordable energy and individual NRDC members' participation is not required to resolve this suit, NRDC has associational standing to challenge the Notice on their behalf.[55] *See Hunt*, 432 U.S. at 343; Trujillo Decl. ¶¶ 7–8.

c.    *Public Citizen*

Public Citizen has standing for substantially the same reasons as NRDC: Both it and its members are electricity consumers. *See* Eyigor Decl. ¶¶ 3–7; White Decl. ¶¶ 4–8. As the Court has already explained, "commonsense economic inferences" and the Plaintiffs' evidence support the conclusion that the Notice will cause electricity prices to rise. *See Diamond Alternative Energy*, 606 U.S. at 120. These price increases will cause concrete and particularized economic harms to Public Citizen and its members, and a favorable decision from this Court would provide

---

[55] Because the Court concludes that NRDC has both organizational standing and associational standing on other grounds, the Court does not reach the closer question of whether NRDC also has associational standing to represent its member, Tam Hunt, who asserts that the Notice will negatively affect his work as counsel and consultant to renewable energy developers. *See* Hunt Decl. ¶¶ 3.

redress for those injuries.  Averting price increases is "germane to the organization's purpose" of advocating for consumers, and individual Public Citizen members' participation is not required to resolve this suit.  *See Hunt*, 432 U.S. at 343; Weissman Decl. ¶ 4.  Accordingly, like NRDC, Public Citizen has both associational and organizational standing to challenge Notice 2025-42.

d.     *Hopi Utilities Corporation*

The Hopi Utilities Corporation ("HUC") has the most straightforward claim to standing of all the Plaintiffs in this action.  HUC is a utility company that is working on developing clean energy projects, including an 8-megawatt solar project that would already have qualified for a federal clean energy investment tax credit under the Five Percent Safe Harbor if not for Notice 2025-42.  Wilkinson Decl. ¶ 16.  Because the tax credit is important to the financial success of the project, HUC has rearranged its plans and incurred significant additional expenses in order to qualify for the tax credit under the Physical Work Test.  *See id.* ¶¶ 14, 22–26.

The Defendants characterize HUC's increased expenses as the result of a "voluntary decision" made "based on the mere possibility" that HUC may not be able to qualify for the tax credits under the Physical Work Test, but this characterization understates the effect that the Notice has had on HUC's work.  *See* Defs.' Mem. at 9.  Like many clean energy developers, HUC intends to finance its 8-megawatt solar project by borrowing against the value of the tax credits for which it expects to qualify in the future.  *See* Wilkinson Decl. ¶ 25.  If not for the Notice, HUC would have already qualified for a tax credit under the Five Percent Safe Harbor.  *Id.* ¶ 16.  Now, because of the Notice, HUC must satisfy the Physical Work Test to qualify for this tax credit and access financing on which its project depends.  *See id.* ¶¶ 22–25.  In effect, the Notice has forced HUC to choose between two forms of economic harm: either foregoing a tax credit for which it would otherwise have qualified or incurring additional expenses to qualify for that credit under a new

32

standard. *See id.* Regardless of its choice, HUC faces a cognizable economic injury. Accordingly, HUC has standing to challenge Notice 2025-42.[56]

e.        *Woven Energy*

Woven's theory of standing is one step removed from HUC's theory. Woven is a consultant that supports Tribes and Tribal organizations like HUC in developing clean energy projects. Schueller Decl. ¶¶ 5–6. For example, Woven is working with HUC on the 8-megawatt solar project that has already been affected by Notice 2025-42. *Id.* ¶ 10. Woven expects that several of its clients' ongoing projects will be negatively affected by Notice 2025-42, and Woven is expediting its work to help these clients rearrange their projects to qualify for tax credits under the Physical Work Test. *See id.* ¶¶ 11–16. These changes are causing Woven to expend additional time and resources on supporting these clients, which is interfering with Woven's ability to develop new clients. *See id.* ¶¶ 16–18. The net result is economic harm to Woven. *See id.*

The Defendants argue that Woven's injuries do not establish standing because they are "entirely derivative of tax uncertainty that is not injury-in-fact" and are "caused by the decisions of taxpayers" rather than by the Notice, but neither of these contentions is persuasive. *See* Defs.' Mem. at 12. As the Court has already explained, developers like HUC that planned to qualify for tax credits under the Five Percent Safe Harbor face direct economic injuries that amount to more than mere "uncertainty." *Cf. id.* And "the predictable effect of Government action on the decisions of third parties" can be a basis for standing—especially when, as in this case, "commonsense economic inferences" provide strong support for a plaintiff's predictions about how third parties will respond. *Dep't of Com.*, 588 U.S. at 768; *Diamond Alternative Energy*, 606 U.S. at 120. Here,

---

[56] Because HUC has standing to challenge the Notice based on its direct economic effects, the Court need not decide whether the Notice has also caused a cognizable reputational injury to HUC. The Plaintiffs raised this theory in their opening brief but retreated from it in their reply. *Compare* Pls.' Mem. at 18–19, *with* Pls.' Reply & Opp'n at 3 n.1 (stating that the Plaintiffs "do not focus on [reputational] harms for purposes of summary judgment").

both record evidence and reasonable inferences support Woven's contention that the Notice has significantly disrupted developers' plans and will continue to do so, resulting in economic harm to Woven's business.

The Defendants also correctly note that "past harm is not redressable" in an APA action seeking vacatur of an agency action, but Woven's theory of standing does not rely on past harm alone. *See* Defs.' Mem. at 12. Instead, Woven asserts that the market disruption resulting from the Notice is causing it ongoing financial harm in the form of added expenses and lost opportunities for future work. *See* Schueller Decl. ¶¶ 11–18. These ongoing and future injuries, rather than any past harms, support Woven's standing.

As is true for other Plaintiffs, a favorable decision from this Court may not fully redress Woven's injuries because some project developers may already have irreversibly delayed or cancelled projects while the Notice was in effect, and it is possible that the Defendants will adopt a policy similar to the Notice again in the future. However, because even "one dollar" of benefit from a favorable decision is enough to make an injury redressable, the economic benefits that Woven argues will flow from vacatur are sufficient to make its injuries redressable. *See Uzuegbunam*, 592 U.S. at 292.

In sum, because Woven has adequately alleged future economic injuries that are not unduly speculative and are both fairly traceable to the Notice and redressable by a favorable decision from this Court, Woven has organizational standing.[57]

### f.    *City and County of San Francisco*

Next, the City and County of San Francisco asserts standing in its capacity as a buyer of electricity through the San Francisco Public Utilities Commission ("SFPUC"). Pls.' Mem. at 19–

---

[57] As with HUC, because Woven has standing to challenge the Notice based on its direct economic effects, the Court need not decide whether the Notice has also caused it to suffer a cognizable reputational injury. *See supra* note 56.

20.    Like other Plaintiffs and many of the Plaintiffs' members, San Francisco faces a concrete injury from Notice 2025-42's likely impacts on future electricity prices.  *See supra* Sections III.A.2.a–c.  As the Court has explained, "commonsense economic inferences" and the Plaintiffs' evidence support the conclusion that the Notice will cause electricity prices to rise.  *See Diamond Alternative Energy*, 606 U.S. at 120.  The Notice therefore threatens imminent economic harm to San Francisco in the form of higher electricity costs, which SFPUC will pass through to San Francisco and other ratepayers in the form of higher prices.  Hyams Decl. ¶¶ 8–9.  Like the similar injuries to other Plaintiffs and Plaintiffs' members who consume electricity, these injuries to San Fransisco are particularized and at least partially redressable by a favorable decision from this Court.  Accordingly, San Francisco has standing to challenge Notice 2025-42.

g.        *Maryland Office of People's Counsel*

Finally, the Maryland Office of People's Counsel ("OPC") asserts standing on behalf of Maryland's residential and noncommercial electricity consumers.  Pls.' Mem. at 22; Szybist Decl. ¶ 5.  However, because binding precedent holds that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government," OPC cannot proceed against the Defendants on Maryland citizens' behalf in this action.  *See Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610, n. 16 (1982)).  This "traditional rule" against State standing, called the "*Mellon* bar," is a matter of prudential standing, rather than a limit on Article III jurisdiction.  *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179–80 (D.C. Cir. 2019) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923)).  Accordingly, the rule has statutory exceptions, such as an exception allowing States to participate in proceedings before the Federal Energy Regulatory Commission.  *See, e.g.*, *Maryland People's Couns. v. FERC*, 760 F.2d 318, 322 (D.C. Cir. 1985).  The Supreme Court has also recognized that States may sue the Federal Government to assert their own quasi-sovereign

interests—rather than their citizens' interests—without running afoul of the *Mellon* bar. *Massachusetts v. E.P.A.*, 549 U.S. 497, 520 n.17 (2007). However, because OPC seeks to proceed under the APA in this case and asserts only the interests of its citizens, not the quasi-sovereign interests of the State of Maryland, the *Mellon* bar precludes its participation. *See Gov't of Manitoba*, 923 F.3d at 179–80. Accordingly, the Court shall **GRANT IN PART** the Defendants' motion to dismiss and **DISMISS** OPC from this action.

### B.     The "Zone of Interests" Test

The Defendants also argue that the Court should reject Woven's claims on prudential grounds because those claims lie outside the "zone of interests" that the clean energy tax credits at issue here are intended to protect. Defs.' Mem. at 12–13.[58]   This argument is unavailing.

The "zone of interests" test calls for courts "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). In short, the question is whether the plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue under" the relevant statute. *Id.* at 128.

Here, the relevant statute conferring a cause of action is the APA. Recognizing the importance of "preserving the flexibility of the APA's omnibus judicial-review provision," the Supreme Court has stated that the prudential zone-of-interests standard is "lenient" and "not 'especially demanding'" in APA cases. *Lexmark*, 572 U.S. at 130 (quoting *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). In this context, "the benefit of any doubt goes to the plaintiff," and a suit is precluded only if a plaintiff's asserted

---

[58] The Defendants advance the same argument regarding the claims of NRDC member Tam Hunt. Because the Court concludes that NRDC has associational standing regardless of whether Mr. Hunt's claims are cognizable, the Court need not decide whether Mr. Hunt's claims lie within the relevant "zone of interests."

interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed" that Congress authorized that plaintiff to sue. *Id.* (quoting *Patchak*, 567 U.S. at 225). For this analysis, courts look to the "substantive provisions" of the statute underlying the Plaintiff's APA claim. *See Bennett v. Spear*, 520 U.S. 154, 175 (1997).

Woven readily clears the zone-of-interest test's low bar. "The zone of interests test does not require that the statute directly regulate the plaintiff, nor does it require specific congressional intent to benefit the plaintiff." *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 589 (D.C. Cir. 2022). Because the test requires only "[c]ongruence" between the plaintiff's interests and the interests that a statute was enacted to protect, "[p]arties motivated by purely commercial interests routinely satisfy the zone of interests test." *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004). Woven provides services to advance the development of clean energy projects—a goal that straightforwardly aligns with the purposes of the tax credits at issue in this case. *See* Schueller Decl. ¶ 6; 168 Cong. Rec. H7664 (daily ed. Aug. 12, 2022) (statement of Rep. Richard Neal) (stating that the tax credits in Sections 45Y and 48E "were drafted with the goal of unleashing clean energy deployment"). Accordingly, the zone-of-interests test does not preclude Woven's claims in this case.

## C.    The Anti-Injunction Act

The Defendants next argue that this case must be dismissed pursuant to the Anti-Injunction Act ("AIA"), 26 U.S.C. § 7421(a), which strips federal district courts of jurisdiction to hear suits "for the purpose of restraining the assessment or collection of any tax," subject to certain exceptions.[59] *See Optimal Wireless LLC v. Internal Revenue Serv.*, 77 F.4th 1069, 1070–71 (D.C.

---

[59] The Declaratory Judgment Act contains a similar provision that effectively precludes suits for declaratory relief related to federal tax administration. *See* 28 U.S.C. § 2201(a) (excluding certain suits "with respect to Federal taxes"). The Supreme Court has noted that this bar to federal tax-related declaratory relief is "at least as broad as" the corresponding bar to injunctions found in the AIA, and in this Circuit, the two are "coterminous." *Bob Jones Univ. v.*

Cir. 2023).  The purpose of the AIA is to "protect[] the Government's ability to collect a consistent stream of revenue" by ensuring that "taxes can ordinarily be challenged only after they are paid, by suing for a refund."  *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 543 (2012).  The AIA states that its prohibition applies regardless of whether the plaintiff "is the person against whom such tax was assessed."  26 U.S.C. § 7421(a).  Because the AIA's bar on certain claims is a creation of Congress, courts look to congressional intent—especially as manifested in statutory language—to decide whether that bar applies to a particular claim.  *NFIB*, 567 U.S. at 544.

The Supreme Court has recognized two exceptions to the AIA's general rule against suits brought "for the purpose of restraining the assessment or collection of any tax."  *See* 26 U.S.C. § 7421(a).  First, under the Court's decision in *South Carolina v. Regan*, 465 U.S. 367, 372–73 (1984), the AIA does not bar an action if "Congress has not provided the plaintiff with an alternative legal way to challenge the validity of a tax."  Second, under the Court's decision in *Enochs v. Williams Packing & Navigation Co.* ("*Williams Packing*"), 370 U.S. 1, 7 (1962), a suit otherwise barred by the AIA may proceed "if it is clear that under no circumstances could the Government ultimately prevail" and the plaintiff makes the showings traditionally required for equitable relief, including demonstrating a sufficient likelihood of irreparable harm.

The Plaintiffs argue that the AIA does not bar their suit for three reasons.  First, and most straightforwardly, they argue that their suit lies outside the plain text of the Act's jurisdictional bar because it is not "for the purpose of restraining the assessment or collection of any tax."  *See* 26 U.S.C. § 7421(a).  Second, they argue that because they have no alternative means of challenging the validity of the Notice, the *South Carolina* exception applies.  Third, they argue that their merits

---

*Simon*, 416 U.S. 725, 732 n.7 (1974); *Cohen v. United States*, 650 F.3d 717, 730 (D.C. Cir. 2011) (en banc).  Like the parties, the Court focuses its analysis here on the AIA.

arguments are sufficiently strong—and their likelihood of irreparable harm is sufficiently great—to satisfy the *Williams Packing* exception.  The Court takes each of these arguments in turn.

### 1.    The Purpose of the Plaintiffs' Suit

The Plaintiffs' first argument requires the Court to decide whether this suit is brough "for the purpose of restraining the assessment or collection of any tax."  26 U.S.C. § 7421(a).  Courts decide the "purpose" of a suit under this provision primarily by examining the relief requested in the plaintiff's complaint.  *CIC Servs., LLC v. Internal Revenue Serv.*, 593 U.S. 209, 218 (2021).  Courts also consider "the claims brought and injuries alleged."  *Id.*; *see also Cohen*, 650 F.3d at 727 (explaining that the AIA "requires a careful inquiry into the remedy sought, the statutory basis for that remedy, and any implication the remedy may have on assessment and collection").  The AIA applies "when the target of a requested injunction is a tax obligation," barring injunctions that run against the "assessment or collection of [a] tax."  *CIC Servs.*, 593 U.S. at 218; 26 U.S.C. § 7421(a)).  In this context, "[a]ssessment" refers to "the trigger for levy and collection efforts," while "'collection' is the actual imposition of a tax against a plaintiff."  *See Cohen*, 650 F.3d at 726 (citing *Hibbs v. Winn*, 542 U.S. 88, 102, 104 (2004)).  Notably, because "assessment" does not encompass "'the entire plan of taxation,'" the AIA does not automatically bar a suit merely because its outcome may affect "the amount of revenue the Treasury retains."  *Id.* (quoting *Hibbs*, 542 U.S. at 102); *see also id.* at 727 (explaining that the AIA does not "reach all disputes tangentially related to taxes").

In this case, the Plaintiffs argue that the "purpose" of their suit is not to restrain tax assessment or collection, but rather to vacate an IRS Notice that they argue is arbitrary and capricious.  Pls.' Mem. at 18–21.  The Plaintiffs emphasize that they are challenging neither an action to obtain payment of taxes due (a "collection") nor a final determination of tax liability (an "assessment").  *See id.*  They also are not seeking a judicial determination of any taxpayer's

39

eligibility for tax credits. *See id.* at 19. Instead, they say, their suit's purpose is limited to "seek[ing] relief from" the Notice's changes to the Five Percent Safe Harbor "and the attendant harms therefrom." *Id.*

Although there is force to the Plaintiffs' contrary arguments, the Court agrees with the Defendants that this case is essentially one "for the purpose of restraining the assessment or collection of [a] tax." *See* 26 U.S.C. § 7421(a). The Plaintiffs' complaint is, on its face, a challenge to the lawfulness of Notice 2025-42, but the remedy that they seek carries clear, direct "implication[s]" for the "assessment and collection" of taxes. *See Cohen*, 650 F.3d at 727.

The Plaintiffs resist this conclusion by analogizing their case to the tax-related challenge that the Supreme Court allowed to proceed in *CIC Services, LLC v. IRS*, 593 U.S. 209 (2021), but there are important differences between this case and *CIC Services*. *See* Pls.' Mem. at 20–21. In *CIC Services*, the plaintiffs challenged an IRS Notice that imposed "onerous reporting requirements," backed by the threat of tax penalties and other sanctions if taxpayers did not comply. *See* 593 U.S. at 216–18. In concluding that the AIA did not bar the plaintiffs' challenge to these reporting requirements, the Supreme Court emphasized that the plaintiffs focused their challenge on the "independently onerous reporting mandates," not the tax penalty that might result from noncompliance. *See id.* at 220. The Court noted that the requirements were "several steps removed" from any tax penalty. *Id.* It also noted that the willful failure to comply with the requirements was "punishable not only by a tax, but by separate criminal penalties." *Id.* at 221. The Court explained that these factors, "taken in combination, refute[d] the idea that [the plaintiffs' challenge was] a tax action in disguise." *Id.* at 220–21.

In this case, unlike in *CIC Services*, the Notice at issue neither imposes new procedural requirements nor establishes non-tax sanctions for noncompliance. *Cf.* 593 U.S. at 216–18.

40

Instead, it alters the rules that govern who is eligible for a tax credit.  And critically, the Plaintiffs'

theories of injury and redressability all flow from the Notice's effects on the tax liability of project

developers and investors, rather than from the cost of compliance with a separate procedural

requirement.  Taken together, these factors lead the Court to conclude that the "purpose" of this

suit is "restraining the assessment or collection of [a] tax."  *See* 26 U.S.C. § 7421(a).

Because this case comes within the textual reach of the AIA's prohibition on suits "for the

purpose of restraining the assessment or collection of any tax," the Court turns next to the Act's

recognized exceptions.  *See* 26 U.S.C. § 7421(a).

### 2.     The *South Carolina* Exception

The first exception that the Plaintiffs invoke arises from the Supreme Court's decision in

*South Carolina v. Regan*, 465 U.S. 367 (1984).  In *South Carolina*, the Court held that the AIA

does not bar an action if "Congress has not provided the plaintiff with an alternative legal way to

challenge the validity of" the tax at issue.  *Id.* at 372–73.  Instead, the Court held, the AIA "was

intended to apply only when Congress has provided an alternative avenue for an aggrieved party

to litigate its claims."  *Id.* at 381.  Accordingly, "[t]he AIA 'does not apply at all where the plaintiff

has no other remedy for its alleged injury.'" *Maze v. Internal Revenue Serv.*, 862 F.3d 1087, 1093

(D.C. Cir. 2017) (quoting *Z Street v. Koskinen*, 791 F.3d 24, 31 (D.C. Cir. 2015)).  This exception

ensures that an "aggrieved party" will not be "required to depend on the mere possibility of

persuading a third party to assert his claims" in a later refund or deficiency proceeding.  *South

Carolina*, 465 U.S. at 381.

One Plaintiff in this case, HUC, sits beyond the reach of the exception that the Supreme

Court recognized in *South Carolina*.  Although the Plaintiffs have stated that HUC "is endeavoring

to retain credit eligibility," the possibility that HUC will succeed in qualifying for the relevant tax

credit by other means does not preclude the recognition of a refund suit or deficiency proceeding

as a relevant "alternative avenue" to pursue its challenge. *See* Pls.' Reply & Opp'n at 22. The relevant question is whether an alternative remedy is *available*, not whether a plaintiff in fact pursues it. *See Ross v. United States*, 460 F. Supp. 2d 139, 148 n.5 (D.D.C. 2006) (JDB) (noting that if the rule were otherwise, "any plaintiff could circumvent the Act's jurisdictional bar on injunctive relief in tax assessment and collection cases"). Rather than continuing to incur additional expenses to qualify for a tax credit under the Physical Work Test, HUC could pursue a refund suit or a deficiency proceeding on the basis that it has already satisfied the Five Percent Safe Harbor. The Defendants admit that HUC would be free to raise their APA challenges to the Notice in those contexts. *See* Defs.' Mem. at 24–25 (citing *Fla. Bankers Ass'n v. U.S. Dep't of the Treasury*, 799 F.3d 1065, 1067 (D.C. Cir. 2015)). Accordingly, HUC has "an alternative avenue . . . to litigate its claims on its own behalf," and the *South Carolina* exception to the AIA does not apply to its claims. *See* 465 U.S. at 381.

However, the claims of the Plaintiffs other than HUC are a different matter. None of these Plaintiffs has a plausible path to accessing a post-enforcement challenge in the form of a refund suit or a deficiency proceeding. Accordingly, if the AIA applied, each of these Plaintiffs "would be required to depend on the mere possibility of persuading a third party to assert [its] claims" in a post-enforcement proceeding. *See South Carolina*, 465 U.S. at 381. That reliance on third parties to assert important rights is exactly the outcome that the Supreme Court rejected in *South Carolina*. *See id.* Accordingly, the AIA does not apply to the claims of the Plaintiffs other than HUC.

The Defendants argue that the Plaintiffs other than HUC should not be allowed to proceed under the *South Carolina* exception because, unlike the situation at issue in that case, taxpayers here will "have every incentive" to raise the same claims in a refund suit or deficiency proceeding. Defs.' Mem. at 25. In support of this argument, the Defendants cite out-of-circuit decisions in

42

*Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau*, 843 F.3d 810, 815 (9th Cir. 2016), and *RYO Machinery, LLC v. U.S. Department of Treasury*, 696 F.3d 467, 472 (6th Cir. 2012), both of which held that the *South Carolina* exception did not apply to situations in which other taxpayers would be overwhelmingly likely to raise the same claims in a later proceeding.

However, this case is unlike the out-of-circuit cases on which the Defendants rely, and requiring the Plaintiffs here to depend on third parties to press their claims would be directly contrary to the Court's reasoning in *South Carolina*. In *Yakama Indian Nation*, the Ninth Circuit held that Yakama Nation could not rely on the *South Carolina* exception to challenge a federal excise tax on tobacco products paid by a tribal corporation organized under Yakama Nation's laws. 843 F.3d at 811, 815. The Court concluded that the corporation and its owner would "have every incentive" to raise the same claims in a refund suit. *Id.* at 815. Similarly, in *RYO Machinery*, the Sixth Circuit held that a manufacturer of "roll-your-own" cigarette machines could not rely on the *South Carolina* exception to challenge a tax paid by retailers because retailers would "have every incentive to contest [the relevant tax ruling] through a refund suit." 696 F.3d at 472. In short, both cases involved a near-certainty that a taxpayer would sue for a refund.

Unlike in these out-of-circuit cases, the relevant taxpayers in this case—HUC among them—face a difficult choice among at least three options: (1) proceeding as planned and suing for a refund under the Five Percent Safe Harbor, (2) accelerating development to qualify for a tax credit under the Physical Work Test, and (3) forfeiting eligibility by cancelling or delaying their projects. Only the first of these options would result in the post-enforcement action in which the Plaintiffs' challenges to the Notice could be presented. And given the complexity of clean energy projects and the time lag between beginning a project and claiming a credit, it may be difficult for

the Plaintiffs to predict which of these options will be most attractive to taxpayers. HUC, for example, appears to be choosing the second option rather than the first. *See* Wilkinson Decl. ¶¶ 22–24. Under these circumstances, the Plaintiffs should not "be required to depend on the mere possibility of persuading a third party to assert [their] claims." *South Carolina*, 465 U.S. at 381.

The Defendants also object that allowing Plaintiffs other than HUC to proceed would allow a circumvention of the AIA that the Supreme Court specifically sought to avoid in *South Carolina*. *See* Defs.' Mem. at 26 (citing *South Carolina*, 465 U.S. at 381 n.19). The relevant language from the *South Carolina* decision is a response to a separate opinion by Justice Sandra Day O'Connor. In her separate opinion, Justice O'Connor had noted that one function of the AIA's broad language was to "prevent taxpayers from sidestepping the anti-injunction policy by bringing suit through non-taxpaying associations of taxpayers." 465 U.S. at 386 (O'Connor, J., concurring in the judgment). Justice O'Connor criticized the Court's opinion for allowing "[n]on-taxpaying associations of taxpayers, and most other nontaxpayers," to "sidestep Congress' policy against judicial resolution of abstract tax controversies" by bringing suits that taxpayers could not bring directly. *Id.* at 394. In response to these concerns, the Court stated that associations of taxpayers "form[ed] . . . to litigate their tax claims . . . could not successfully argue that the [AIA] does not apply" because the alternative remedies available to taxpayers joining such an association would be imputed to the association. 465 U.S. at 381 n.19. Invoking this language, the Defendants argue that the nontaxpayer Plaintiffs—especially those with large memberships, which may include taxpayers—should not be allowed to proceed under the *South Carolina* exception. *See* Defs.' Mem. at 26 (citing *Nat'l Taxpayers Union, Inc. v. United States*, 862 F. Supp. 531, 535 (D.D.C. 1994) (RCL), *aff'd,* 68 F.3d 1428 (D.C. Cir. 1995)).

44

This Court disagrees that the rule against suits by nontaxpayer associations formed to litigate tax claims bars the claims by Plaintiffs other than HUC in this case. First, none of the relevant organizations in this case were "form[ed] . . . to litigate [the] tax claims" of their members. *Cf.* 465 U.S. at 381 n.19. Second, on the present record, the Court cannot conclude that any of the Plaintiffs have members who are taxpayers who will be able to challenge the Notice through a refund suit or deficiency proceeding. *Cf.* 862 F. Supp. at 535 (concluding that the *South Carolina* exception did not apply where the plaintiff "concede[d] that some of its members may challenge the tax themselves"). Although the Defendants posit that some of the Plaintiffs with large memberships must have some members who are taxpayers with standing, they have not introduced declarations or identified any materials in the record to support this contention. *Cf.* Fed. R. Civ. P. 56(c)(1), (e). And the existence of such a member is not obvious from the size of the Plaintiffs' memberships alone: because the Plaintiffs' members are individuals, not utility companies, more than speculation is required to show that they include taxpayers with plausible rights to claim the clean energy production and investment tax credits at issue in this case. Meanwhile, the Defendants have expressly disavowed any request for additional discovery under Federal Rule of Civil Procedure 56(d). Defs.' Mem. at 15 n.6. On this record, the Court declines to hold that the Plaintiffs' claims are barred by the mere possibility of a remedy for an unnamed member.

In sum, the *South Carolina* exception to the AIA applies to the claims of all Plaintiffs except for HUC.

### 3. The *Williams Packing* Exception

Finally, the Plaintiffs argue that the *Williams Packing* exception to the AIA applies to the claims of all Plaintiffs—including HUC—because "it is clear that under no circumstances could the Government ultimately prevail" in this case and the Plaintiffs have made each of the traditional showings required for the grant of equitable relief. *See Williams Packing*, 370 U.S. at 7.

This narrow exception does not apply in this case. Although the Plaintiffs may be able to satisfy the requirement for equitable relief, the exception's condition that the Government could prevail "under no circumstances" is satisfied "[o]nly if it is then apparent that, under the most liberal view of the law and the facts, the United States cannot establish its claim." *Id.* Although the Court ultimately agrees with the Plaintiffs on the merits of their APA challenges, *see infra* Sections III.D and E, the Plaintiffs' contentions are "sufficiently debatable" to take this case outside the scope of the *Williams Packing* exception. *See Bob Jones Univ.*, 416 U.S. at 749.

\*      \*      \*

Because the relief requested in the Plaintiffs' suit would necessarily affect the assessment or collection of a tax and the Plaintiffs' theories of injury flow through those tax effects, rather than through any independent feature of the Notice, their suit comes within the textual reach of the AIA's bar on suits "for the purpose of restraining the assessment or collection of any tax." *See* 26 U.S.C. § 7421(a). However, because the claims of the Plaintiffs other than HUC fall within the *South Carolina* exception to the AIA's bar, this Court has jurisdiction to consider those claims. *See* 465 U.S. at 371–72. The narrow *Williams Packing* exception does not apply to any of the Plaintiffs' claims, including those of HUC. *See* 370 U.S. at 7. Accordingly, the Court shall **GRANT IN PART** the Defendants' motion to dismiss and **DISMISS** HUC from this action.

### D.    Availability of APA Review

Next, the Defendants argue that the Plaintiffs lack a proper cause of action under the APA. The APA provides for judicial review of actions "made reviewable by statute" and "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The Defendants do not dispute that Notice 2025-42 is "final agency action." *See* Defs.' Mem., Dkt. No. 35-1 at 28. However, they argue that adequate alternative remedies available under the Internal Revenue Code bar this action. *Id.* at 28–29. Specifically, they argue that both refund suits and deficiency

46

proceedings in the Tax Court—the same remedies that defeat the *South Carolina* exception to the AIA for HUC—afford adequate alternative remedies for any defects in Notice 2025-42. *Id.* (citing 26 U.S.C. §§ 6532(a)(1), 7422(a); 28 U.S.C. § 1346(a)(1)).

For substantially the same reasons that the Anti-Injunction Act does not foreclose the claims of Plaintiffs other than HUC, the Court concludes that those Plaintiffs have no "other adequate remedy in a court" that precludes an action under the APA. *See* 5 U.S.C. § 704. A plaintiff may not proceed under the APA if Congress has already provided "special and adequate review procedures" in another statute. *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (quoting Attorney General's Manual on the Administrative Procedure Act 101 (1947)). For HUC, the Internal Revenue Code does provide "special and adequate review procedures" in the form of refund suits and deficiency proceedings. *See id.*; 26 U.S.C. §§ 6532(a)(1), 7422(a); 28 U.S.C. § 1346(a)(1). But none of the other Plaintiffs in this action have access to those proceedings. Accordingly, these Plaintiffs' claims are not barred by the existence of alternative remedies for entities like HUC that are eligible to sue for refunds or pursue deficiency proceedings.

### E.    The Merits of the Plaintiffs' APA Challenge

Turning to the merits, the Plaintiffs argue that Notice 2025-42 must be set aside because it is arbitrary and capricious. *See* Pls.' Mem. at 25–35; 5 U.S.C. § 706(2)(A) (providing that a reviewing court must "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). The Plaintiffs' APA argument is threefold. First, they argue that the Defendants failed to articulate a reasoned basis for the major policy change reflected in the Notice. Pls.' Mem. at 25–29. Second, they argue that the Notice arbitrarily singles out wind and certain solar projects for disfavored treatment without justification. *Id.* at 29–33. Third, they argue that the Defendants entirely failed to consider serious

reliance interests or evaluate alternative policy options when adopting the Notice.  *Id.* at 33–35.  The Plaintiffs are correct on each of these points.  Notice 2025-42 is arbitrary and capricious.

The fundamental command of the APA is that agencies must "engage in 'reasoned decisionmaking.'"  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).  "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational."  *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998).  Accordingly, an agency must "reasonably reflect upon the information contained in the record and grapple with contrary evidence."  *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017).

When an agency changes its own longstanding guidance or practice, it must take account of "serious reliance interests" engendered by its prior policy, and it must provide a reasoned explanation for its departure from that policy.  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).  Although the agency need not provide "better" reasons for a new policy than it had for an older one, the agency must not disregard the "facts and circumstances that underlay or were engendered by the prior policy."  *Fox Television*, 556 U.S. at 515–16.

The agency carries the burden of showing that its decisions are "the product of reasoned decisionmaking."  *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  A court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" from the materials in the record.  *Id.* at 43 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).  In an APA case, a reviewing court "is not to substitute its judgment for that of the agency."  *Id.* at

48

43. However, it is the agency's burden to "articulate a satisfactory explanation for its action," and a reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)); *see also Farrell v. Blinken*, 4 F.4th 124, 137 (D.C. Cir. 2021) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action." (quoting *Chenery*, 332 U.S. at 196–97)).

Notice 2025-42 falls short of these standards. The Notice's elimination of the Five Percent Safe Harbor is a significant change in the IRS's position on what it means to "begin construction" for purposes of clean energy tax credits. This changed position implicates "serious reliance interests," which the agency actively invited by repeatedly restating its prior approach. *See Encino Motorcars*, 579 U.S. at 221–22. Although the record shows that the Defendants received clear warnings about those reliance interests before adopting the Notice, the agency failed to justify its decision to change course. Because neither the Notice nor the administrative record provides an explanation from which "the agency's path may reasonably be discerned" in light of all the facts and circumstances, the Notice is arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

The Defendants resist the conclusion that Notice 2025-42 implicates serious reliance interests by arguing that the specific tax credits at issue "are of recent vintage," meaning that the availability of the Five Percent Safe Harbor to establish the "beginning of construction" for these tax credits cannot be a matter of serious reliance. *See* Defs.' Mem. at 35. However, this argument casts the issue at the wrong level of generality. As recently as January 2025, the IRS itself has described the "beginning of construction date" as "an established, defined concept in tax law," distinct from any individual credit or statutory provision. *See* 90 Fed. Reg. 2224, 2246 (Jan. 10, 2025). Accordingly, the relevant question is not the age of the tax credits themselves, but the

49

pedigree of the Five Percent Safe Harbor as a means of establishing the "beginning of construction" more broadly.

Considered at the appropriate level of generality, the IRS's policy regarding the Five Percent Safe Harbor has engendered serious reliance. After adopting the Five Percent Safe Harbor in 2013, the IRS repeatedly reaffirmed for more than a decade that this method was an available means of establishing the "beginning of construction" for a range of clean energy tax credits. *See supra* note 5 (collecting agency guidance). During that period, Congress enacted several rounds of changes to tax credits to which the IRS's guidance applied, without ever directing the agency to change its approach. *See supra* note 6 (collecting legislation). And many of the comments that the Defendants received immediately before adopting the Notice highlighted the fact that industry participants have, in fact, relied on the stability of the IRS's position on the "beginning of construction." *See, e.g.*, RER Letter, J.A. at 251; Data Center Coalition Letter, J.A. at 371; ITIC Letter, J.A. at 375; Comments of Z. Bischof, J.A. at 381; TEBA Letter, J.A. at 405. Under these circumstances, the Defendants cannot escape the duty to explain their change in policy by arguing that the reliance interests at issue were not "serious."

Because the Notice implicates serious reliance interests, the Court turns next to the adequacy of the Defendants' explanation for their change in policy. *See Encino Motorcars*, 579 U.S. at 221–22. Here, the question is not whether the Defendants' reasons for adopting Notice 2025-42 are "better" than the reasons that supported its prior policy, but simply whether the record shows that the agency gave due consideration to the "facts and circumstances that underlay or were engendered by the prior policy." *Fox Television*, 556 U.S. at 515–16.

The only direct window into the IRS's reasoning for removing the Five Percent Safe Harbor for wind and large-scale solar projects can be found in a single paragraph of the Notice.

50

*See* 2025-36 I.R.B. 351 § 1.03 (2025) (*also available at* J.A. at 11).  That paragraph states that "[t]he Treasury Department and the IRS have determined that the guidance contained in this notice is necessary and appropriate to properly enforce the credit termination date for applicable wind and solar facilities."  *Id.*; *see also* Office of Tax Policy Approval Memorandum, J.A. at 37 (containing substantially the same statement).  The Notice goes on to state, in relevant part, that the guidance will "prevent taxpayers from circumventing the statutory credit termination date," "prevent the artificial manipulation of eligibility for the § 45Y credit and § 48E credit," and "ensure that a substantial portion" of any relevant project "is built by the beginning of construction deadline."  2025-36 I.R.B. 351 § 1.03 (2025) (*also available at* J.A. at 11).

Considered in the context of the IRS's prior position and the entire administrative record, this explanation is inadequate.  Critically, it does not explain how the agency concluded that some projects satisfying the Five Percent Safe Harbor may be "circumventing" statutory cutoff dates or engaging in "artificial manipulation of eligibility."  *See id.*  It also does not explain why the agency chose to eliminate the Five Percent Safe Harbor for wind and large-scale solar projects rather than adopt any of the alternative anti-circumvention and anti-manipulation measures that commenters had proposed.  *Cf.* Comments of First Solar, J.A. at 288–89 (proposing that the IRS restrict the use of purchases of products or components from "prohibited foreign entit[ies]" to satisfy the Five Percent Safe Harbor); ConservAmerica Letter, J.A. at 351–53 (proposing new reporting requirements and audit procedures).  Finally, the Notice does not explain why the agency chose to treat wind and large-scale solar projects differently than other kinds of clean energy projects, even though the tax credits themselves are technology-neutral and multiple commenters expressed concern about the regulatory fragmentation that would result from applying different standards to different technologies.  *See, e.g.*, Data Center Coalition Letter, J.A. at 371; ITIC Letter, J.A. at

376; CEBA Letter, J.A. at 409. Although the Defendants have argued that wind and large-scale solar projects are situated differently than other projects because Congress set an earlier credit-termination date for those specific technologies in the OBBBA, the record does not show that the agency made a reasoned decision that this difference in termination date alone should lead to a different methodology for determining the beginning of construction. *Cf.* Defs.' Mem. at 40.

The Defendants argue that the brief explanation in the Notice makes the agency's "path" sufficiently clear, but this contention is unpersuasive. The Defendants argue in their briefs—while candidly acknowledging that arguments in litigation briefs may only "elaborat[e]" on the reasoning reflected in the record and are not a substitute for direct evidence of the agency's own reasoned decisionmaking—that the Notice is based on the IRS's determination that it needed to modify the beginning-of-construction requirements to prevent abusive "stockpiling" transactions. Defs.' Mem. at 37–38; *see* Defs.' Reply at 23–24 (quoting *Chiquita Brands Int'l, Inc. v. SEC*, 805 F.3d 289, 299 (D.C. Cir. 2015)). Citing extra-record commentary by various industry watchers who mentioned "stockpiling" in their analysis of the Notice, the Defendants argue that "it is evident that the agency's path could be discerned because industry watchers did, in fact, discern it." Defs.' Mem. at 37–38, 40. But outsiders' informed speculations are not a substitute for reasoned explanation—particularly when, as here, evidence in the record leaves substantial doubt that the proffered explanation sincerely accounts for the agency's decision.

A thorough review of the record undercuts the conclusion that the Defendants made a reasoned decision to eliminate the Five Percent Safe Harbor for wind and large-scale solar projects based on concerns about stockpiling. After the President issued Executive Order No. 14,315, the Treasury Department received several detailed comments addressing stockpiling, some of which included specific proposals for targeted interventions designed to address this issue. For example,

one commenter proposed new reporting requirements and audit procedures.  *See* ConservAmerica Letter, J.A. at 351–53.  Another proposed prohibiting taxpayers from satisfying the Five Percent Safe Harbor through purchases from foreign entities of concern, while leaving that path intact for purchases from U.S.-based businesses.  Comments of First Solar, J.A. at 288–89.  If the agency diligently considered and rejected these possibilities and decided that its chosen path was the best way of addressing stockpiling concerns, the record before this Court does not show it.  Moreover, nothing in the Notice or the administrative record explains why the concerns about stockpiling that the Defendants have identified in their briefing apply to wind and large-scale solar projects, but not to similarly situated clean energy projects based on other technologies.

Taken together, these factors lead the Court to conclude that the Notice's cursory explanation is insufficient to show the "path" that led the IRS to eliminate the Five Percent Safe Harbor for wind and large-scale solar projects, while leaving the Safe Harbor in place for other clean energy projects.  *See State Farm*, 463 U.S. at 43 (quoting *Bowman Transp.*, 419 U.S. at 286). Because the Defendants failed to articulate a reasoned explanation for this consequential decision or give due consideration to the serious reliance interests engendered by its prior policy, Notice 2025-42 is arbitrary and capricious.

### F.    Remedy

Finally, the parties disagree about the proper remedy for the APA violation that the Plaintiffs have identified.  The Plaintiffs request the usual remedy for a violation of the APA, which is vacatur of the agency action and remand to the agency for further proceedings.  Pls.' Mem. at 35; Pls.' Reply & Opp'n at 40–43.  The Defendants urge the Court to remand without vacating the Notice or, in the alternative, to vacate the Notice only as applied to the Plaintiffs. Defs.' Mem. at 41–44.  The Court agrees with the Plaintiffs that the correct remedy in this case is to vacate Notice 2025-42 in full and remand the matter to the agency for further consideration.

When a plaintiff prevails on the merits of an APA claim, "it is entitled to relief under that statute, which normally will be a vacatur" of the agency action at issue. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001); *see also* 5 U.S.C. § 706 (providing that "[t]he reviewing court *shall . . . set aside* agency action . . . found to be . . . arbitrary [or] capricious" (emphasis added)). "[R]emand without vacatur" is possible, but it is an "exceptional remedy." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020). When deciding whether to remand an action to an agency without vacating it, courts in this Circuit consider both "the seriousness of the [action's] deficiencies (and thus the extent of doubt whether the agency chose correctly)" and "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993) (quoting *Int'l Union, UMW v. FMSHA*, 920 F.2d 960, 966–67 (D.C. Cir. 1990)).

Here, the relevant factors support vacatur. The Plaintiffs are entitled to relief in this case because the record does not show that Notice 2025-42 was, as the APA requires, a "product of reasoned decisionmaking." *See State Farm*, 463 U.S. at 52. That defect calls into question "whether the agency chose correctly" because it indicates that the Defendants did not fully consider all the relevant interests and alternatives before acting. *See Allied-Signal*, 988 F.2d at 150. Accordingly, the first factor—the "seriousness" of the Notice's "deficiencies"—weighs in favor of vacatur. *See id.* Meanwhile, the second factor—"the disruptive consequences of an interim change that may itself be changed"—is in equipoise because, under the circumstances, a significant amount of uncertainty and disruption are inevitable. *See id.*

As Senator Michael D. Crapo noted during the recent congressional debate on a CRA resolution challenging the Notice, overturning the Notice now will likely lead to "uncertainty and unpredictability," especially as project developers and investors rush to qualify for tax credits

54

ahead of the July 4 beginning-of-construction deadline. *See* 172 Cong. Rec. S1597 (daily ed. Mar. 25, 2026). Unfortunately, significant uncertainty will exist no matter how this Court resolves this case and what remedy it awards. Regardless of whether the Court vacates the Notice, on remand, the Defendants will be required to address the deficiencies the Court has identified. In doing so, they may decide to adopt new substantive guidance on the meaning of "beginning of construction," requiring further responses from market participants. Meanwhile, as the Defendants correctly note, the timing of the parties' dispositive motions in this case has made it clear that, no matter how quickly this Court acts, there is "almost zero chance" that the parties' appellate rights will not extend beyond the July 4 beginning-of-construction deadline. *See* Defs.' Reply at 34. It is likely that market participants will need to await the outcome of an appeal before they will have certainty about the legal effect of the Notice. And even a decision from a higher court may not settle the relevant issues: if a reviewing court disagrees with this Court's jurisdictional holdings, it may not reach the APA question at all, leaving that issue to be decided far into the future in a refund suit.

Under all these circumstances, the Court recognizes that vacating the Notice will have "disruptive consequences" for the IRS and for clean energy developers and investors. *See Allied-Signal*, 988 F.2d at 150. However, the Court considers those consequences in the context of the significant uncertainties that will surround the Notice regardless of how this Court rules. Given the Court's conclusion that there are significant questions about "whether the agency chose correctly," remanding the Notice without vacating it risks inviting even more disruption later, when there is even less—if any—time left for market participants to respond before the July 4 beginning-of-construction deadline. *See id.* For all these reasons, the second factor, "the disruptive consequences of an interim change that may itself be changed," is in equipoise, and the two factors taken together weigh in favor of vacatur. *See Allied-Signal*, 988 F.2d at 150.

Turning to the question of the proper scope of vacatur, the Defendants argue that any remedy in this case should be "limited to the Plaintiffs and their members," meaning that Notice 2025-42 should be allowed to continue in effect with respect to others. Defs.' Mem. at 44. The Court declines to limit the relief granted in this manner. As the Defendants acknowledge, binding precedent in this Circuit recognizes that universal vacatur of unlawful agency actions is an available remedy under the APA. *Id.*; *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829–37 (2024) (Kavanaugh, J., concurring) (explaining that "longstanding and settled precedent adhering to [the APA's] text and history" show that vacatur that "acts directly on" agency action is an available remedy). That remedy is especially appropriate where, as here, only universal vacatur would afford complete relief to the injured parties with standing who are before the Court and a narrower remedy risks causing confusion or other harms. *See Trump v. CASA, Inc.*, 606 U.S. 831, 851–52 (2025) (recognizing that, even outside the APA context, courts may award equitable remedies that "incidentally" benefit nonparties if doing so is necessary "to afford the plaintiff complete relief"). Because the prevailing Plaintiffs' injuries flow not from their own tax treatment but from readily foreseeable economic consequences of the Notice's treatment of others, it is not possible to redress their injuries with a vacatur that is "limited to" them and their members. *Cf.* Defs.' Mem. at 44. Accordingly, the correct remedy is the one most commonly awarded in this Circuit: vacatur of the Notice in full. *See Nat'l Min. Ass'n*, 145 F.3d at 1409.

Because vacating Notice 2025-42 in full is the appropriate equitable remedy under the circumstances presented here, the Court shall award that relief, without imposing the limitations that the Defendants have requested.

56

## IV. CONCLUSION

For the foregoing reasons, the Court shall **GRANT IN PART** and **DENY IN PART** the Defendants' Motion to Dismiss; **DISMISS** Plaintiffs HUC and OPC; **DENY** the Defendants' Motion in the Alternative for Summary Judgment; **GRANT** the Plaintiffs' Motion for Summary Judgment; **VACATE** Notice 2025-42, and **REMAND** this matter to the IRS for further administrative action.  An appropriate Order accompanies this Memorandum Opinion.


**Dated:** June 6, 2026

COLLEEN KOLLAR-KOTELLY
United States District Judge